IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SEAFREEZE SHORESIDE, INC.<br>100 Davisville Pier, North Kingstown, RI 02852,<br><br>LONG ISLAND COMMERCIAL FISHING ASSOC., INC.<br>P.O. Box 191, Montauk, NY 11954,<br><br>XIII NORTHEAST FISHERY SECTOR, INC.<br>205 Rockland Street, Dartmouth, MA 01748,<br><br>HERITAGE FISHERIES, INC.<br>6 Rhody Drive, Westerly, RI 92891,<br><br>NAT. W. INC.<br>6 Rhody Drive, Westerly, RI 92891,<br><br>and<br><br>OLD SQUAW FISHERIES, INC.<br>P.O. Box 1036, Montauk, NY 11954,<br>*Plaintiffs,*<br><br>v.<br><br>THE UNITED STATES DEPARTMENT OF THE INTERIOR,<br><br>THE HONORABLE DEB HAALAND, *in her official capacity as the Secretary of the Department of the Interior*,<br><br>THE BUREAU OF OCEAN ENERGY MANAGEMENT,<br><br>AMANDA LEFTON, *in her official capacity as the Director of the Bureau of Ocean Energy Management*,<br><br>LAURA DANIEL-DAVIS, *in her official capacity as Principal Deputy Assistant* | Case No. _____ |

*Secretary, Land and Minerals Management,*
*Department of the Interior*

THE UNITED STATES DEPARTMENT OF
COMMERCE,

THE HONORABLE GINA M. RAIMONDO,
*in her official capacity as the Secretary of the*
*Department of Commerce,*

THE NATIONAL OCEANIC AND
ATMOSPHERIC ADMINISTRATION
/NATIONAL MARINE FISHERIES
SERVICE,

CATHERINE MARZIN*, in her official*
*capacity as the Deputy Director of NOAA*
*Fisheries and Acting Director of the National*
*Marine Fisheries Service Office of Protected*
*Resources*

THE UNITED STATES DEPARTMENT OF
DEFENSE,

THE HONORABLE LLOYD J. AUSTIN, *in*
*his official capacity as the Secretary of the*
*Department of Defense,*

THE UNITED STATES ARMY CORPS OF
ENGINEERS,

LT. GEN. SCOTT A. SPELLMON, *in his*
*official capacity as the Commander and Chief*
*of Engineers of the United States Army Corps*
*of Engineers*, and

COLONEL JOHN A. ATILANO II, *in his*
*official capacity as the District Engineer of the*
*New England District of the United States*
*Army Corps of Engineers,*
                    *Defendants.*

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

THEODORE HADZI-ANTICH
ROBERT HENNEKE
CONNOR MIGHELL (*Application for Admission Pending*)
TEXAS PUBLIC POLICY FOUNDATION
901 Congress Avenue
Austin, Texas 78701
Telephone:     (512) 472-2700
Facsimile:     (512) 472-2728

*Attorneys for Plaintiffs*

## I.    INTRODUCTION

1.    This is an action for declaratory and injunctive relief against the United States Departments of the Interior, Commerce, and Defense, their subagencies, and their officers acting in their official capacities (collectively, the "Federal Defendants") for violations of the Outer Continental Shelf Lands Act, the Endangered Species Act, the Clean Water Act, the Marine Mammal Protection Act, the National Environmental Policy Act, and their respective rules and regulations (collectively, the "Federal Laws").

2.    Each of the Federal Defendants violated one or more of the Federal Laws in connection with the issuance of Lease OCS-A-0501 and the approval of the Construction and Operations Plan for a massive offshore wind energy generating facility located in an expansive area of the Outer Continental Shelf off the southern coast of Nantucket, Massachusetts, known as the Vineyard Wind 1 offshore wind energy project (the "Vineyard Wind project"). The Plaintiffs ask this Court to set aside the illegal lease issuance and the approval of the Construction and Operations Plan.

3.    Plaintiffs are comprised of commercial fishermen and their trade associations as well as a shoreside business. Their livelihoods and economic futures depend on fishing in the Vineyard Wind project area. The final Record of Decision ("ROD") for the Vineyard Wind project states that approval of the project will likely result in the permanent abandonment of commercial fishing in the entire project area. *See Record of Decision: Vineyard Wind 1 Offshore Wind Energy Project Construction and Operations Plan*, BUREAU OF OCEAN ENERGY MANAGEMENT (May 10, 2021), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Final-Record-of-Decision-Vineyard-Wind-1.pdf at 39 ("While Vineyard Wind is not authorized to prevent free access to the entire wind development area, due to the placement of the turbines it

is likely that the *entire* 75,614 acre area will be *abandoned* by commercial fisheries due to difficulties with navigation.") (emphasis added).  Because the ability to fish in the Vineyard Wind lease area is key to the survival of the Plaintiffs as ongoing businesses, they will be economically ruined by the Federal Defendants' collective action in approving the project.

4.      While greenlighting the Vineyard Wind project, the Federal Defendants failed to adhere to their substantive statutory and regulatory responsibilities, acted in ways that are *ultra vires,* and fell short of complying with mandated procedures, all to the injury of the Plaintiffs.

5.      The violations of the Federal Laws resulted from the Federal Defendants' unintelligent pursuit of their overarching governmental goal of increasing the capacity of renewable energy generation on the Outer Continental Shelf at any cost.  By indiscriminately pursuing that goal, the Federal Defendants disregarded their legal responsibilities.  Accordingly, the Court should declare the issuance of the lease and the approval of the Construction and Operations Plan unlawful and enjoin further construction of the Vineyard Wind project.

## II.      PARTIES

### A.      Plaintiffs

6.      Plaintiff Seafreeze Shoreside, Inc. ("Seafreeze") is one of the largest fish dealers in Point Judith, Rhode Island, with sales in both domestic and international markets.  Seafreeze purchases, sells, and processes product—primarily squid—from its own customers and other local wholesalers.  Seafreeze is also the primary ice supplier to squid fishing vessels in Port Judith. Seafreeze services a company-owned, federally-permitted vessel (which supplies Seafreeze with squid and other marine species) and additionally services approximately 20 independently-owned vessels, many of which are federally-permitted squid vessels.  Seafreeze employs about 40 people, including temporary workers.  Squid is vital to Seafreeze's business and the vessels it services.  In

addition to participating in fishery management processes, Seafreeze has long supported cooperative research and works to enhance scientific understanding of fisheries' resources in the context of the wider marine environment.  Seafreeze's entire business is injured because the issuance of Lease OCS-A-0501 and the approval of the Construction and Operations Plan will result in the cessation of commercial fishing activities in the Vineyard Wind lease area, on which Seafreeze depends for a substantial portion of its revenues.

7.      Plaintiff Long Island Commercial Fishing Association, Inc. ("LICFA") is a commercial fishing industry group representing New York's commercial fishermen and fishing industry in 11 gear groups in 14 ports on Long Island.  LICFA represents owners and operators from over 150 fishing businesses, boats, and fishermen who are home-ported on Long Island, some of which fish in state and federal waters that include the Vineyard Wind Lease area.  LICFA and its members support extensive cooperative scientific research aimed at improving understanding of the marine environment, in addition to engaging in fisheries management, public education, and outreach.  LICFA members are injured because the issuance of Lease OCS-A-0501 and the approval of the Construction and Operations Plan will result in the cessation of commercial fishing activities in the Vineyard Wind lease area, on which some LICFA members depend for a substantial portion of their revenues.

8.      Plaintiff XIII Northeast Fisheries Sector, Inc. ("Sector XIII") is a private organization of commercial fishermen formed in 2010 with 49 members responsible for monitoring compliance with 60 fishing permits along the Coast of the Northeast United States and supporting the commercial fishing industry in the area.  Members of Sector XIII fish the waters of the Vineyard Wind lease area, and their livelihoods depend upon the availability of that area for fishing.  Members of Sector XIII are injured because the issuance of Lease OCS-A-0501 and the

approval of the Construction and Operations Plan will result in the cessation of commercial fishing activities in the Vineyard Wind lease area, on which Sector XIII members depend for a substantial portion of their revenues.

9.      Plaintiff Heritage Fisheries, Inc. ("Heritage Fisheries") is a commercial fishing company whose President is Thomas E. Williams, Sr., a commercial fisherman who started fishing commercially in 1967.  Heritage Fisheries owns a fishing boat called "FV Heritage" that fishes the waters of the Vineyard Wind lease area, which provides approximately 30% - 40% of the annual revenues of the company.  FV Heritage is captained by Thomas E. Williams Sr.'s son, Thomas Williams.  The continuing economic viability of Heritage Fisheries depends on its ability to continue to fish in the Vineyard Wind lease area.  Heritage Fisheries is injured because the issuance of Lease OCS-A-0501 and the approval of the Construction and Operations Plan will result in the cessation of commercial fishing activities in the Vineyard Wind lease area, on which Heritage Fisheries depends for a substantial portion of its revenues.

10.     Plaintiff NAT W., Inc. ("NAT") is a commercial fishing company whose President is Thomas E. Williams, Sr.  NAT owns a fishing boat called "FV Tradition," which is captained by Thomas E. Williams' son, Aaron Williams.  FV Tradition fishes the waters of the Vineyard Wind lease area, which provides approximately 50-60% of the revenues of NAT.  The continuing economic viability of NAT depends on its ability to continue to fish in the Vineyard Wind lease area.  NAT is injured because the issuance of Lease OCS-A-0501 and the approval of the Construction and Operations Plan will result in the cessation of commercial fishing activities in the Vineyard Wind lease area, on which NAT depends for a substantial portion of its revenues.

11.     Plaintiff Old Squaw Fisheries, Inc. ("Old Squaw") is a commercial fishing company based in Montauk, New York, whose President is David Aripotch.  Old Squaw owns a fishing boat

4

called "FV Caitlin & Mairead," which is captained by David Aripotch.  FV Caitlin & Mairead

fishes the waters of the Vineyard Wind lease area, which provides approximately 30% of the

revenues of Old Squaw.  The continuing economic viability of Old Squaw depends on its ability

to continue to fish in the Vineyard Wind lease area.  Old Squaw is injured because the issuance of

Lease OCS-A-0501 and the approval of the Construction and Operations Plan will result in the

cessation of commercial fishing activities in the Vineyard Wind lease area, on which Old Squaw

depends for a substantial portion of its revenues.

**B.     Defendants**

12.     Defendant The United States Department of the Interior ("Interior") is a federal

executive department created in 1849 and responsible for managing and conserving federal lands

and natural resources.  Interior manages approximately 75% of the United States' federal public

land.   Interior  also  administers  federal  historic  preservation  programs  and  oversees  federal

engagement with Native Americans, Alaska Natives, Native Hawaiians, insular areas, and other

federal territories.  Among other things, Interior is responsible for implementation of the Outer

Continental Shelf Lands Act.

13.     Defendant The Hon. Deb Haaland is the current Secretary of the Interior.

14.     Defendant Bureau of Ocean Energy Management ("BOEM") is a federal agency

within Interior established in 2010 to oversee development of the Outer Continental Shelf.  BOEM

evaluates the resources of the Outer Continental Shelf and leases portions of it.   BOEM also

supervises and approves any oil, gas, or renewable energy projects conducted within Outer

Continental Shelf leases.

15.     Defendant Amanda Lefton is the current Director of BOEM.

16.     Defendant Laura Daniel-Davis is the Deputy Assistant Secretary, Land and Minerals Management, Department of the Interior.

17.     Defendant The United States Department of Commerce ("Commerce") is a federal executive department focused on job creation, promoting economic growth, encouraging sustainable development, and blocking harmful international trade practices.  Commerce also gathers a wide array of economic and demographic data to assist in business and government decision-making, and sets industry standards in many major fields.  One of Commerce's sub-agencies is the National Oceanic and Atmospheric Administration ("NOAA").  NOAA forecasts weather, monitors a variety of oceanic and atmospheric conditions, charts and explores the oceans, and (notably for this case) manages protection of marine mammals, threatened species, and endangered species in United States territory.

18.     Defendant The Hon. Gina M. Raimondo is the current Secretary of Commerce.

19.     Defendant The National Marine Fisheries Service ("NMFS" or "NOAA Fisheries") is a federal agency founded in 1871 and placed within NOAA in 1970.  NMFS oversees national marine resources and conserves fish species and manages fisheries, promoting sustainability and preventing overfishing, species decline, and habitat destruction.  NMFS implements and enforces the Endangered Species Act with regard to marine organisms.

20.     Defendant Catherine Marzin is the current Deputy Director of NOAA Fisheries.

21.     Defendant The United States Department of Defense ("Defense") is the federal executive department responsible for coordinating and supervising all government functions related to national security and the United States' armed forces.

22.     Defendant The Hon. Lloyd J. Austin is the current Secretary of Defense.

23.     Defendant The United States Army Corps of Engineers ("Corps") is a division of the United States Army, which is a sub-agency of Defense.  The Corps' mission is to serve as combat engineers, oversee military construction, and construct civil works like canals and dams. The Corps is also charged with administering portions of the Clean Water Act.

24.     Defendant Lt. Gen. Scott A. Spellmon is the current Commander and Chief of Engineers of the Corps.

25.     Defendant Col. John A. Atilano II is the current District Engineer of the New England District of the Corps.

### III.     JURISDICTION AND VENUE

26.     Plaintiffs bring this action under the relevant provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706; the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1349(a)(2)(A); the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1540(g)(1)(A), (B); the Clean Water Act ("CWA"), 33 U.S.C. § 1365(b); the Marine Mammal Protection Act ("MMPA"), 16 U.S.C. § 1371; and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370h.

27.     This court has subject matter jurisdiction pursuant to 5 U.S.C. §§ 701-706 (APA); 28 U.S.C. § 2201 (Declaratory Judgment Act); 43 U.S.C. § 1349(a)(2)(A) (OCSLA citizen suit provision); 16 U.S.C. §§ 1540(g)(1)(A) and (C) and (g)(2)(A) and (B) (ESA citizen suit provisions); and 33 U.S.C. § 1365(b) (CWA citizen suit provision).

28.     Pursuant to the citizen suit provisions of OCSLA, ESA and CWA, Plaintiffs sent a 60-day notice of intent ("NOI") to sue the Federal Defendants over their respective failures to comply with OCSLA, ESA and CWA in reviewing and approving the Vineyard Wind Construction and Operations Plan.  *See* Exhibit A.  The NOI was sent to all Federal Defendants

and certain other addressees required by statute on September 17, 2021, and was received by the last of them on September 20, 2021.  Accordingly, Plaintiffs have complied with the 60-day notice requirements of OCSLA, ESA, and CWA.  Signed copies of related mail receipts are attached to this complaint.  *See* Exhibit B.

29.     The relief requested is authorized by 28 U.S.C. § 2201 (declaratory judgment); 28 U.S.C. § 2202 (injunctive relief); 5 U.S.C. §§ 701-706 (APA); 43 U.S.C. § 1349 (OCSLA citizen suit provision); 16 U.S.C. § 1540(g) (ESA citizen suit provision); and 33 U.S.C. § 1365(b) (CWA citizen suit provision).

30.     This Court also has jurisdiction pursuant to 28 U.S.C. § 1331, which grants the district courts "original jurisdiction of all civil actions arising under the . . . laws . . . of the United States."

31.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(e)(2) because the Federal Defendants reside in this district and a substantial part of the events or omissions giving rise to the claims occurred in this district.  Venue is also appropriate under 16 U.S.C. § 1540(g)(3)(A) because the violation occurred in this district.  Venue is also appropriate also under 5 U.S.C. § 703.

32.     An actual, justiciable controversy exists between the parties within the meaning of 28 U.S.C. § 2201.

33.     The federal Government has waived sovereign immunity in this action pursuant to 5 U.S.C. § 702, 43 U.S.C. § 1349, 16 U.S.C. § 1540, and 33 U.S.C. § 1365.

34.     Plaintiffs have exhausted all administrative remedies, the agency action is final and ripe for review, and all Plaintiffs have standing because they are injured in fact because of the Federal Defendants' actions or omissions and this court has the power to redress those injuries.

## IV.     LEGAL BACKGROUND

**A.     Outer Continental Shelf Lands Act and Implementing Regulations**

35.     The United States Congress enacted OCSLA in August 1953, authorizing the Secretary of the Interior to oversee mineral exploration and development in the Outer Continental Shelf by granting leases through a competitive bid process now managed by BOEM.  43 U.S.C. §§ 1331–1356.  The law requires that "the character of the waters above the outer continental shelf as high seas and the right to navigation and fishing therein shall not be affected" by BOEM's management and regulation.  *Id*. § 1332(2).

36.     In 2005, Congress amended OCSLA to impose a legal obligation on BOEM to protect existing "reasonable uses" of the Outer Continental Shelf, including commercial fishing, and to consider the impact of proposed leases' on fishing and navigational uses.  43 U.S.C. § 1337(p)(4)(I), (J).  Congress included this requirement in a list of factors BOEM must consider when examining any proposed Outer Continental Shelf lease.  43 U.S.C. 1337(p)(4).

37.     In 2011, BOEM decided to revise an earlier 2009 rulemaking, referring to its revisions as the "Smart From The Start" policy.  76 Fed. Reg. 28178 (May 16, 2011) (amending 30 C.F.R. § 285).  This revision was supposed to streamline review and approval of offshore wind energy leases by allowing BOEM to streamline its review process and bypass periods of public comment that existed under the 2009 Rule.  Under the prior rule, issuance of a lease and approval of development occurred in four phases: (1) planning and analysis; (2) lease issuance; (3) Site Assessment Plan approval; and (4) Construction and Operations Plan approval.  With regard to leasing, the "Smart From The Start" policy merged the first three steps, leaving only one opportunity for public comment upon receipt of an unsolicited lease proposal, removing any pre-bid opportunity for public comment on the lease locations, and torpedoing any on-site evaluation

of environmental impacts or existing "reasonable uses," including fishing, prior to lease issuance. Essentially, the "Smart From The Start" policy purports to authorize BOEM to lease large areas of the Outer Continental Shelf to private companies without adequate process and without consideration of alternative sites.

**B.    Endangered Species Act and Implementing Regulations**

38.    The United States Congress enacted the Endangered Species Act ("ESA") to protect species vulnerable to extinction.  Before a species receives full protection under the ESA, it must be listed as "threatened" or "endangered."  A "threatened" species is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."  16 U.S.C. § 1532(20).  An "endangered" species is "in danger of extinction throughout all or a significant portion of its range."  16 U.S.C. § 1532(6).  The government determines whether to list a species based on certain factors using the "best scientific and commercial data available."  16 U.S.C. § 1533(b)(1)(A).

39.    Once a species is listed as "threatened" or "endangered," the ESA protects it by making it unlawful for any person to "take" such species.  16 U.S.C. § 1538(a)(1)(B).  To "take" means to "harass, harm, hunt, pursue, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19).

40.    Moreover, the government has a duty to specify critical habitat for any threatened or endangered species "to the maximum extent prudent and determinable."   16 U.S.C. § 1533(a)(3)(A).  Critical habitat means "the specific areas within the geographical area occupied by the species . . . on which are found those physical or biological features essential to the conservation of the species and which may require special management considerations or protection," as well as specific areas outside an endangered species' range "upon a determination

10

by the Secretary [of Commerce] that such areas are essential for the conservation of the species."
16 U.S.C. § 1532(5)(A)–(B) (cleaned up).

41.     Federal agencies must ensure that any action they authorize, fund, or carry out "is
not likely to jeopardize the continued existence of any endangered species or threatened species or
result in the destruction or adverse modification of [critical] habitat of such species."  16 U.S.C. §
1536(a)(2).  If a permit applicant "has reason to believe that an endangered species or a threatened
species may be present in the area affected by his project and that implementation of such action
will likely affect such species[,]" the federal agency involved must consult with the Secretary of
Commerce.  The Secretary must provide the consulting agency and applicant with a Biological
Opinion summarizing how the project will impact a species or its critical habitat, and the basis for
that decision. *See* 16 U.S.C. § 1536(b)(3)(A).  If the Biological Opinion finds jeopardy or adverse
modification, it must suggest "reasonable and prudent alternatives" for the agency and applicant
to avoid these negative outcomes.  *Id*.  If the Biological Opinion finds no jeopardy or adverse
modification, the Secretary must issue a written incidental take statement.  This statement must (1)
specify the impact of an incidental taking on the species, (2) specify reasonable and prudent
measures necessary or appropriate to minimize that impact, and (3) set forth the terms and
conditions with which the agency or applicant must comply to implement those measures.  16
U.S.C. § 1536(b)(4)(B)(i)–(iv).

C.     **Clean Water Act and Implementing Regulations**

42.     Congress enacted the Federal Water Pollution Control Act, subsequently amended
as the Clean Water Act ("CWA"), in 1972 to regulate "navigable waters," meaning the "waters of
the United States, including the territorial seas."  33 U.S.C. § 1362(7).  The CWA prohibits
discharging dredged and fill material into navigable waters without a permit. 33 U.S.C. § 1311(a).

11

However, the Secretary of the Army, through the Army Corps of Engineers, may issue permits for such discharges.  33 U.S.C. § 1344.

43.     When making permitting decisions, the Corps must follow the CWA's statutory guidelines.  33 U.S.C. § 1344(b).  These guidelines bar the Corps from granting a permit "if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences."  40 C.F.R. § 230.10(a).  A practicable alternative is "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes."  Id.  This includes locations that the permit applicant does not currently own, but could "reasonably be obtained, utilized, expanded, or managed in order to fulfill the basic purpose of the proposed activity."  Id.  And practicable alternatives also include "[a]ctivities which do not involve a discharge of dredged or fill material into the waters of the United States[,]" including onshore renewable energy projects.  Id.

44.     In addition, the CWA's implementing regulations require the Corps to conduct a public interest review for each permit application, and prohibits the granting of any permit that would be "contrary to the public interest."  33 C.F.R. § 320.4(a)(1).

**D.     Marine Mammal Protection Act and Implementing Regulations**

45.     Congress enacted the Marine Mammal Protection Act ("MMPA") in 1972.  It prohibits (with few exceptions) the "take" of marine mammals in United States waters and by United States citizens on the high seas, and the importation of marine mammals and marine mammal products into the United States.  The law's primary purpose is protecting marine mammals, and Congress did not intend it to balance between the welfare of marine mammals and

the interests of other industries.  *See Comm. for Humane Legis., Inc. v. Richardson*, 414 F. Supp. 297 (D.D.C.), *aff'd*, 540 F.2d 1141 (D.C. Cir. 1976).

**E.      National Environmental Policy Act and Implementing Regulations**

46.      The National Environmental Policy Act ("NEPA") is our "basic national charter for the protection of the environment."  40 C.F.R. § 1500.1(a).  It achieves its purpose by "action forcing procedures . . . requir[ing] that agencies take a hard look at environmental consequences." *Robertson v. Methow Valley Citizens Counsel*, 490 U.S. 332, 350 (1989).  This "hard look" means federal agencies must consider "any adverse environmental effects which cannot be avoided."  42 U.S.C. § 4332(C)(ii).  This process requires agencies to "identify and develop methods and procedures . . . which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decision-making along with economic and technical considerations."  42 U.S.C. § 4332(B).

47.      Agencies fulfill these duties by preparing a "detailed statement" for all major agency actions "significantly affecting the quality of the human environment," known as an environmental impact statement ("EIS") 42 U.S.C. § 4332(C).  For actions that are not likely to have significant effects or where the significance of the effects is unknown, agencies must prepare an Environmental Assessment ("EA") to analyze the potentially affected environment and consider "connected actions." 40 C.F.R. § 1501.3(a)–(b).

48.      An EIS must include within its scope "[c]umulative actions [that] when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement" and "[s]imilar actions [that] when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequences together."  40 C.F.R. § 1508.25(a)(2)–(3).  This

cumulative impact requirement ensures that agencies consider the collective effects of individually minor but related actions over time when examining environmental impact.  40 C.F.R. § 1508.7.

49.     "Effects" and "impacts" are synonymous with respect to NEPA.  40 C.F.R. § 1508.8.  The EIS must analyze "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative" effects.  40 C.F.R. § 1508.8.  Direct effects "are caused by the action and occur at the same time and place."  40 C.F.R. § 1508.8(a).  Indirect effects "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable."  40 C.F.R. § 1508.8(b).

50.     The EIS must not only identify impacts but evaluate their severity.  40 C.F.R. § 1502.16(a)–(b) (recognizing that agency must explain the "significance" of effects).  And when providing reasonable alternatives, agencies must include even those they do not have the specific authority to implement.  *See NRDC v. Morton*, 458 F.2d 827 (D.C. Cir. 1972).

51.     The law also requires agencies to "prepare supplements to either draft or final environmental impact statements if . . . [t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns, or . . . [t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  40 C.F.R. § 1502.9(c)(1).

**F.     Administrative Procedure Act**

52.     The Administrative Procedure Act ("APA") provides a right to judicial review for any "person suffering legal wrong because of agency action."  5 U.S.C. § 702. This includes final agency actions "for which there is no other adequate remedy in a court."  5 U.S.C. § 704.  The reviewing court must "hold unlawful and set aside agency action" that it finds "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law; . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;" or "without observance of procedure required by law . . . ."  5 U.S.C. § 706(2)(A), (C), (D).

## V.  FACTUAL ALLEGATIONS

### BOEM Promulgates the "Smart From The Start" Program

53.  On November 23, 2010, the Obama Administration announced its "Smart From The Start" program, designed to "speed offshore wind energy development off the Atlantic Coast." *Press Release*, U.S. DEPT. OF INTERIOR, https://www.doi.gov/news/pressreleases/Salazar-Launches-Smart-from-the-Start-Initiative-to-Speed-Offshore-Wind-Energy-Development-off-the-Atlantic-Coast.

54.  The "Smart From The Start" program was based on a regulatory initiative that purports to allow BOEM to issue, publish, and award offshore wind leases without satisfying its statutory duty of pre-leasing review.  *Id.*; *see also* 43 U.S.C. § 1337(p)(4) (outlining required factors for pre-leasing review).

55.  BOEM amended its regulations to set the stage to fully implement the "Smart From The Start" program on May 16, 2011.  *See* 76 Fed. Reg. 28178.

### BOEM Implements the "Smart From The Start" Program

56.  On February 6, 2012, BOEM published a notice of intent to prepare an environmental assessment for siting several "Smart From The Start" wind energy leases located off the coast of Massachusetts.  *See* 77 Fed. Reg. 5830.

57.  On the same day, BOEM published a call for information and nominations "for commercial leases" off the Massachusetts coast.  77 Fed. Reg. 5820 (Feb. 6, 2012).

58.     BOEM made limited efforts to review commercial fishing impacts as part of its siting decision for its "Smart From The Start" leases located off the coast of Massachusetts. *See Site Assessment Plan (SAP)*, BUREAU OF OCEAN ENERGY MANAGEMENT (Nov. 22, 2017), https://www.boem.gov/sites/default/files/renewable-energy-program/State-Activities/MA/VW-Site-Assessment-Plan.pdf.

59.     The review purports to list state-by-state fishery dollar values based on commercial landings by weight and value for species that contribute over $1 million in Massachusetts for a single year—a highly-limited snapshot of fishing activity in the proposed lease area that is the subject of this litigation (the "Vineyard Wind lease area" or "Vineyard Wind site"). *Id*. at 58–59.

60.     BOEM's review lists impacts to the Commonwealth of Massachusetts when discussing sites off of the Massachusetts coast, despite the fact that the proposed sites were in federal waters and impacted fisheries from multiple states—one of several narrow limitations BOEM adopted in its "Smart From The Start" program. *Id*. at 56.

61.     BOEM's review found that "[s]tate commercial fishing effort" was "low to medium in State waters south of Martha's Vineyard, adjacent to the location of the [proposed lease site]." *Id*. (cleaned up).  However, the Vineyard Wind lease area is not in "state" waters but is in federal waters on the Outer Continental Shelf.  Accordingly, this finding by its own terms does not apply to the Vineyard Wind lease area.

62.     The entire review was based on a faulty process which defined the Wind Energy Area (the "WEA") through the BOEM Massachusetts Renewable Energy Task Force, whose primary method of communication with affected stakeholders was through a Massachusetts-based focused group that did not conduct substantial outreach to affected federal fisheries permit holders in states other than Massachusetts, such as Rhode Island and New York, where the bulk of

commercial fisheries using the Vineyard Wind lease area are based. *Id.* Failure to reach out to commercial fisheries in Rhode Island and New York during the initial phases of implementing the "Smart From The Start" policy doomed the policy to failure from the start.

**BOEM Awards An Offshore Wind Lease to the Predecessor of**
**Vineyard Wind LLC Based on "Smart From The Start"**

63.     BOEM awarded Lease OCS-A-0501 (the "Vineyard Wind lease") to a company called Offshore MW LLC in 2015. *See* 79 Fed. Reg. 70545 (Nov. 26, 2014) (FSN); https://www.boem.gov/sites/default/files/renewable-energy-program/State-Activities/MA/Lease-OCS-A-0501.pdf.

64.     The Vineyard Wind lease became effective on April 1, 2015. *See id*.

65.     Offshore MW LLC and Vineyard Power, a Martha's Vineyard energy cooperative, were partners in the bidding and lease award.

66.     Through several corporate transactions, Offshore MW LLC became Vineyard Wind LLC. *See* Final EIS at 1-1.

67.     BOEM awarded Lease OCS-A-0501 under the "Smart From The Start" policy—in other words, without considering the requirements set forth in 43 U.S.C. § 1337(p)(4).

68.     BOEM prepared an environmental assessment ("EA") in connection with the lease award. *See* https://www.boem.gov/sites/default/files/uploadedFiles/BOEM/BOEM_Newsroom/Library/Publications/2021/BOEM-2012-087.pdf.

69.     BOEM awarded the Vineyard Wind lease without issuing an environmental impact statement ("EIS").

70.     BOEM received multiple public comments before awarding this lease, some of which specifically objected to BOEM's issuance of the lease without first complying fully with the requirements of 43 U.S.C. § 1337(p)(4) and NEPA.

17

**Vineyard Wind LLC Submits Its Construction and Operations Plan
(the "COP")**

71.    In December 2017, Vineyard Wind LLC (hereinafter "Vineyard Wind") submitted the COP to BOEM for review.

72.    The COP did not provide sufficient data to demonstrate that its planned construction or operation would ensure safe passage and navigation for commercial fishing boats, safe operations for bottom trawl vessels, or a safe environment for emergency rescue operations or marine life.

**BOEM Issues Its Draft Environmental Impact Statement (the "Draft EIS")
and Initiates Consultation with NMFS under the ESA, While The United States Army
Corps of Engineers (the "Corps of Engineers" or the "Corps") Begins Public Review of
Vineyard Wind's Permit Application Under the CWA**

73.    Shortly after receiving the COP, BOEM published a Notice of Intent to prepare a Draft EIS in connection with its review of the COP.  *See* 83 Fed. Reg. 13777 (Mar. 30, 2018).

74.    BOEM published the Draft EIS on December 7, 2018 and requested public comment.  *See* 83 Fed. Reg. 63184.

75.    Among other things, the Draft EIS found that the turbines Vineyard Wind originally planned to use would not be able to survive a category 3 hurricane.  Draft EIS at 2–18.

76.    Concurrently with its issuance of the Draft EIS, BOEM initiated ESA consultation with the National Marine Fisheries Service pursuant to the requirements of the ESA.

77.    The Corps of Engineers announced its public-interest review of Vineyard Wind's Clean Water Act permit application for the Vineyard Wind site on December 26, 2018, and closed the comment period on January 28, 2019.

**Vineyard Wind Enters into a Private Contract with Electric Companies to Provide Offshore Wind Energy and Obtains Regulatory Approval from Massachusetts**

78.     On July 18, 2018, months before the DEIS was published for public comment and months before consultation with NMFS was commenced, Vineyard Wind filed a power purchase agreement with several Massachusetts electric companies for offshore wind energy and renewable energy certificates.

79.     In February 2019, the comment period closed for the Draft EIS.

80.     Shortly afterward, the Massachusetts Department of Public Utilities approved Vineyard Wind's power purchase agreements and issued the requested renewable energy certificates.

**NMFS Calls "Time Out"**

81.     In March 2019, NMFS refused to concur with BOEM's Draft EIS, citing concerns over the impact of the Vineyard Wind project on marine species, marine habitat, and socioeconomic resources.

82.     Among other concerns, NMFS identified the Vineyard Wind lease area and cable route as "one of the primary documented spawning locations for longfin squid" and pointed out that the draft EIS lacks "adequate study on the effects of electrical and electromagnetic frequency "EMF" and heat from transmission cables on invertebrates . . . ."  Noah Asimow, *NOAA Raises Concerns About Effects of Wind Farm and Undersea Cables*, VINEYARD GAZETTE (Mar. 26, 2019), https://vineyardgazette.com/news/2019/03/26/noaa-raises-concerns-about-effects-wind-farm-and-undersea-cables.

83.     On July 29, 2019, Massachusetts Governor Charlie Baker traveled to Washington, DC to lobby BOEM to approve the Vineyard Wind COP despite NMFS's concerns.  Douglas Hook, *Gov. Charlie Baker is in Washington D.C. to push for the wind farm off the coast of*

*Martha's Vineyard*, MASSLIVE (Jul. 29, 2019), https://www.masslive.com/capecod/2019/07/gov-charlie-baker-is-in-washington-d-c-to-push-for-the-wind-farm-off-the-coast-of-marthas-vineyard.html.

84.     At NMFS's urging, on August 9, 2019, BOEM delayed approval of the Vineyard Wind project to conduct an expanded "cumulative impacts analysis" before issuing its final environmental impact statement ("Final EIS").  Colin A. Young, *Federal Review Will Further Delay Vineyard Wind*, WBUR (Aug. 9, 2019), https://www.wbur.org/news/2019/08/09/vineyard-wind-project-delayed.

85.     Governor Charlie Baker's office called BOEM's delay "a step in the wrong direction." *Id*.

86.     On September 16, 2019, Brendan Moss (press secretary for Governor Charlie Baker) became communications director for Vineyard Wind.

**NMFS Bungles Its Consultation Responsibilities**

87.     In 2019, NMFS promulgated a set of interagency consultation regulations, that:

a.     limit when agency action would be deemed to adversely modify designated critical habitat by requiring the action to affect habitat as a whole;

b.     alter the definitions of "effects of the action" and "environmental baseline" to limit the scope of analysis of effects;

c.     require that the effects be:

i.     a but-for result of agency action;

ii.    reasonably certain to occur; and

iii.   based on clear and substantial information;

d.     limit when changed circumstances would require new consultation;

  e.  limit agencies' duties to ensure mitigation of adverse effects;

  f.  unlawfully delegate to other agencies the ability to make biological determinations that NMFS is required to make; and

  g.  allow for rote, slapdash consultations that replace legally required site-specific, in-depth analysis of proposed agency action.

*See* 84 Fed. Reg. 44976 (Aug. 27, 2019).

  88.  NMFS's consultation with BOEM regarding the Vineyard Wind COP resulted in several errors.

  a.  NMFS did not provide BOEM with any alternative lease sites in connection with any endangered species, despite the lease area encompassing a large area of habitat for the endangered North Atlantic Right Whale.

  b.  NMFS issued a biological opinion that (1) does not properly establish the environmental baseline, (2) excludes a number of effects the Vineyard Wind project will have on the endangered North Atlantic Right Whale, (3) fails to properly consider the impact of the project on the survival and recovery of endangered species in the area, (4) fails to consider research studies showing the short-term harms to the marine habitat of endangered species caused by the construction and operation of wind farms, and (5) is additionally flawed for the reasons set forth in items 1 through 49 of the 60-Day Notice letter dated May 24, 2021, sent on behalf of the Nantucket Residents Against Turbines. *See* Exhibit C.

21

c.      NMFS issued inadequate incidental take statements that failed to take into account all effects to endangered species, especially to the North Atlantic Right Whale.

d.      BOEM failed to reinitiate consultation after receiving new data that would have affected the biological opinion and incidental take statement, or after Vineyard Wind altered its project to include large new Haliade-X turbines.

**BOEM Issues Its Supplemental Draft EIS and NMFS Issues its Biological Opinion**

89.     On June 12, 2020, BOEM issued a notice of availability of a supplemental draft environmental impact statement ("Supplemental Draft EIS") that analyzed "reasonably foreseeable effects from an expanded cumulative activities scenario for offshore wind development, previously unavailable fishing data, a new transit lane alternative, and changes to the COP since publication of the Draft [EIS]."  85 Fed. Reg. 35952 (June 12, 2020).

90.     BOEM closed comments on the Supplemental Draft EIS on July 27, 2020.  *Id.*

91.     The Supplemental Draft EIS confirmed that the Vineyard Wind project would likely harm the local ecosystem, local marine species, commercial fisheries, scientific research and surveys, and military and national security uses.  Specifically, the Supplemental Draft EIS shows that:

a.      Special aquatic sites for coral, eel grass, and wetlands are located within the impact zone for the Vineyard Wind project.  *See* Supplemental Draft EIS at ES-7.

b.      Construction on the Project would likely kill, displace, or disturb local species, including endangered species.  *See id.* at 3-114.

      c.     There would be "major" adverse cumulative impacts on commercial fisheries, scientific research and surveys, and military and national security uses.  *See id*. at ES-3.

92.     Three months after BOEM issued the Supplemental Draft EIS, NMFS issued its Biological Opinion, dated September 11, 2020.

93.     BOEM planned to issue a Final EIS on the Vineyard Wind project by December 11, 2020 and a decision on the COP by January 15, 2021.

**Vineyard Wind Terminates Federal Review Of The COP**

94.     On December 1, 2020, Vineyard Wind withdrew its COP from federal review.

95.     Vineyard Wind characterized this withdrawal as "temporary" and claimed it was necessary "to allow the project team to conduct a final technical review associated with the inclusion of General Electric Company's ("GE's") 13-14 MW Haliade-X into the final project design." *Statement on BOEM's Acknowledgement of Temporary COP Withdrawal*, VINEYARD WIND (accessed Nov. 17, 2021), https://www.vineyardwind.com/press-releases/2020/12/14/vineyard-wind-statement-on-boems-acknowledgement-of-temporary-cop-withdrawal.

96.     GE's 13-14 MW Haliade-X is an enormous prototype wind turbine that BOEM had never before analyzed in any context for use on the Outer Continental Shelf before the Vineyard Wind project review.

97.     GE's website story on the Haliade-X turbine begins with the sentence: "It's hard to conceive of just how large it is." *Meet the Haliade-X – Powering 16,000 Homes*, GE RENEWABLE ENERGY, last accessed Nov. 17, 2021, https://www.ge.com/renewableenergy/stories/new-wind-turbine-to-increase-efficiency-in-offshore-wind-farms.

98.     The 13-14 MW Haliade-X turbine stretches 260 meters in height (approximately 853 feet), which is the approximate height of San Francisco's Transamerica Pyramid, with blades "as long as a football field."  *Id.*  The turbine's blades are 107 meters long and the rotor is 220 meters.  *Haliade-X offshore wind turbine*, GE RENEWABLE ENERGY, last accessed December 6, 2021,     https://www.ge.com/renewableenergy/wind-energy/offshore-wind/haliade-x-offshore-turbine.

99.     The Vineyard Wind project includes sixty-two 13-14 MW Haliade-X units in its final design.  Michelle Lewis, *It gets real – Vineyard Wind orders its Haliade-X wind turbines*, ELECTREK (Oct. 13, 2021), https://electrek.co/2021/10/13/egeb-it-gets-real-vineyard-wind-orders-its-haliade-x-wind-turbines/.

100.     When Vineyard Wind began reviewing the Haliade-X turbine, the only operating 13-14 MW Haliade-X turbine in the world was located on land at the Port of Rotterdam, Netherlands.

101.     The Rotterdam Haliade-X turbine had been in operation for less than a year when Vineyard Wind began reviewing it for inclusion in its project pursuant to the notice dated December 1, 2020.

102.     In its statement on withdrawal, Vineyard Wind stated that it "look[s] forward to working together [with BOEM] again after we notify [BOEM] to resume its review."  *Statement*, VINEYARD WIND (accessed Nov. 17, 2021).  This statement misrepresents what it means to withdraw a COP from review, as opposed to seeking a suspension of review.

103.     BOEM published notice that it had terminated (and not merely suspended) review of the Vineyard Wind COP on December 16, 2020.  85 Fed. Reg. 81486 (Dec. 16, 2020).

104.    BOEM's notice of termination stated that "[s]ince the COP has been withdrawn from review and decision-making, there is no longer a proposal for a major federal action awaiting technical and environmental review, *nor is there a decision pending before BOEM*." *Id.* (emphasis added).

### BOEM Raises The Vineyard Wind COP From The Dead

105.    Shortly after the Biden Administration entered office, Vineyard Wind asked BOEM via letter dated January 22, 2021, to resume review of its terminated COP, indicating that it "had completed its technical and logistical due diligence review and had concluded that inclusion of the Haliade-X turbines did not warrant any modifications to the COP."  86 Fed. Reg. 12495 (Mar. 3, 2021).

106.    Vineyard Wind's letter did not provide detailed documentation of its review of the 13-14 MW Haliade-X turbines.

107.    Nothing in Vineyard Wind's letter indicates that Vineyard Wind solicited public input on the safety, efficacy, or environmental impact of using the large 13-14 MW Haliade-X turbines during its review from December 16, 2020, to January 22, 2021.

108.    BOEM published the following notice in the Federal Register: "Vineyard Wind . . . informed BOEM that it was rescinding its temporary withdrawal and asked BOEM to resume its review of the COP.  Because Vineyard Wind has indicated that its proposed COP is a 'decision pending before BOEM', BOEM is resuming its review of the COP under NEPA." *Id.*

109.    BOEM resumed review of the terminated Vineyard Wind COP because Vineyard Wind falsely claimed that the COP was pending review.

110.    BOEM resumed review of the terminated Vineyard Wind COP without requiring Vineyard Wind to update the agency with details describing studies, surveys, and other project-

specific information Vineyard Wind gathered during its 13-14 MW Haliade-X review between December 1, 2020 and January 22, 2021.

**BOEM, NMFS, and the Corps Jointly Issue the Final EIS Under NEPA**

111.    Nine days after officially resuming review of the COP, BOEM published the Vineyard Wind site Final EIS.  86 Fed. Reg. 14153 (Mar. 12, 2021).

112.    The Final EIS confirmed that the Vineyard Wind project would significantly harm the ecosystem, marine life, the fishing industry, shoreside businesses, and other statutorily-protected interests such as scientific research and navigational radar.  Specifically, the Final EIS found that:

  a.    The Vineyard Wind project will increase the risk of collision between marine vessels.  *See* Final EIS at 3-246.

  b.    The project will result in massive devastation of the marine environment if severe weather or a hurricane fells Vineyard Wind's large Haliade-X turbines, which have never before been tried or tested anywhere other than at the Port of Rotterdam.  *See id.* at 3-81, 89, 219.

  c.    The project will disturb the coastal breeding grounds of the horseshoe crab, a species whose blood is an essential ingredient for life-saving medical tests and treatments.  *See id*. at 3-28.

  d.    The project will likely permanently harm, displace, and disturb existing fish, sea turtle, and mammal populations.  *See id.* at 3–43, 46, 75, 76, 103, 105.

e.     The proposed spacing between wind turbines will make it nearly impossible for commercial fishing trawl and dredge vessels to operate in the lease area, especially at night and in severe weather. *See id.* at 3–96, 207, 214, 215.

f.     The wind turbines will interfere with navigational radar. *See id.* at 3-214; *see also, e.g.,* Report to the Congressional Defense Committees, "The Effect of Windmill Farms on Military Readiness," Department of Defense Office of the Director of Defense and Research Engineering (2006) at 4.

113.    The Final EIS lacked any findings on whether Vineyard Wind's new prototype Haliade-X turbines could survive an adverse weather event with high winds and surf, such as a major hurricane.

114.    The Final EIS concluded that "approximately 22 GW of Atlantic offshore wind development is reasonably foreseeable." Final EIS at 1-6. This figure is inconsistent with the Administration's stated goal of "deploy[ing] 30 gigawatts (GW) of offshore wind in the United States by 2030 . . . Achieving this target also will unlock a pathway to 110 GW by 2050 . . . ." *FACT SHEET: Biden Administration Jumpstarts Offshore Wind Energy Projects to Create Jobs*, THE WHITE HOUSE (Mar. 29, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/03/29/fact-sheet-biden-administration-jumpstarts-offshore-wind-energy-projects-to-create-jobs/.

115.    The Final EIS failed to consider a reasonable range of alternatives to the COP that were located outside of the lease area covered by Lease OCS-A-0501 because BOEM's application of the "Smart From The Start" program impermissibly and effectively limited all alternatives to only those that were within the lease area.

116.    Although the Draft Supplemental EIS considered some cumulative impacts, the Final EIS curiously removed most of the cumulative impacts analysis and failed to properly analyze the foreseeable, cumulative ecological impacts that implementation of BOEM's pledged plans to approve multiple wind farms near the Vineyard Wind project would have, including:

   a.    the oil spill risks associated with wind turbines;

   b.    the cumulative environmental risks associated with pile-driving installation of the turbines;

   c.    the cumulative impact that operational underwater sound associated with the installation and operation the turbines will have on marine life and resources;

   d.    the cumulative impact of electrical and electromagnetic frequency ("EMF") discharge from generators and cabling will have on the marine environment; and

   e.    the cumulative impact on commercial fishermen, small harvester fishing businesses, onshore seafood processors, and other point of service seafood sales and businesses.

117.    After resuming review of the COP, BOEM did not engage with commercial fishermen, shoreside businesses, or the general public when preparing the Final EIS, including on such crucial issues as environmental and economic impacts.

118.    After BOEM resumed its review, affected states gathered no substantial input from the plaintiff commercial fishermen or other similarly situated businesses that use the Vineyard Wind lease area with regard to the environmental and economic impacts of the Vineyard Wind project.

119.    Throughout the process, BOEM, affected states, and Vineyard Wind provided a meager opportunity for financial mitigation to certain limited fishing interests and shoreside businesses without consulting with or mitigating the impact of the COP on other fishing interests, thereby favoring some commercial fishing businesses over others, without adequate explanation.

### BOEM Reinitiates the ESA Consultation Process with NMFS While Simultaneously Issuing its Joint Record of Decision (the "ROD") Under NEPA With NMFS and the Corps of Engineers

120.    On May 7, 2021, two months after issuing the final EIS, BOEM submitted a request to NMFS to reinitiate consultation to consider new information regarding the impacts of the Vineyard Wind Project on endangered species.

121.    Three days later, and before NMFS had the opportunity to analyze the new information submitted by BOEM, on May 10, 2021, BOEM issued its Joint Record of Decision under NEPA with NMFS and the Corps of Engineers approving the Vineyard Wind COP and clearing the way for construction to begin.  *See* 86 Fed. Reg. 26541 (May 14, 2021); *see also Record of Decision: Vineyard Wind 1 Offshore Wind Energy Project Construction and Operations Plan*, BUREAU OF OCEAN ENERGY MANAGEMENT (May 10, 2021), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Final-Record-of-Decision-Vineyard-Wind-1.pdf.

122.    Among other things, the ROD states the following:

a.      "The purpose of the [agency action on the Vineyard Wind COP] is to determine whether to approve, approve with modifications, or disapprove the COP . . . to meet New England's demand for renewable energy.  More specifically, the proposed Project would deliver power to the New England Energy grid to contribute to Massachusetts' renewable energy

requirements—particularly, the Commonwealth's mandate that distribution companies jointly and competitively solicit proposals for offshore wind energy generation . . . ."  ROD at 10—11.

b.      "BOEM's decision on Vineyard Wind's COP is needed to carry out its duty to approve, approve with modifications, or disapprove the proposed Project in furtherance of the United States policy to make OCS energy resources available for expeditious and orderly development . . . ."  ROD at 11.

123.    The ROD shows that BOEM dismissed several alternatives to locating the Vineyard Wind project in the lease area in the ROD.  Such alternatives included:

a.      proposals made by Seafreeze that the COP should not be approved until the agencies could fully analyze radar interference caused by Vineyard Wind with search-and-rescue operations;

b.      comments showing that the COP's structural analysis was flawed and should be changed;

c.      concrete proposals to eliminate certain important fisheries areas of the lease from the COP;

d.      concrete proposals showing that Vineyard Wind's decision to use larger turbines would have cumulative impacts necessitating further analysis;

e.      comments urging consideration of the devastating impact the Vineyard Wind project would have on fisheries, specifically the longfin squid fishery;

f.      concrete proposals regarding compensation for commercial fishermen and shoreside industries negatively impacted by the Vineyard Wind Project;

      g.     the proposal of the High Frequency Radar Wind Turbine Interference Community Working Group dated June 2019; and

      h.     the proposal of a reasonable alternative that set forth proposed transit lanes in the lease area to ensure safety and viability of commercial fishing operations put forward by the Responsible Offshore Development Alliance ("RODA").

124.     BOEM and the other agencies involved in compiling the ROD did not adequately cite sources or sufficiently explain why the following comments do not warrant further response:

      a.     Comment 1063-002, which concerned fisheries mitigation and compensation;

      b.     Comment 0076-004, which questions the sufficiency of the purpose and need statement for the purposes of NEPA;

      c.     Comment 13185-017, which pointed out BOEM's failure to consider the cumulative impact of fisheries mitigation plans and associate compensation;

      d.     Comment 13185-018, which addressed BOEM's failure to fully analyze impacts to shoreside businesses or gather enough peer review or public input; and

      e.     All comments made by Seafreeze regarding the last-minute increase in megawatt capacity for each wind turbine generator without adequate analysis.

      f.     Comments 0116-001 through 05, which concerns the fact that New York was not given factual consistency review, was not included in the task force,

and accordingly had no way to negotiate compensation to New York squid fishermen.

125.    BOEM approved Vineyard Wind's terminated, insufficient, and out-of-date COP without any further environmental impact assessment, despite material and significant discrepancies involving the Vineyard Wind project envelope and project material parameters from the Draft EIS, to the Supplemental Draft EIS, and through the Final EIS.

126.    BOEM approved this terminated, insufficient, and out-of-date COP without public notice or opportunity for comment on the choice of a large prototype wind turbine for the Vineyard Wind project made during the period December 1, 2020, to January 22, 2021.

127.    BOEM approved this terminated, insufficient, and out-of-date COP in disregard of adverse impacts to endangered species, or approved it despite knowing it would harm endangered species.

128.    BOEM approved this terminated, insufficient, and out-of-date COP without accounting for its own plans for widespread development of wind farms on the outer Continental Shelf, or any foreseeable cumulative impacts.

129.    The Corps of Engineers' final decision regarding Vineyard Wind's Clean Water Act permit application was included in the ROD.  *See* ROD at 30—49.

130.    Among other things, the ROD states the following regarding the Corps' permit grant:

  a.    "Vineyard Wind's contractual obligation with the Commonwealth of Massachusetts to deliver the generated energy to the Massachusetts power grid was used as criteria for the evaluation of alternatives as the ability to

deliver to the power grid limits where the project can be located geographically." ROD at 32.

b.      "[D]ue to the placement of the turbines it is likely that the entire [lease] area will be abandoned by commercial fisheries due to difficulties with navigation. The extent of impact to commercial fisheries and loss of economic income is estimated to total $14 million over the expected 30-year lifetime of the project. . . . When considering these factors, the project as proposed is anticipated to have a negligible beneficial effect to local economics." ROD at 39.

131.    As part of its review, the Corps found no jeopardy to endangered species and recommended no adverse modification to the NMFS.

132.    The Corps did not sufficiently consider practicable alternative locations for the Vineyard Wind project outside the lease area in the public-interest review portion of the Record of Decision.

133.    The Corps admitted that "[Vineyard Wind] does not require access or proximity to or siting within a special aquatic site to fulfill its basic project purpose." ROD at 31. Yet the Corps also restricted analysis of practicable alternatives to areas in the water because the existing Vineyard Wind lease was in the ocean.

134.    The Corps also erroneously concluded in its public-interest review that the Vineyard Wind project would not discharge into a special aquatic site, even though environmental impact analysis showed it would. *See id.*, *see also* Supplemental Draft EIS at ES–7. Specifically, the public-interest review found that "[t]he project does not propose impacts to wetlands and therefore, the project will have no effect on wetlands." ROD at 40.

135.    The Corps did not take other planned outer Continental Shelf wind energy projects into account when considering the possible cumulative impact of Vineyard Wind.

136.    The Corps' review documentation does not address:

    a.    the rise in temperatures at and near the project area due to the project's turbines;

    b.    the potential vulnerabilities to the electrical grid caused by relying on so much energy from one source (namely offshore wind power);

    c.    the impact on the commercial fishing industry;

    d.    harm to endangered species and their critical habitat; or

    e.    adverse impacts on food supply.

137.    The Corps never appropriately analyzed the impact that the Vineyard Wind project would likely have on horseshoe crabs—a marine species whose blood contains compounds used for gold-standard endotoxin testing, which is required for all drugs and vaccines, and many implantable medical devices.

138.    BOEM's official letter informing Vineyard Wind that the COP was approved was dated July 15, 2021, and constitutes BOEM's most recent application of the illegitimate "Smart From The Start" program in connection with the Vineyard Wind project.  *See* Exhibit D.

139.    On September 17, 2021, counsel for the Plaintiffs sent the Defendants (among others) a 60-day notice letter informing the Defendants of their intent to sue.  The facts set forth in the notice letter, which is attached as Exhibit A, are hereby incorporated herein.

140.    On October 18, 2021, months after BOEM approved the Vineyard Wind COP, NMFS completed the reinstituted ESA consultation process and published major revisions to the Biological Opinion, which addressed serious risks to endangered species from noise, vessel traffic,

and critical habitat and environmental conditions during construction, operation, and decommissioning activities in connection with the Vineyard Wind project.

141.    To date, BOEM has not reopened the Final EIS or ROD in order to address the revised Biological Opinion, has not rescinded its approval of the COP, and has not required Vineyard Wind to halt construction of the project pending BOEM's review of the revised Biological Opinion.

## VI.    PLAINTIFFS' CLAIMS FOR RELIEF

### *OCSLA CLAIMS*

### First Claim for Relief

### BOEM'S "SMART FROM THE START" POLICY VIOLATES OCSLA

### (Violation of 43 U.S.C. 1337(p)(4); 5 U.S.C. § 702)

142.    The plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 141 as though fully set forth herein.

143.    OCSLA imposes a mandatory duty on BOEM to "ensure that [leasing in the Outer Continental Shelf] is carried out in a manner that provides for":

      a.      safety;

      b.      protection of the environment;

      c.      prevention of waste;

      d.      conservation of natural resources of the outer Continental Shelf;

      e.      protection of national security interests;

      f.      prevention of interference with other reasonable uses;

    g.     adequate consideration of the location of, and any scheduling related to, the

                lease and other uses of the sea or seabed (such as for a fishery, a sealane,

                and navigation);

    h.     oversight, inspection, research, monitoring, and enforcement.

43 U.S.C. §§ 1337(p)(4)(A), (B), (C), (D), (F), (I), (J), or (L).

144.    In 2011, BOEM amended its regulations according to its "Smart From The Start" policy. *See* Proposed Rule, 76 Fed. Reg. 8962 (Feb. 16, 2011); Final Rule, 76 Fed. Reg. 28178 (May 16, 2011).

145.    As amended under the "Smart From The Start" policy, 30 C.F.R. § 285.232 (2011), the current regulation allows BOEM to issue, publish, and award a lease without satisfying its mandatory duty to consider whether the proposed lease (or any associated easements or rights-of-way) meets any of the relevant criteria the OCSLA lists at 43 U.S.C. §§ 1337(p)(4)(A), (B), (C), (D), (F), (I), (J), or (L).

146.    BOEM's "Smart From The Start" amendment is *ultra vires* because nothing in 43 U.S.C. § 1337 or elsewhere in OCSLA authorizes BOEM to issue a lease in the Outer Continental Shelf before reviewing and analyzing the criteria set forth in § 1337(p)(4).

147.    The APA allows a court reviewing agency policy to "hold unlawful and set aside agency action" that it finds:

    1.     "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

                with law;"

    2.     "in excess of statutory jurisdiction, authority, or limitations, or short of

                statutory right;" or

    3.     "without observance of procedure required by law . . . ."

5 U.S.C. § 706(2)(A), (C), (D).

148.     Because BOEM's "Smart From The Start" regulatory amendment is *ultra vires*, it constitutes agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, or without observance of procedure required by law. 5 U.S.C. § 706(2)(A), (C), (D).

## Second Claim for Relief

**BOEM'S ISSUANCE, PUBLICATION, AND AWARD OF THE VINEYARD WIND LEASE VIOLATES OCLSA BECAUSE IT APPLIES THE ILLEGITIMATE 'SMART FROM THE START" POLICY TO THE VINEYARD WIND PROJECT**

**(Violation of 43 U.S.C. 1337(p)(4); 5 U.S.C. § 706(2))**

149.     The plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 148 as though fully set forth herein.

150.     BOEM issued and published the Final Sale Notice ("FSN") for Lease OCS-A-0501 in November 2014 and awarded the lease to Offshore MW LLC (now Vineyard Wind LLC).  *See* 79 Fed. Reg. 70545 (Nov. 26, 2014) (FSN).  This lease became effective on April 1, 2015. *See id*.

151.     BOEM violated its statutory duties under OCSLA, 43 U.S.C. §§ 1337(p)(4)(A), (B), (C), (D), (F), (I), (J), (L), by failing to issue, publish, and award Lease OCS-A-0501 without adequately considering and providing for safety, protection of the environment, prevention of waste, conservation of natural resources of the Outer Continental Shelf, protection of national security interests, prevention of interference with other reasonable uses, adequate consideration of the location of and any scheduling related to the lease and other uses of the sea or seabed (such as for a fishery, a sealane, and navigation), or oversight, inspection, research, or monitoring and enforcement.

152.    In violation of its statutory duties under OCSLA, BOEM issued, published, and awarded Lease OCS-A-0501 under the "Smart From The Start" policy, and did not provide adequate opportunity for public comment regarding the lease or its attendant easements or rights-of-way with specific reference to 43 U.S.C. §§ 1337(p)(4)(A), (B), (C), (D), (F), (I), (J), (L).  *See* 79 Fed. Reg. 70545 (Nov. 26, 2014).

153.    BOEM's decision to issue, publish, and award Lease OCS-A-0501 without following the requirements of OCSLA was *ultra vires*, and therefore is arbitrary, capricious, an abuse of discretion, in excess of statutory authority, without observance of procedure required by law, and otherwise not in accordance with law.  5 U.S.C. § 706(2)(A), (C), (D).

**Third Claim for Relief**

**BOEM'S APPROVAL OF THE COP VIOLATES OCSLA BECAUSE IT IS THE MOST RECENT APPLICATION OF BOEM'S ILLEGITIMATE "SMART FROM THE START" POLICY**

**(Violation of 43 U.S.C. § 1337(p)(4); 5 U.S.C. § 706(2))**

154.    The plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 153 as though fully set forth herein.

155.    After resuming review of the Vineyard Wind COP that it had terminated, BOEM approved the COP on July 15, 2021.

156.    BOEM issued the ROD as part of its overall application of its "Smart From The Start" policy to the Vineyard Wind project.

157.    BOEM's ROD states that approval of the COP will likely lead to the complete abandonment of commercial fishing within the Vineyard Wind project area.  *See* ROD at 39.

158.    BOEM's decision to approve the Vineyard Wind COP is the most recent application of its illegitimate "Smart From The Start" policy.

159.   BOEM approved the COP despite knowing that the project would interfere with reasonable uses of the high seas and without considering the use of the project area for a fishery. *See* 43 U.S.C. § 1337(p)(4)(I), (J)(ii) (OCLSA requirements).

160.   BOEM's decision to approve the Vineyard Wind COP under these circumstances was *ultra vires*, and therefore is arbitrary, capricious, an abuse of discretion, in excess of statutory authority, without observance of procedure required by law, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A), (C), (D).

**Fourth Claim for Relief**

**BOEM'S DECISION TO RESUME REVIEW OF THE VINEYARD WIND COP AFTER VINEYARD WIND WITHDREW THE COP FROM CONSIDERATION VIOLATES OCSLA AND MULTIPLE FEDERAL REGULATIONS**

**(Violation of 43 U.S.C. § 1337(p)(4); 40 CFR § 1500.2; 30 CFR § 585.626; 5 U.S.C. § 706(2))**

161.   The plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 160 as though fully set forth herein.

162.   In December 2020, Vineyard Wind officially withdrew its Construction and Operations Plan ("COP") from consideration, citing a need to fully reconsider its choice of wind turbines for the project.  85 Fed. Reg. 81486 (Dec. 16, 2020).

163.   BOEM immediately took final action by formally terminating its review of the Vineyard Wind COP, stating that "[s]ince the COP has been withdrawn from review and decision-making, there is no longer a proposal for a major federal action awaiting technical or environmental review, nor is there a decision pending before BOEM."  *Id*.

164.   On January 22, 2021, Vineyard Wind asked BOEM to recommence the review of the withdrawn and terminated COP.

165.    BOEM resumed review of the COP less than two months later "[b]ecause Vineyard Wind has indicated that its proposed COP is 'a decision pending before BOEM[.]'" *Notice to Resume*, 86 Fed. Reg. 12494 (Mar. 3, 2021).

166.    BOEM's decision to resume review of the formally terminated COP for the sole reason that the project sponsor falsely claimed that the COP was still pending review was *ultra vires* because such an action is not authorized by OCSLA or any other federal statute and is not among the powers delegated by Congress to BOEM or to any other federal agency.

167.    BOEM did not comply with OCSLA's statutory requirement of public notice and comment before deciding to resume review of the terminated COP.  *See* 43 U.S.C. § 1337(p)(4)(K).

168.    BOEM did not ensure that Vineyard Wind's independent review of the turbine technology sufficiently demonstrated that the use of that technology would satisfy OCSLA's statutory requirements before resuming review of the COP.  *See* 43 U.S.C. § 1337(p)(4).

169.    BOEM's decision to revive Vineyard Wind's terminated COP without public notice and comment violates its duty to encourage and facilitate public involvement in decisions which affect the quality of the human environment.  *See* 40 C.F.R. § 1500.2(d).

170.    BOEM decided to revive Vineyard Wind's terminated COP without requiring Vineyard Wind to update the COP with details describing studies, surveys, and other project-specific information gathered during Vineyard Wind's review of its turbine technology from December 16, 2020 to January 22, 2021, in violation of 30 C.F.R. § 585.626.

171.    BOEM's *ultra vires* decision to resume review of the Vineyard Wind COP is arbitrary, capricious, an abuse of discretion, in excess of statutory authority, without observance of procedure required by law, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A), (C), (D).

**Fifth Claim for Relief**

**BOEM'S APPROVAL OF THE VINEYARD WIND CONSTRUCTION AND
OPERATIONS PLAN VIOLATES OCSLA IN NUMEROUS OTHER WAYS**

**(Violation of 43 U.S.C. § 1337(p)(4); 43 U.S.C. § 1332(2); 30 CFR § 585.621(b); 5 U.S.C. §
706(2))**

172.    The plaintiffs reallege and incorporate by reference the allegations contained in

Paragraphs 1 through 171 as though fully set forth herein.

173.    After resuming review of the Vineyard Wind COP that it had terminated, BOEM

approved the COP on July 15, 2021.

174.    OCSLA requires BOEM to ensure that the Vineyard Wind COP provides for

"**safety**." 43 U.S.C. § 1337(p)(4)(A).  Related regulations state that a COP must demonstrate that

its proposed activity "[i]s safe." 30 C.F.R. § 585.621(b).  BOEM violated OCSLA and its attendant

regulations by approving the Vineyard Wind COP, which did not demonstrate that its proposed

activity was safe by failing to ensure safe travel for commercial fishing boats, safe operation of

bottom trawl vessels, or a safe environment for emergency rescue operations.  The project will

interfere with marine navigational radar, increasing risks for all vessels in the area.  BOEM

received multiple comments on this matter, but disregarded them.  *See* Supplemental Draft EIS at

60–62.  This interference will only become more pronounced with Vineyard Wind's decision to

use gargantuan 13-14 MW Haliade turbines, rather than the originally-planned 8-10 MW size.

BOEM failed to properly review and analyze Vineyard Wind's decision to increase its turbine size

even though it made the project less safe—a willful lack of due diligence that puts every ship

traveling through the Vineyard Wind project area at risk.

175.    OCSLA requires BOEM to ensure that the Vineyard Wind COP provides for

"**protection of the environment**."  43 U.S.C. § 1337(p)(4)(B).  Related regulations add that a

COP must demonstrate that its proposed activity "does not cause undue harm or damage to natural

41

resources; life (including human and wildlife) . . . [or] the marine, coastal[,] or human environment." 30 C.F.R. § 585.621(d).  BOEM violated OCSLA and its attendant regulations by approving the Vineyard Wind COP, which did not demonstrate that its activity would not unduly harm or damage natural resources, life, or the environment, as follows:

a.   Construction would likely kill, displace, or disturb local species.  *See* Supplemental EIS at 3-114.

b.   The project itself is likely to result in the loss of human life by significantly increasing the risk of collision, exacerbated by failure to adequately research the project's impact on navigational radar.  *See* Final EIS at 3-246.

c.   The operation of the project will likely result in massive devastation of the marine environment—especially if severe weather or a hurricane fells one or more wind turbines.  *See id.* at 3-81, 89, 219.

d.   The project will disturb the important coastal breeding grounds of the horseshoe crab, whose blood is an essential ingredient for life-saving medical tests and treatments.  *See id*. at 3-28.

176.   OCSLA requires BOEM to ensure that the Vineyard Wind COP provides for "**conservation of the natural resources of the outer Continental Shelf**."   43 U.S.C. § 1337(p)(4)(D); *see also* 30 C.F.R. § 585.102(a)(4).   Fish and marine mammals are "natural resources" of the outer Continental Shelf.  16 U.S.C. § 1801.  BOEM violated OCSLA and its attendant regulations by approving the Vineyard Wind COP, which not only fails in general to conserve fish and marine mammals in the outer Continental Shelf, but will permanently harm, displace, and disturb existing fish, sea turtle, and mammal populations in the lease area.  *See* Final EIS at 3–43, 46, 75, 76, 103, 105.

177.   OCSLA requires BOEM to ensure that the Vineyard Wind COP provides for "**protection of national security interests of the United States**."   43 U.S.C. § 1337(p)(4)(F). The implementing regulations also state that a COP must demonstrate that its proposed activities will not "unreasonably interfere" with national security or defense.   30 C.F.R. § 585.102(a)(6). BOEM violated OCSLA and its attendant regulations by approving the Vineyard Wind COP, which unreasonably interferes with national security and defense by adversely impacting the ability of radar units to detect and track incoming aircraft.   *See* e.g., Report to the Congressional Defense Committees, "The Effect of Windmill Farms on Military Readiness," Department of Defense Office of the Director of Defense and Research Engineering (2006) at 4.

178.   OCSLA requires BOEM to provide for "**prevention of interference with reasonable uses . . . of the exclusive economic zone, the high seas, and the territorial seas**" when considering COPs.   43 U.S.C. § 1337(p)(4)(I); *see also* 30 C.F.R. § 585.621(c) (requiring project sponsors like Vineyard Wind to show its plan will not "unreasonably interfere with other uses of the [outer Continental Shelf]").   Such reasonable uses include the "use of the sea or seabed . . . for a fishery . . . sealane . . . or navigation."   43 U.S.C. § 1337(p)(4)(J).   BOEM violated OCSLA and its attendant regulations by approving the Vineyard Wind COP, which proposed wind energy activities that would unreasonably bar access to and unreasonably interfere with fishing activities and navigation in the lease area, as follows:

a.   The proposed narrow spacing between wind turbines and the lack of a Coast-Guard-designated transit lane through the Vineyard Wind lease will impact the ability of trawl and dredge vessels to navigate and carry out their operation, especially at night and in severe weather.   *See* Final EIS at 3–96,

207, 214, 215.  It will also interfere with navigational radar.  *See id*. at 3–214.

b.    The arrangement of wind turbines does not provide adequate spacing in the most predominant travel direction for Coast Guard rescue operations.

c.    BOEM's approval of the Vineyard Wind COP makes travel to and from fishing sites significantly more costly.

d.    The Draft EIS and the Supplemental Draft EIS both determined that the impacts on commercial fishing would be "major." BOEM impermissibly reduced the level of impacts to commercial fishing from "major" to "minor to moderate" based on the woefully inadequate compensation packages, which in no way prevented the "interference with reasonable uses" for commercial fishing.

179.    OCSLA provides that **"the character of the waters above the outer continental shelf as high seas and the right to navigation and fishing therein shall not be affected"** by BOEM's management and regulation.  43 U.S.C. § 1332(2).  BOEM admitted in the ROD that, as a practical matter, "due to the placement of the turbines it is likely that the *entire* 75,614 acre area will be *abandoned* by commercial fisheries due to difficulties with navigation.") (emphasis added). Because the issuance of the ROD and the subsequent approval of the COP will "likely" result in the abandonment of fishing due to difficulties in navigation occasioned by "the placement of the turbines" in the Vineyard Wind area, BOEM violated 43 U.S.C. § 1332(2) when it approved the COP.

180.    Because BOEM's decision to approve the Vineyard Wind COP violated multiple duties under § 1337(p)(4) of OCSLA, it is arbitrary, capricious, an abuse of discretion, in excess

44

of statutory authority, without observance of procedure required by law, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A), (C), (D).

### ESA CLAIMS

### Sixth Claim for Relief

### THE FEDERAL DEFENDANTS VIOLATED THE ESA BY IGNORING ITS MANDATE TO CONSERVE ENDANGERED AND THREATENED SPECIES

### (Violation of 16 U.S.C. § 1536(a)(1); 5 U.S.C. § 706(2))

181.    The plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 180 as though fully set forth herein.

182.    The ESA requires all federal agencies to "utilize their authorities in furtherance of the purposes of [the ESA] by carrying out programs for the conservation of endangered species and threatened species."  16 U.S.C. § 1536(a)(1).

183.    This mandatory duty to advance and assist the conservation of species requires agencies to adopt a program of conservation that brings a species to the point of recovery and delisting.  *See* 16 U.S.C. § 1532(3).

184.    The ESA prohibits "[a]ll persons, including federal agencies" from "taking" endangered species—"meaning that no one is to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect such life forms."  *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184–85 (1978) (cleaned up).

185.    The ESA directs federal agencies to use "*all* methods and procedures which are necessary to preserve the endangered species."  *Id*.  (emphasis in original).

186.    The Federal Defendants repeatedly and continuously disregarded adverse impacts to endangered species or approved the Vineyard Wind project despite knowing it would harm endangered species, and in doing so violated their mandatory duties under the ESA.

187.    The Federal Defendants' failure to abide by their mandatory duties under the ESA was arbitrary, capricious, an abuse of discretion, without observance of procedure required by law, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A), (C), (D).

### Seventh Claim for Relief

### DEFENDANTS BOEM AND NMFS FOLLOWED UNLAWFUL REGULATORY STANDARDS THAT TAINTED THE VINEYARD WIND ESA CONSULTATION PROCESS

### (Violation of 16 U.S.C. § 1536(a)(1); 5 U.S.C. § 706(2))

188.    The plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 187 as though fully set forth herein.

189.    In 2019, the NMFS promulgated certain interagency consultation regulations that:

a.    limit when agency action would be deemed to adversely modify designated critical habitat by requiring the action to affect habitat as a whole;

b.    alter the definitions of "effects of the action" and "environmental baseline" to limit the scope of analysis of effects;

c.    require that the effects be:

   i.    a but-for result of agency action;

   ii.    reasonably certain to occur; and

   iii.    based on clear and substantial information;

d.    limit when changed circumstances would require new consultation;

e.    limit agencies' duties to ensure mitigation of adverse effects;

f.    unlawfully delegate to other agencies the ability to make biological determinations that NMFS is required to make; and

g.      allow for rote, slapdash consultations that replace legally required site-specific, in-depth analysis of proposed agency action.

*See* 84 Fed. Reg. 44976 (Aug. 27, 2019).

190.    These changes are not authorized by the ESA and not comprehended by existing Supreme Court precedent on the Endangered Species Act.  *See Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184–85 (1978).  As such, they do not utilize agency authority in furtherance of the ESA's purposes.  *See* 16 U.S.C. § 1536(a)(1).

191.    Using these unlawful, *ultra vires* interagency consultation regulations, the Defendants downplayed the effects the Vineyard Wind project would have on endangered species in their subsequent biological opinion.

192.    Because the Defendants issued a soft-pedaled, self-generous biological opinion, any consultation process was fatally flawed, and the *ultra vires* decision to issue, publish, and award the Vineyard Wind lease based in part on the biological opinion constitutes agency action that is on its face arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, or without observance of procedure required by law.  5 U.S.C. § 706(2)(A), (C), (D).

**Eighth Claim for Relief**

**BOEM, NMFS, AND THE ARMY CORPS OF ENGINEERS VIOLATED THE ESA BY FAILING TO SEEK AN EXEMPTION FOR THE VINEYARD WIND PROJECT**

**(Violation of 16 U.S.C. § 1536(a)(2); 5 U.S.C. § 706(2))**

193.    The plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 192 as though fully set forth herein.

194.    The ESA requires federal agencies to "ensure that any action authorized . . . by such agency is not likely to jeopardize the continued existence of any endangered species or threatened

species or result in the destruction or adverse modification of [critical] habitat of such species unless such agency has been granted an exemption for such action by the Committee."  16 U.S.C. § 1536(a)(2).  The ESA establishes this committee at 16 U.S.C. § 1536(h).

195.    BOEM, NMFS, and the Army Corps of Engineers did not seek an exemption from the Committee once they knew that critical habitat of the North American right whale would be destroyed or adversely modified by the Vineyard Wind project.

196.    BOEM, NMFS, and the Corps' *ultra vires* decision to issue, publish, and award the Vineyard Wind lease without an exemption constitutes agency action that is arbitrary, capricious, an abuse of discretion, in excess of statutory jurisdiction, authority, or limitations, short of statutory right, without observance of procedure required by law, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A), (C), (D).

**Ninth Claim for Relief**

**NMFS VIOLATED FEDERAL LAW BY FAILING TO CONSIDER THE CUMULATIVE EFFECTS OF THE VINEYARD WIND PROJECT**

**(Violation of 50 C.F.R. § 402.14(g)(4); 5 U.S.C. § 706(2))**

197.    The plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 196 as though fully set forth herein.

198.    Federal regulations require NMFS to "[a]dd the effects of the action and cumulative effects to the environmental baseline" when determining whether an agency action is likely to harm endangered species or their critical habitat.  50 C.F.R. § 402.14(g)(4).

199.    NMFS failed to properly consider cumulative effects when making such determination.

200.    NMFS's failure to properly consider cumulative effects on endangered species or their critical habitat is arbitrary, capricious, an abuse of discretion, in excess of statutory authority,

without observance of procedure required by law, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A), (C), (D).

**Tenth Claim for Relief**

**NMFS VIOLATED FEDERAL LAW BY FAILING TO INFORM BOEM OF ALTERNATIVES THAT WOULD AVOID HARMING ENDANGERED SPECIES**

**(Violation of 50 C.F.R. § 402.14(g)(5); 5 U.S.C. § 706(2))**

201.    The plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 200 as though fully set forth herein.

202.    Federal regulations require NMFS to inform BOEM of "reasonable and prudent alternatives" that BOEM and a lease applicant can take to avoid harming endangered species or their critical habitat. 50 C.F.R. § 402.14(g)(5).

203.    NMFS did not provide BOEM with sufficient reasonable and prudent alternatives in connection with endangered species, including but not limited to the North Atlantic Right Whale.

204.    NMFS's failure to provide BOEM with sufficient reasonable and prudent alternatives that would avoid harm to endangered species or their critical habitat is arbitrary, capricious, an abuse of discretion, in excess of statutory authority, without observance of procedure required by law, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A), (C), (D).

**Eleventh Claim for Relief**

**NMFS VIOLATED THE ESA BY ISSUING A FLAWED
BIOLOGICAL OPINION**

**(Violation of 16 U.S.C. § 1536(a)(2); 5 U.S.C. § 706(2))**

205.    The plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 204 as though fully set forth herein.

206.    The ESA requires agencies to use "the best scientific and commercial data available" when preparing a biological opinion.  16 U.S.C. § 1536(a)(2).  Such data must support the conclusions of the biological opinion on jeopardy and adverse modification, and a biological opinion is arbitrary and capricious if it fails to consider relevant factors and articulate a rational connection between the facts found and the choice made.  *See U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 606 (D.C. Cir. 2016).

207.    The ESA also requires that agencies take responsibility "to ensure that [their] actions will no[t] jeopardize a listed species" under the ESA.  *See, e.g., Haw. Longline Ass'n v. Nat'l Marine Fisheries Serv.*, 281 F. Supp. 2d 1, 25 (D.D.C. 2003).

208.    NMFS violated the ESA by issuing a biological opinion that falls short of satisfying its statutory and regulatory responsibilities.  Specifically, the biological opinion:

   a.    does not properly establish the correct environmental baseline;

   b.    does not properly set forth the "[e]ffects of the action" by excluding the direct, indirect, interrelated, and cumulative effects of the Vineyard Wind lease and COP approval will likely have on endangered species and critical habitat, most notably the habitat of the North Atlantic Right Whale;

   c.    does not properly consider the impacts of the Vineyard Wind project on survival and recovery of endangered species in the project area;

d.    does not properly outline reasonable and prudent alternatives in its incidental take statement or the conditions for complying with those alternatives that would prevent an ESA violation;

e.    disregards the "best scientific and commercial data available" by failing to adequately consider research studies demonstrating that wind farms harm the marine environment more in the short-term than coal or gas emissions;

f.    disregards the "best scientific and commercial data available" by ignoring scientific data showing the prevalence of North Atlantic Right Whales in the lease area, the danger posed to North Atlantic Right Whales by increased boat traffic during construction, and the likelihood of substantial takes of the endangered North Atlantic Right Whale during construction of the Vineyard Wind project;

g.    disregards the "best scientific and commercial data available" by downplaying the substantial negative impact of pile driving on marine endangered species during construction of the Vineyard Wind lease; and

h.    disregards the "best scientific and commercial data available" by dismissing the impact that underwater noise produced by construction and turbine operation in the Vineyard Wind lease area will have on endangered species.

209.    NMFS violated the ESA by issuing a biological opinion that is legally flawed for the additional reasons set forth in items 1 through 49 of the 60-Day Notice letter dated May 24, 2021 sent on behalf of the Nantucket Residents Against Turbines.  *See* Exhibit D.

210.    NMFS's decision to issue a defective biological opinion is arbitrary, capricious, an abuse of discretion, in excess of statutory authority, without observance of procedure required by law, and otherwise not in accordance with law.  5 U.S.C. § 706(2)(A), (C), (D).

### Twelfth Claim for Relief

### BOEM VIOLATED THE ESA BY RELYING ON NMFS'S FLAWED BIOLOGICAL OPINION

### (Violation of 50 C.F.R. § 402.14(h); 5 U.S.C. § 706(2))

211.    The plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 210 as though fully set forth herein.

212.    The ESA and its attendant regulations require BOEM to "ensure that its actions will no[t] jeopardize a listed species."  50 C.F.R. § 402.14(h).  BOEM relied on the biological opinion, which did not follow this requirement.

213.    BOEM's decision to rely on NMFS' deeply flawed biological opinion is arbitrary, capricious, an abuse of discretion, in excess of statutory authority, without observance of procedure required by law, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A), (C), (D).

### Thirteenth Claim for Relief

### BOEM'S FAILURE TO REINITIATE CONSULTATION WITH NMFS AFTER RECEIVING NEW SCIENTIFIC STUDIES VIOLATED FEDERAL LAW

### (Violation of 50 C.F.R. § 402.14, 402.16; 5 U.S.C. § 706(2))

214.    The plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 213 as though fully set forth herein.

215.    After NMFS issued its flawed biological opinion and inadequate incidental take statement, BOEM received further scientific data regarding the Vineyard Wind lease area (detailed

in the Final EIS) that should have led it to modify the Vineyard Wind COP and reinitiate consultation with NMFS.  Specifically, the Final EIS found that:

    a.    The Vineyard Wind project will increase the risk of collision between marine vessels.  *See* Final EIS at 3-246.

    b.    The project will result in massive devastation of the marine environment if severe weather or a hurricane fells Vineyard Wind's turbines.  *See id.* at 3-81, 89, 219.

    c.    The project will disturb the coastal breeding grounds of the horseshoe crab, a species whose blood is an essential ingredient for life-saving medical tests and treatments.  *See id*. at 3-28.

    d.    The project will likely permanently harm, displace, and disturb existing fish, sea turtle, and marine mammal populations.  *See id.* at 3–43, 46, 75, 76, 103, 105.

216.    Federal regulations require BOEM and NMFS to use "the best scientific and commercial data available" to inform and evaluate NMFS's biological opinion and take statement. 50 C.F.R. § 402.14.

217.    BOEM failed to reinitiate consultation under 50 C.F.R. § 402.16 after receiving new scientific data that would have altered the biological opinion and incidental take statement.

218.    BOEM's failure to reinitiate consultation after receiving the new scientific data was arbitrary, capricious, an abuse of discretion, without observance of procedure required by law, and otherwise not in accordance with law.  5 U.S.C. § 706(2)(A), (C), (D).

**Fourteenth Claim for Relief**

**BOEM VIOLATED ITS OWN ESA REGULATIONS BY FAILING TO
REINITIATE CONSULTATION AFTER VINEYARD WIND SELECTED
PROTOTYPE WIND TURBINES**

**(Violation of 50 C.F.R. § 402.14, § 402.16; 5 U.S.C. § 706(2))**

219.    The plaintiffs reallege and incorporate by reference the allegations contained in
Paragraphs 1 through 218 as though fully set forth herein.

220.    At some point in the period December 2020 to January 2021, Vineyard Wind made
a final decision to use larger, prototype 13-14 MW Haliade-X wind turbines in the Vineyard Wind
area—turbines that NMFS had not assessed in the context of impact on endangered species.

221.    Prior to Vineyard Wind's decision, NMFS issued its flawed biological assessment
and take statement.

222.    In December 2020, Vineyard Wind withdrew its COP from consideration, citing a
need to further review its choice of turbines.  85 Fed. Reg. 81486 (2020).

223.    BOEM immediately terminated its process of deciding whether to approve the COP
in response to Vineyard Wind's withdrawal.  *Id*.

224.    On January 22, 2021, Vineyard Wind informed BOEM that its review was complete
and asked the Agency to revive the terminated process.  BOEM did so, impermissibly.

225.    BOEM failed to reengage in the consultation process with NMFS after Vineyard
Wind finalized its turbine plans, despite the novel nature and size of these prototype turbines, and
the increase in power needed to install and operate them.

226.    BOEM's decision not to reinitiate consultation with NMFS after Vineyard Wind
made the final decision to use the 13-14 MW Haliade X technology violated the ESA and its
attendant regulations and is therefore arbitrary, capricious, an abuse of discretion, in excess of

statutory authority, without observance of procedure required by law, and otherwise not in accordance with law.  5 U.S.C. § 706(2)(A), (C), (D).

### Fifteenth Claim for Relief

### BOEM VIOLATED THE ESA AND ITS ATTENDANT REGULATIONS BY FAILING TO CONSIDER THE IMPACT OF LIKELY CATASTROPHIC WEATHER EVENTS

### (Violation of 16 U.S.C. § 1536(a)(2); 5 U.S.C. § 706(2))

227.    The plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 226 as though fully set forth herein.

228.    The ESA requires agencies to insure that any action they take "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of critical habitat, using "the best scientific and commercial data available."  16 U.S.C. § 1536(a)(2).

229.    At some point prior to December 2020, Vineyard Wind made a decision to use larger, prototype wind turbines in the Vineyard Wind lease—turbines that no federal agency had ever assessed in the context of impact on endangered species.

230.    The draft environmental impact statement stated that the smaller turbines Vineyard Wind previously planned to use would "be designed to endure sustained wind speeds of up to 112 mph," which means that these turbines would not survive a category 3 or higher hurricane.  Draft EIS at 2–18.

231.    The final environmental impact statement, issued after Vineyard Wind adopted larger prototype wind turbines, included no language regarding whether such turbines could sustain wind speeds of a category 3 or higher hurricane.

232.    After impermissibly reviving Vineyard Wind's terminated COP approval process, BOEM approved the COP without considering whether Vineyard Wind's novel and nearly-

untested prototype turbines would have the structural integrity to withstand an adverse weather event of a category 3 or higher hurricane.

233.    BOEM failed to consider the structural integrity of Vineyard Wind's prototype 13-14 MW Haliade-X turbines when approving the COP despite scientific data showing the likely devastation that turbine failure would wreak upon the marine environment, including harm to and/or the possible extinction of the North Atlantic Right Whale and other endangered species in the lease area.

234.    BOEM's failure to consider whether Vineyard Wind's new turbines could survive a category 3 or higher hurricane before approving the Vineyard Wind COP violated the ESA and is arbitrary, capricious, an abuse of discretion, without observance of procedure required by law, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A), (C), (D).

**Sixteenth Claim for Relief**

**BOEM VIOLATED THE ESA BY FAILING TO REOPEN THE EIS AND ROD TO ADDRESS NMFS'S REVISED BIOLOGICAL OPINION AFTER BOEM APPROVED THE COP**

**(Violation of 50 C.F.R. § 402.14(h); 5 U.S.C. § 706(2))**

235.    The plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 234 as though fully set forth herein.

236.    On October 18, 2021, months after BOEM approved the Vineyard Wind COP, NMFS completed the reinstituted ESA consultation process and published major revisions to the Biological Opinion, which addressed serious risks to endangered species from noise, vessel traffic, and critical habitat and environmental conditions during construction, operation, and decommissioning activities in connection with the Vineyard Wind project.

237.    BOEM failed to reopen the Final EIS or ROD to address the second revised Biological Opinion

238.    BOEM has not rescinded its approval of the COP in light of the revised Biological Opinion.

239.    BOEM has not required Vineyard Wind to halt construction of the project pending review of the revised Biological Opinion.

240.    The ESA and its attendant regulations require BOEM to "ensure that its actions will no[t] jeopardize a listed species."  50 C.F.R. § 402.14(h).  BOEM's failure to address or take appropriate action to rescind the COP approval and put a halt to construction activities in light of NMFS's revised Biological Opinion violates this duty, and is arbitrary, capricious, an abuse of discretion, in excess of statutory authority, without observance of procedure required by law, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A), (C), (D).

### *CWA CLAIMS*

**Seventeenth Claim for Relief**

**THE CORPS OF ENGINEERS VIOLATED THE CLEAN WATER ACT BY FAILING TO REVIEW PRACTICABLE ALTERNATIVES OUTSIDE THE LEASE AREA**

**(Violation of 40 C.F.R. § 230.10(a); 33 C.F.R. § 320.4(a)(1); 5 U.S.C. § 706(2))**

241.    The plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 240 as though fully set forth herein.

242.    The CWA authorizes the Secretary of the Army (through the Corps) to issue permits for discharge of dredged or fill material into navigable waters after notice and opportunity for public hearings.  *See* 33 U.S.C. § 1344(a).

243.    The CWA prohibits the Corps from granting such a permit "if there is a practicable alternative" that would have "less adverse impact on the aquatic ecosystem" and "does not have

other significant adverse environmental consequences.  40 C.F.R. § 230.10(a).  An alternative is practicable if it is "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes," and such alternatives are not restricted to property owned or leased by the permit applicant.  *Id*. at (a)(2).

244.   The CWA requires the Corps to conduct a public interest review for every proposed discharge.  33 C.F.R. § 320.4(a)(1).

245.   The CWA prohibits the Corps from granting a permit that would not comply with the CWA's guidelines or would be contrary to the public interest.  *Id*.

246.   Despite its finding that the Vineyard Wind project is not water-dependent, the Corps restricted its analysis of practicable alternatives to sites in the water—simply because the existing Vineyard Wind lease was located in the ocean.  This restriction was arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and unsupported by the evidence.

247.   The Corps did not consider other practicable alternative locations for the Vineyard Wind project outside of the Vineyard Wind lease area—a failure that is arbitrary, capricious, an abuse of discretion, without observance of procedure required by law, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A), (C), (D).

**Eighteenth Claim for Relief**

**THE CORPS VIOLATED THE CLEAN WATER ACT AND ITS REGULATIONS
BY ERRONEOUSLY FINDING THAT THE PROJECT WOULD NOT
DISCHARGE INTO A SPECIAL AQUATIC SITE**

**(Violation of 33 C.F.R. § 320.4(a)(1), 40 C.F.R. § 230.10(a)(3); 5 U.S.C. § 706(2))**

248.   The plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 247 as though fully set forth herein.

249.     The CWA regulations define the term "special aquatic site" as "a geographic area that has "ecological characteristics of productivity, habitat, wildlife protection, or other important and easily disrupted ecological values."  40 C.F.R. § 230.3(m).

250.     The regulations state that "[w]here the activity associated with a discharge which is proposed for a special aquatic site . . . does not require access or proximity to or siting within the special aquatic site in question to fulfill its basic purpose (*i.e.*, is not "water dependent"), practicable alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise."  40 C.F.R. § 230.10(a)(3).

251.     The Corps erroneously concluded that the project would not discharge into a special aquatic site, violating the presumption set forth in § 230.10(a)(3).  Specifically, special aquatic sites for coral, eel grass, and wetlands are found in the 10-mile impact zone for the Vineyard Wind project.  *See* Supplemental EIS at ES–7; *see also* 40 C.F.R. § 230.41, 43, 44.

252.     The Corps' erroneous conclusion and any subsequent decisions resulting from it constitute agency action that is on its face arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).

### Nineteenth Claim for Relief

**THE CORPS OF ENGINEERS VIOLATED FEDERAL REGULATIONS BY FAILING TO DEMONSTRATE THAT THE VINEYARD WIND PROJECT DISCHARGES WILL NOT UNACCEPTABLY IMPACT THE ECOSYSTEM**

**(Violation of 40 C.F.R. § 230.1(c); 5 U.S.C. § 706(2))**

253.     The plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 252 as though fully set forth herein.

254.     40 C.F.R. § 230.1(c) states that "dredged or fill material should not be discharged into the aquatic ecosystem unless it can be demonstrated that such a discharge will not have an

unacceptable adverse impact either individually or in combination with known and/or probable impacts of other activities affecting the ecosystems of concern."

255.    The Corps did not consider the probable impacts of other activities in combination with the Vineyard Wind lease, including the planned hundreds of wind turbines that will dot the Outer Continental Shelf.

256.    Because the Corps did not consider the probable impacts of other, related activities, it failed to demonstrate that the Vineyard Wind project's discharges will not unacceptably impact the aquatic ecosystem, and its decision was therefore arbitrary, capricious, an abuse of discretion, without observance of procedure required by law, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A), (C), (D).

**Twentieth Claim for Relief**

**IN VIOLATION OF ITS OWN REGULATIONS, THE CORPS FAILED TO CONSIDER THE PUBLIC INTEREST WHEN REVIEWING THE VINEYARD WIND PROJECT**

**(Violation of 33 C.F.R. § 320.4(a)(1); 5 U.S.C. § 706(2))**

257.    The plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 256 as though fully set forth herein.

258.    Federal regulations require the Corps to find that a proposed project is in the public interest before issuing a permit.  33 C.F.R. § 320.4(a)(1).

259.    The Corps failed to show in its documentation that the Vineyard Wind project meets the public interest test because the documentation does not address:

    a.    the rise in temperatures at and near the project area due to the project's turbines;

    b.    the potential vulnerabilities to the electrical grid caused by relying on so much energy from one source (namely offshore wind power);

c.      the impact on the commercial fishing industry;

d.      harm to endangered species and their critical habitat; or

e.      adverse impacts on food supply.

260.    The Corps violated 33 C.F.R. § 320.4(a)(1) by failing to show that the Vineyard Wind project is in the public interest, and accordingly, its review and approval of the Vineyard Wind lease was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

261.    Certain compounds found in horseshoe crab blood are essential and necessary for gold-standard endotoxin testing, which is required for all drugs (including vaccines), and many implantable medical devices.

262.    The Vineyard Wind lease is located in horseshoe crab habitat, and the COP proposes running cables through horseshoe crab habitat.

263.    The Vineyard Wind project's turbine foundations, scour protection, cabling, electromagnetic fields from cables, and cable installation will all harm existing horseshoe crab populations.

264.    The Corps did not conduct appropriate impacts analysis of offshore wind farm construction to the U.S. medical supply based on threats to horseshoe crabs.

265.    The Corps failed to properly consider the public interest when dealing with adverse impacts of the Vineyard Wind project on area horseshoe crab populations, and therefore violated 33 C.F.R. § 320.4.  Because the Corps violated this regulation, its review and approval of the Vineyard Wind project constitutes agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A), (C), (D).

*MMPA CLAIMS*

**Twenty-First Claim for Relief**

**NMFS VIOLATED THE MMPA BY ALLOWING THE TAKE AND HARASSMENT OF MARINE MAMMALS WITHOUT PROPER CONSIDERATION**

**(Violation of 16 U.S.C. § 1373(b); 5 U.S.C. § 706(2))**

266.    The plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 265 as though fully set forth herein.

267.    The MMPA requires the Secretary of NMFS to "give full consideration to all factors which may affect the extent to which such animals may be taken[,]" before prescribing regulations with respect to a taking, including:

      a.      current and future population levels of marine mammal species;

      b.      the marine ecosystem and related environmental matters;

      c.      conserving, developing, and using fishery resources; and

      d.      how economically and technologically feasible implementation of a regulation may be.

16 U.S.C. § 1373(b)(1), (3)–(5).

268.    In its Incidental Harassment Authorization ("IHA") for the Vineyard Wind project, NMFS authorized the take and harassment of certain marine mammals.

269.    NMFS authorized this take and harassment without properly considering the best scientific evidence available or adequately analyzing the impact of certain project elements, including:

      a.      the increase in local temperatures in the project area attributable to the project's wind turbine generators;

      b.      potential catastrophic oil spills from the generators;

c.      potential impacts of severe hurricanes to the generators;

d.      vessel strikes during construction and maintenance activities;

e.      ocean noise from construction and operation activities;

f.      sudden changes to the project's scope and design envelope without corresponding studies or analysis;

g.      dredged material causing harmful impacts to the ocean habitat;

h.      loss of habitat for endangered species, including but not limited to the North Atlantic right whale; and

i.      failure to account for the sizable risk this project poses to the North Atlantic right whale species in particular.

270.    This failure to properly consider "the well-being of . . . marine mammals" violates the "primary goal of the MMPA . . . ." *Comm. for Humane Legis., Inc. v. Richardson*, 414 F. Supp. 297, 308–09 (D.D.C. 1976) (opining that "even the use of the best technology available cannot justify results inconsistent with the purpose of the Act" and that the take of marine mammals "may not be authorized if the impact is to the disadvantage of the mammals involved").

271.    NMFS's decision to allow the take of marine mammals without considering relevant factors is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, or without observance of procedure required by law.  5 U.S.C. § 706(2)(A), (C), (D).

**Twenty-Second Claim for Relief**

**NMFS VIOLATED THE MMPA BY ALLOWING A TAKING LASTING LONGER THAN ONE (1) YEAR**

**(Violation of 16 U.S.C. § 1371(a)(5)(D)(i); 5 U.S.C. § 706(2))**

272.    The plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 271 as though fully set forth herein.

273.    The MMPA allows NMFS to authorize (for one year or less) "the incidental, but not intentional, taking by harassment of small numbers of marine mammals" if NMFS finds that the harassment "will have a negligible impact on such species or stock . . . ."  16 U.S.C. § 1371(a)(5)(D)(i).

274.    NMFS has failed to provide evidence that:

    a.    the takes from the Vineyard Wind project will only affect small numbers of marine mammals;

    b.    the Vineyard Wind project would have a negligible impact on marine mammal species or stocks; or

    c.    the project will be completed within a year of the issuance of NMFS's IHA.

275.    Even if NMFS had provided this evidence, NMFS's incidental take authorization would still have violated the MMPA because the take of marine mammals will continue to occur even beyond the end of the useful life of the project, far exceeding the one-year statutory limitation on an IHA and the five-year statutory limitation on permitting applicable here.

276.    Accordingly, NMFS's *ultra vires* approval of the Vineyard Wind project is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A), (C), (D).

*NEPA CLAIMS*

**Twenty-Third Claim for Relief**

**BOEM, THE CORPS, AND NMFS VIOLATED NEPA BY DEFINING THE PURPOSE OF THE ACTION IN CONNECTION WITH THE VINEYARD WIND COP TOO NARROWLY**

**(Violation of 42 U.S.C. § 4331(b)–(c); 5 U.S.C. § 706(2))**

277.    The plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 276 as though fully set forth herein.

278.    In its Record of Decision ("ROD"), BOEM, the Corps, and NMFS state that

> [t]he purpose of the [agency action on the Vineyard Wind COP] is to determine whether to approve, approve with modifications, or disapprove the COP . . . to meet *New England's demand* for renewable energy.  More specifically, the proposed Project would deliver power to the New England Energy grid to contribute to *Massachusetts' renewable energy requirements*—particularly, *the Commonwealth's mandate that distribution companies jointly and competitively solicit proposals* for offshore wind energy generation . . . .

ROD § 2.2 (emphasis added).  In essence, the ROD states that the purpose of the federal action is to ensure that Massachusetts' energy requirements under state law are met.

279.    The ROD also states that BOEM, the Corps, and NMFS used "Vineyard Wind's contractual obligation with the Commonwealth of Massachusetts to deliver the generated energy to the Massachusetts power grid" as a major criterion when deciding whether to approve the COP. *See* ROD at 32.

280.    BOEM, the Corps, and NMFS decided to unreasonably, arbitrarily, and capriciously cabin the purpose of their federal action to the goal of complying with Massachusetts state law.

281.    This impermissible decision predetermines the result of the federal action and allows state law to hold federal policymaking hostage, essentially abrogating federal responsibility to a state legislature.  *Citizens against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991) (holding that "[an] agency may not define the objectives of its action in terms so unreasonably narrow that only one alternative . . . would accomplish the agency's action . . . .").

282.    The statement of purpose violates NEPA by tying the specific purpose of this federal action to state-determined renewable energy requirements, rather than following the factors Congress intended for agencies to consider under NEPA.  *See* 42 U.S.C. § 4331(b)–(c); *see also Nat'l Ass'n of Home Builders v. Defs. of Wildlife,* 551 U.S. 644, 658 (2007) (stating that it is arbitrary and capricious for an agency's decision to rely "on factors Congress did not wish it to consider").

283.    The decision violates NEPA by aiming the federal action's purpose at ensuring distributor compliance with a single state's energy policies and statutes.  This purpose is *ultra vires*, arbitrary, capricious, and unreasonably narrow.  And it has no relevance to any of the factors Congress wished federal agencies to consider when evaluating a COP.  *See* 42 U.S.C. § 4331(b)–(c).

284.    By using the COP's sponsor's contractual obligations as a major factor when determining whether to approve the COP, BOEM, the Corps, and NMFS violated NEPA by allowing existing private contracts to define the need for the project, thereby impermissibly predetermining the outcome of their review and taking agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, or without observance of procedure required by law.  5 U.S.C. § 706(2)(A), (C), (D).

**Twenty-Fourth Claim for Relief**

**BOEM, THE CORPS, AND NMFS VIOLATED NEPA BY FAILING TO PROPERLY CONSIDER A REASONABLE RANGE OF ALTERNATIVES TO THE COP**

**(Violation of 40 C.F.R. 1500.2(e) and 40 C.F.R. § 1502.14(a); 5 U.S.C. § 706(2))**

285.   The plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 284 as though fully set forth herein.

286.   NEPA's implementing regulations require federal agencies to "[u]se the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment."  40 C.F.R. § 1500.2(e).

287.   NEPA's implementing regulations also characterize assessing and identifying reasonable alternatives as "the heart of the environmental impact statement" and require agencies to "rigorously explore and objectively evaluate all reasonable alternatives to proposed actions." 40 C.F.R. § 1502.14.

288.   As the lead agency in connection with the NEPA review of the Vineyard Wind project, BOEM applied its *ultra vires* "Smart From The Start" program by impermissibly limiting the range of alternatives to only those within the geographic area of Lease OCS-A-0501, thereby violating NEPA's requirement to review a reasonable range of alternatives.

289.   BOEM, the Corps, and NMFS decided to grant the Vineyard Wind COP and allow the project to go forward in the lease area, knowing that their failure to adequately review reasonable alternatives outside of the lease area would decimate the commercial fishing industry and related shoreside businesses.  *See* ROD at 39 (stating that "due to the placement of the turbines it is likely that the entire [lease] area will be abandoned by commercial fisheries due to difficulties with navigation").

67

290.   BOEM, the Corps, and NMFS violated NEPA by failing to diligently explore and dispassionately evaluate all reasonable alternatives to placing the Vineyard Wind project in the lease area.

291.   The unduly narrowly-defined nature of the federal action impermissibly cabined the range of reasonable alternatives that BOEM, the Corps, and NMFS considered, essentially limiting them to approving the Vineyard Wind project in the lease area or nowhere at all.  This transformed the agencies' review of the COP into a rubber stamp, not the hard look federal law requires, and constitutes a violation of NEPA.

292.   BOEM, the Corps, and NMFS also violated NEPA by impermissibly and summarily dismissing significant, concrete, reasonable alternatives to locating the Vineyard Wind project in the lease area during the comment process without adequate explanation, including:

     a.   proposals made by Seafreeze that the COP should not be approved until the agencies could fully analyze radar interference caused by Vineyard Wind with search-and-rescue operations;

     b.   comments showing that the COP's structural analysis was flawed and should be changed;

     c.   concrete proposals to eliminate certain important fishery areas of the lease from the COP;

     d.   concrete proposals showing that Vineyard Wind's decision to use larger turbines would have cumulative impacts necessitating further analysis;

     e.   comments urging consideration of the devastating impact the Vineyard Wind project would have on fisheries, specifically the longfin squid fishery;

f.  concrete proposals regarding compensation for commercial fishermen and shoreside industries negatively impacted by the Vineyard Wind Project;

g.  the proposal of the High Frequency Radar Wind Turbine Interference Community Working Group dated June 2019; and

h.  the proposal of a reasonable alternative that set forth proposed transit lanes in the lease area to ensure safety and viability of commercial fishing operations put forward by the Responsible Offshore Development Alliance ("RODA").

293.  This lack of full and fair consideration of a reasonable range of alternatives available outside the area of Lease OCS-A-0501 and the full and fair consideration of proposals submitted by the public within the area of Lease OCS-A-0501 was arbitrary, capricious, an abuse of discretion, in excess of statutory authority, without observance of procedure required by law, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A), (C), (D).

**Twenty-Fifth Claim for Relief**

**BOEM, THE CORPS, AND NMFS VIOLATED NEPA BY FAILING TO COMPLY WITH REQUIREMENTS FOR ANALYZING CUMULATIVE IMPACTS**

**(Violation of 40 C.F.R. § 1508.7; 5 U.S.C. § 706(2))**

294.  The plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 293 as though fully set forth herein.

295.  NEPA's implementing regulations define "cumulative impact" as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and *reasonably foreseeable* future actions . . . ."  40 C.F.R. 1508.7 (emphasis added).

296.    In the decision documents, BOEM did not account for its own plans to develop whole swaths of the Outer Continental Shelf for wind energy generation when assessing cumulative impact in the environmental assessment connected to the Vineyard Wind COP.

297.    BOEM, the Corps, and NMFS did not take into account the "foreseeable" impacts outside of the COP area associated with BOEM's set plans to place wind farms across much of the outer Continental Shelf when compiling the Final EIS or the ROD.

298.    This failure to account for reasonably foreseeable future actions when analyzing cumulative impact under NEPA is arbitrary, capricious, an abuse of discretion, in excess of statutory authority, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A), (C), (D).

### Twenty-Sixth Claim for Relief

### BOEM, THE CORPS, AND NMFS FAILED TO COMPLY WITH RELEVANT NEPA IMPLEMENTING REGULATIONS

### (Violation of 40 C.F.R. § 1502.22; 5 U.S.C. § 706(2))

299.    The plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 298 as though fully set forth herein.

300.    NEPA's implementing regulations require agencies to follow certain steps when there is "incomplete information relevant to reasonably foreseeable significant adverse impacts." *See* 40 C.F.R. §§ 1502.22(a)–(b).

301.    BOEM, the Corps, and NMFS did not follow those steps despite a lack of information relevant to multiple reasonably foreseeable adverse impacts of the Vineyard Wind project, including:

      a.    the oil spill risks associated with Vineyard Wind's prototype wind turbines;

      b.    the environmental risks associated with pile-driving installation of these turbines;

c.      the impact operational underwater sound associated with the installation

and operation of these turbines could have on marine life and resources;

d.      the impact of electrical discharge from generators and cabling into the

marine environment; and

e.      the adverse impact Vineyard Wind will have on commercial fishermen and

onshore seafood processors.

302.    This failure to follow these NEPA implementing regulations caused these agencies

to arbitrarily limit not only the consideration of cumulative impacts but also their "reasoned choice

among alternatives," and is therefore arbitrary, capricious, an abuse of discretion, in excess of

statutory authority, without observance of procedure required by law, or otherwise not in

accordance with law.  5 U.S.C. § 706(2)(A), (C), (D).

### Twenty-Seventh Claim for Relief

### BOEM IMPERMISSIBLY LIMITED THE SCOPE OF THE EIS TO THE VINEYARD WIND PROJECT AREA

### (Violation of 40 C.F.R. § 1508.25(a)(1)(iii); 5 U.S.C. 706(2))

303.    The plaintiffs reallege and incorporate by reference the allegations contained in

Paragraphs 1 through 302 as though fully set forth herein.

304.    In the ROD for the Vineyard Wind project, BOEM, the Corps, and NMFS stated

that the purpose of BOEM's decision on the COP was "to carry out its duty . . . in furtherance of

the United States Policy to make OCS energy resources available for expeditious and orderly

development."

305.    NEPA's implementing regulations state that if an agency action is one of many

"interdependent parts of a larger action," it "depends on the larger action for [its] justification."

40 C.F.R. § 1508.25(a)(1)(iii).

306.    BOEM's analysis of the "reasonably foreseeable effects measured by installed power capacity," Final EIS at 1–5, was inappropriately narrow because it did not adequately examine the cumulative environmental impact of offshore wind development on neighboring lease areas, the broader Atlantic coast, the Pacific coast, or the Gulf coast.

307.    The Vineyard Wind Final EIS considered only 22 GW of Atlantic offshore wind development "reasonably foreseeable" when the already-pledged target commitment was 30 GW—making its environmental impact analysis inadequate. *See* FEIS, p. 1–6.

308.    BOEM failed to identify the proper scope of analysis for cumulative impact in the Final EIS.

309.    BOEM's failures in this area render its EIS fundamentally flawed, arbitrary, capricious, and otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).

**Twenty-Eighth Claim for Relief**

**BOEM, THE CORPS, AND NMFS VIOLATED NEPA BY FAILING TO MAKE DILIGENT EFFORTS TO INVOLVE THE PUBLIC**

**(Violation of 40 C.F.R. § 1506.6; 5 U.S.C. § 706(2))**

310.    The plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 309 as though fully set forth herein.

311.    NEPA's implementing regulations require agencies to make "diligent efforts to involve the public in preparing and implementing their NEPA procedures."  40 C.F.R. § 1506.6.

312.    BOEM repeatedly failed to engage with the public when preparing and implementing decisions related to Vineyard Wind, instead relying on state agencies and their appointed boards (including the Rhode Island Fisheries Advisory Board ("FAB") and the Rhode Island Coastal Resources Management Council ("CRMC")) to do this for them.

313.    The FAB did not engage with a significant and relevant portion of the public (namely, offshore squid trawl fishermen, shoreside businesses, and any offshore fishing interests from the State of New York) when considering and developing mitigation measures.  Instead, it conducted these negotiations behind closed doors.

314.    BOEM did not provide offshore squid trawl fishermen, shoreside businesses, or New York offshore fishing interests with substantive opportunity to actively participate in and access documents relating to these negotiations.

315.    BOEM did not include any economic catch data or consider traditional fishing grounds important to New York-based commercial fishermen, leaving these interests with no safe or sufficient transit lane for travel to or from their fishing grounds.

316.    BOEM impermissibly delegated to the Commonwealth of Massachusetts the task of negotiating certain commercial fishing mitigation measures for Vineyard Wind.  Massachusetts then failed to garner substantial input on these measures from commercial fishermen.

317.    These failures to involve the public in preparation and implementation of NEPA procedures with respect to Vineyard Wind are arbitrary, capricious, an abuse of discretion, without observance of procedure required by law, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A), (C), (D).

**Twenty-Ninth Claim for Relief**

**THE DEFENDANTS VIOLATED NEPA BY FAILING TO ADEQUATELY EXPLAIN WHY CERTAIN COMMENTS DO NOT WARRANT A FURTHER RESPONSE**

**(Violation of 40 C.F.R. § 1503.4(a)(5); 5 U.S.C. § 706(2))**

318.    The plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 317 as though fully set forth herein.

319.    NEPA's implementing regulations require agencies to adequately cite "the sources, authorities, or reasons which support the agency's position . . . [and] indicate those circumstances which would trigger agency reappraisal or further response."  40 C.F.R. § 1503.4(a)(5).

320.    These regulations also require agencies to explain why certain comments "do not warrant further agency response."  *Id.*

321.    BOEM and other agencies involved in responding to specific public comments did not adequately cite their sources or sufficiently explain why comments do not warrant further response.  These comments include:

    a.    Comment 1063-002, which concerned fisheries mitigation and compensation;

    b.    Comment 0076-004, which questions the sufficiency of the purpose and need statement for the purposes of NEPA;

    c.    Comment 13185-017, which pointed out BOEM's failure to consider the cumulative impact of fisheries mitigation plans and associate compensation;

    d.    Comment 13185-018, which addressed BOEM's failure to fully analyze impacts to shoreside businesses or gather enough peer review or public input; and

    e.    All comments made by Seafreeze Ltd. regarding the last-minute increase in megawatt capacity for each wind turbine generator without adequate analysis.

322.    The defendants' failure to provide adequate explanation and sourcing for their responses to comments is arbitrary, capricious, an abuse of discretion, without observance of

procedure required by law, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A), (C), (D).

### Thirtieth Claim for Relief

### THE DEFENDANTS VIOLATED NEPA BY FAILING TO ATTACH SUBSTANTIVE COMMENTS TO THE FINAL STATEMENT

### (Violation of 40 C.F.R. § 1503.4(b); 5 U.S.C. § 706(2))

323.    The plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 322 as though fully set forth herein.

324.    Federal regulations require an agency to attach "all substantive comments received on the draft statement (or summaries thereof where the response has been exceptionally voluminous) to the final statement."  40 C.F.R. § 1503.4(b).

325.    The defendants did not attach all substantive comments to the final statement.

326.    The defendants' failure to attach such comments is arbitrary, capricious, an abuse of discretion, without observance of procedure required by law, and otherwise not in accordance with law.  5 U.S.C. § 706(2)(A), (C), (D).

### Thirty-First Claim for Relief

### THE DEFENDANTS VIOLATED NEPA AND THE APA BY FAILING TO PREPARE AN EIS PRIOR TO ISSUING THE VINEYARD WIND LEASE

### (Violation of 40 C.F.R. § 1501.3, 40 C.F.R. § 1502.14; 5 U.S.C. § 706(2))

327.    The plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 326 as though fully set forth herein.

328.    NEPA's implementing regulations require any action that "[i]s likely to have significant effects" on the environment to include an environmental impact statement ("EIS").  40

C.F.R. § 1501.3(a).  Alternatively, any action that "is not likely to have significant effects or the significance of the effects is unknown" requires only an environmental assessment ("EA").  *Id*.

329.   When considering whether the effects are significant, agencies "analyze the potentially affected environment and the degree of the effects of the action," and consider connected actions as well.  40 C.F.R. § 1501.3(b).

330.   Agencies must consider "the affected area . . . and its resources, such as listed species and designated critical habitat under the Endangered Species Act" when deciding whether the environment will be potentially affected.  *Id*.

331.   Agencies must also consider "[b]oth short- and long-term effects . . . [b]oth beneficial and adverse effects . . . [e]ffects on public health and safety . . . [and e]ffects that would violate Federal . . . law protecting the environment" when determining the degree of the action's effects. *Id*.

332.   When BOEM issued the Vineyard Wind lease, it conducted an EA, but did not issue an EIS.

333.   The Vineyard Wind lease sits directly on designated critical habitat for the endangered North Atlantic Right Whale.

334.   Construction and operation of the Vineyard Wind project will disrupt and harm the ocean environment in the short and long term, likely decreasing marine populations due to physical construction, undersea noise, and electrical discharge.

335.   BOEM foresaw or should have foreseen these significant adverse effects when it chose not to issue an environmental impact statement before leasing Vineyard Wind.

336.   By failing to prepare an EIS for Vineyard Wind prior to leasing, BOEM did not consider a reasonable range of alternative locations for wind energy construction and therefore

shirked its duty to "[e]valuate reasonable alternatives to the proposed action . . . ."  40 C.F.R. § 1502.14(a).

337.    BOEM's decision not to issue an environmental impact statement in connection with the issuance of the lease is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, or without observance of procedure required by law.  5 U.S.C. § 706(2)(A), (C), (D).

### Thirty-Second Claim for Relief

### BOEM VIOLATED NEPA BY SEGMENTING ITS NEPA ANALYSIS

### (Violation of 40 C.F.R. § 1508.25; 5 U.S.C. § 706(2))

338.    The plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 337 as though fully set forth herein.

339.    When preparing an EA, an agency must give a hard look toward "connected actions" within the same EA, including actions that are "interdependent parts of a larger action and depend on the larger action for justification."  *See* 40 C.F.R. § 1508.25.

340.    BOEM improperly segmented its NEPA analysis by "divid[ing] connected, cumulative, or similar federal actions into separate projects and thereby fail[ing] to address the true scope and impact of the activities that should be under consideration."  *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014).

341.    Because BOEM improperly segmented its analysis, it failed to consider foreseeable impacts of a wind energy farm in the lease area on fisheries, ocean and benthic fish habitat, protected species, and navigation before issuing the final lease notice.

342.    BOEM's decision to segment its NEPA analysis is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, or without observance of procedure required by law.  5 U.S.C. § 706(2)(A), (C), (D).

### Thirty-Third Claim for Relief

### THE DEFENDANTS VIOLATED NEPA BY USING OUTDATED NEPA REGULATIONS TO DEMONSTRATE CURRENT COMPLIANCE

### (5 U.S.C. § 706(2))

343.    The plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 342 as though fully set forth herein.

344.    The defendants prepared the Final EIS and ROD under NEPA regulations in effect before September 14, 2020 because "BOEM's NEPA review of the proposed Project *began* prior to . . . September 14, 2020."  ROD at 3 n.1 (emphasis added).

345.    The defendants issued the Final EIS in March 2021 and issued the ROD in May 2021.

346.    The defendants did not refer to or use then-current NEPA regulations in the Final EIS or ROD.

347.    The defendants' decision to use prior, outdated NEPA regulations to demonstrate compliance with NEPA's procedural requirements is arbitrary, capricious, an abuse of discretion, without observance of procedure required by law, and otherwise not in accordance with law.  5 U.S.C. § 706(2)(A), (C), (D).

### VII.    PLAINTIFFS' PRAYERS FOR RELIEF

WHEREFORE, Plaintiffs respectfully seek an Order of this Court:

A.    Declaring, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, that the (1) the issuance, publication, and award of the Vineyard Wind lease, (2) the issuance of the Vineyard Wind FEIS and the ROD, and (3) the approval of the Vineyard Wind COP were in violation of OCSLA, ESA, CWA, MMPA, and NEPA and their implementing regulations, constituting acts and omissions that were *ultra vires*, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, or without observance of procedure required by law;

B.    Holding unlawful, vacating, and setting aside (1) the issuance, publication, and award of the Vineyard Wind lease, (2) the issuance of the Vineyard Wind FEIS and the ROD, and (3) the approval of the Vineyard Wind COP;

C.    Enjoining all further wind farm construction and related activity within the Vineyard Wind lease area;

D.    Enjoining all further wind farm construction and related activity within any leases awarded under the "Smart From The Start" program;

E.    Enjoining the Federal Defendants from accepting submissions for wind leases under the Smart From The Start program;

F.    Retaining continuing jurisdiction of this matter until Federal Defendants fully remedy the violations of law complained of herein;

G.    Awarding financial compensation and full restitution to Plaintiffs for Federal Defendants' *ultra vires*, arbitrary, capricious, and unlawful actions in (1) issuing, publishing, and awarding the Vineyard Wind lease, (2) issuing the FEIS and ROD; and (3) approving the Vineyard Wind COP;

H.      Awarding Plaintiffs their costs and attorney fees as appropriate; and

I.      Providing such other relief as is just and proper.

DATED: December 15, 2021          Respectfully submitted,

*/s/Theodore Hadzi-Antich*
THEODORE HADZI-ANTICH
CA Bar No. 264663
tha@texaspolicy.com
ROBERT HENNEKE
TX Bar No. 24046058
rhenneke@texaspolicy.com
CONNOR MIGHELL (*Application for Admission Pending*)
TX Bar No. 24110107
cmighell@texaspolicy.com
TEXAS PUBLIC POLICY FOUNDATION
901 Congress Avenue
Austin, Texas 78701
Telephone:     (512) 472-2700
Facsimile:     (512) 472-2728

## CERTIFICATE OF SERVICE

I hereby certify that on December 15, 2021, I electronically filed the foregoing Complaint for Declaratory and Injunctive Relief, Exhibits A-D, and this Certificate of Service with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system.  In accordance with Fed. R. Civ. Proc. 4, I am causing to be served one true and correct copy of the filed documents via certified mail, along with a summons, on each of the following persons:

Matthew M. Graves
U.S. Attorney for the District of Columbia
555 4th Street NW
Washington, DC 20530

The United States Department of the Interior
1849 C Street NW
Washington, DC 20240

The Honorable Deb Haaland,
in her official capacity as the
Secretary of the Department of the Interior
1849 C Street NW
Washington, DC 20240

The Bureau of Ocean Energy Management
1849 C Street NW
Washington, DC 20240

Amanda Lefton,
in her official capacity as the Director of the
Bureau of Ocean Energy Management
Office of Public Affairs
1849 C Street NW
Washington, DC 20240

Laura Daniel-Davis,
in her official capacity as
Principal Deputy Assistant Secretary
Land and Minerals Management
U.S. Department of the Interior
1849 C Street NW
Washington, DC 20240

The United States Department of Commerce
1401 Constitution Avenue NW
Washington, DC 20230

The Honorable Gina M. Raimondo,
in her official capacity as the Secretary of the
U.S. Department of Commerce
1401 Constitution Avenue NW
Washington, DC 20230

The National Oceanic and Atmospheric
Administration/National Marine Fisheries
Service
U.S. Department of Commerce
1401 Constitution Avenue NW, Room 5128
Washington, DC 20230

The United States Department of Defense
101 Army Pentagon
Washington, DC 20310-0101

Catherin Marzin,
in her official capacity as the
Deputy Director of NOAA Fisheries and
Acting Director of the National Marine
Fisheries Service Office of
Protected Resources
U.S. Department of Commerce
1315 East-West Highway, 13th Floor
Silver Springs, MD 20910

Colonel John A. Atilano II,
in his official capacity as the
District Engineer of the New England District
U.S. Army Corps of Engineers
U.S. Department of the Army
696 Virginia Road
Concord, MA 01742-2751

The Honorable Lloyd J. Austin,
in his official capacity as the Secretary of the
U.S. Department of Defense
1000 Defense Pentagon
Washington, DC 20301-1000

Lt. Gen. Scott A. Spellmon,
in his official capacity as the
Commander and Chief of Engineers of the
U.S. Army Corps of Engineers
441 G Street NW
Washington, DC 20314-1000

The United States Army Corps of Engineers
441 G Street NW
Washington, DC 20314-1000


*/s/Theodore Hadzi-Antich*
THEODORE HADZI-ANTICH