# EXHIBIT A



September 17, 2021

**BY EMAIL AND FEDERAL EXPRESS**

Gina M. Raimondo
Secretary of Commerce
U.S. Department of Commerce
1401 Constitution Avenue NW
Washington, DC 20230
secyraimondo@doc.gov

Leslie Kiernan
General Counsel
U.S. Department of Commerce
1401 Constitution Avenue NW
Washington, DC 20230
LKiernan@doc.gov

Janet Coit
Assistant Administrator
National Marine Fisheries Service
U.S. Department of Commerce
1401 Constitution Avenue NW, Room 5128
Washington, DC 20230
janet.coit@noaa.gov

Richard W. Spinrad, Ph.D.
Under Secretary of Commerce
Oceans and Atmosphere
U.S. Department of Commerce
1401 Constitution Avenue NW, Room 5128
Washington, DC 20230
richard.spinrad@noaa.gov

Deb Haaland
Secretary of the Interior
U.S. Department of the Interior
1849 C Street NW
Washington, DC 20240
feedback@ios.doi.gov

Laura Daniel-Davis
Principal Deputy Assistant Secretary
Land and Mineral Management
U.S. Department of the Interior
1849 C Street NW
Washington, DC 20240
feedback@ios.doi.gov

Amanda Lefton
Director
The Bureau of Ocean Energy Management
Office of Public Affairs
1849 C Street, NW
Washington, DC 20240
amanda.lefton@boem.gov

Robert Anderson
Principal Deputy Solicitor
U.S. Department of the Interior
1849 C Street NW
Washington, D.C. 20240
feedback@ios.doi.gov

September 17, 2021
Page 2

Lloyd J. Austin III
U.S. Secretary of Defense
U.S. Department of Defense
1000 Defense Pentagon
Washington, DC 20301-1000
dpcintrn@osd.pentagon.mil

Christine Wormuth
U.S. Secretary of the Army
Department of Defense
101 Army Pentagon
Washington, DC 20310-0101
dpcintrn@osd.pentagon.mil

Caroline Krass
General Counsel
U.S. Department of Defense
1000 Defense Pentagon
Washington, D.C. 20301-1000
dpcintern@osd.pentagon.mil

Lt. Gen. Scott A. Spellmon
Commander and Chief of Engineers
U.S. Corps of Engineers
441 G Street NW
Washington, DC 20314-1000
scott.a.spellmon@mail.mil

Peter Neronha
Attorney General, State of Rhode Island
150 South Main Street
Providence, RI 02903
peter.neronha@riag.ri.gov

Daniel McKee
Governor, Rhode Island
Office of the Governor
82 Smith Street
Providence, RI 02903
governor@governor.ri.gov

Catherine Marzin
Deputy Director
NOAA Fisheries
Office of Protected Resources
U.S. Department of Commerce
1315 East-West Highway, 13th Floor
Silver Spring, MD 20910
catherine.marzin@noaa.gov

Charlie Baker
Governor, State of Massachusetts
Massachusetts State House
Office of the Governor
24 Beacon Street, Room 360
Boston, MA 02133
ago@state.ma.us

Maura Healey
Attorney General, State of Massachusetts
1 Ashburton Place, 20th Floor
Boston, MA 02108
ago@state.ma.us

John A. Atilano II
Colonel, Corps of Engineers
District Engineer
New England District
U.S. Army Corps of Engineers
U.S. Department of the Army
696 Virginia Road
Concord, MA 01742-2751
cenae-pa@usace.army.mil

Letitia James
Attorney General, State of New York
1 Empire State Plaza
The Capitol
Albany, NY 12224-0341
letitia.james@ag.ny.gov

901 Congress Avenue, Austin, TX 78701      512-472-2700      FAX 512-472-2728      www.texaspolicy.com

September 17, 2021
Page 3

Lars Thaaning Pedersen
Chief Executive Officer
Vineyard Wind, Inc.
700 Pleasant Street, Suite 510
New Bedford, MA 02740
lpedersen@vineyardwind.com

The Honorable Kathy Hochul
Governor, State of New York
NYS State Capitol Building
Albany, NY 12224
gov.hochul@chamber.state.ny.us

> RE:   **Notice of Violations of Law under the Outer Continental Shelf Lands Act, the
> Endangered Species Act, the Clean Water Act, the Marine Mammal
> Protection Act, and the National Environmental Policy Act in Connection with
> the Vineyard Wind -1 Project with Regard to Lease OCS-A 0501 on the Outer
> Continental Shelf**

Dear Secretaries, Directors, Commanders, Governors, General Counsel, Attorneys General and
Other Addressees:

Pursuant to the citizen suit provisions of the Outer Continental Shelf Lands Act, 43 U.S.C.
§ 1349(a)(2)(A) ("OCSLA"), the Endangered Species Act, 16 U.S.C. § 1540(g)(1)(A) and (C) and
16 U.S.C. § 1540 (g)(2)(A) and (B) ("ESA"), and the Clean Water Act, 33 U.S.C. § 1365(b)
("CWA") (and in accordance with 40 CFR § 135.3 implementing the notice provisions of the
CWA), on behalf of XIII Northeast Fishery Sector, Inc., Heritage Fisheries, Inc., Nat. W. Inc.,
Seafreeze Shoreside, Inc., Long Island Commercial Fishing Assoc., Inc., and Old Squaw Fisheries,
Inc., we hereby provide you with this 60-Day Notice of Violations of OCSLA, ESA, and CWA
committed by your respective departments, divisions, branches, other governmental units and/or
their respective officers and/or employees in connection with the Vineyard Wind – 1 Project with
regard to Lease OCS-A 0501 on the Outer Continental Shelf (the "Vineyard Wind Project" or the
"Project"). This notice letter is hereby also provided to the other addressees as may be required
by law.

In addition, although not required by law, this letter provides you with notice of violations
of the Marine Mammal Protection Act ("MMPA") and the National Environmental Policy Act
("NEPA") committed by your respective departments, divisions, branches, other governmental
units and/or their respective officers and/or employees in connection with the Vineyard Wind
Project. Furthermore, this notice letter describes your actions and failures to act that are
inconsistent with or otherwise in violation of the requirements of the Administrative Procedure
Act ("APA").

After the expiration of the 60-Day Notice Period, we plan to file a complaint in the
appropriate federal court for relief on behalf of our clients.

September 17, 2021
Page 4

## VIOLATIONS OF OCSLA COMMITTED BY THE DEPARTMENT OF THE INTERIOR, THE BUREAU OF OCEAN ENERGY MANAGEMENT, AND THEIR OFFICERS AND/OR EMPLOYEES (COLLECTIVELY "BOEM")

**A.    Violations Based on Awarding Lease OCS-A 0501**

1.    BOEM violated its duties under OCSLA by issuing and publishing the Final Sale Notice ("FSN") in 79 Fed. Reg. 70545 (November 26, 2014) and awarding Lease OCS-A 0501 via a competitive lease sale held in January 2015 to Offshore MW LLC (which subsequently changed its name to Vineyard Wind LLC) without first adhering to the criteria set forth in 43 U.S.C. § 1337(p)(4).  Lease OCS-A 0501 became effective on April 1, 2015.  Specifically:

      a.    BOEM failed to ensure that issuance of Lease OCS-A 0501 was carried out in a manner that provides for safety, protection of the environment, prevention of waste, conservation of natural resources of the outer Continental Shelf, protection of national security interests, and prevention of interference with reasonable uses.  *See* 43 U.S.C. §§ 1337(p)(4)(A), (B), (C), (D), (F), and (I);

      b.    BOEM failed to provide adequate consideration of the location of, and any scheduling relating to, Lease OCS-A 0501 and other uses of the sea or seabed, including but not limited to use for a fishery, a sealane, and navigation.  *See* 43 U.S.C. §§ 1337(p)(J)(i)-(ii);

      c.    BOEM failed to provide adequate consideration of public notice and comment on proposed Lease OCS-A 0501, as well as for easements or rights-of way associated therewith.  *See* 43 U.S.C. § 1337(p)(4)(K); and

      d.    BOEM failed to adequately consider oversight, inspection, research, monitoring, and enforcement relating to Lease OCS-A 0501, including easements or rights of way in connection therewith.

2.    BOEM's "Smart from the Start" policy, as described in 76 Fed. Reg. 8962 (February 12, 2011) (amending 30 C.F.R. Part 285) both on its face and as applied to the approval of Lease OCS-A 0501 for the Vineyard Wind Project exceeds BOEM's authority under the OCSLA because nothing in 43 U.S.C. § 1337(p) explicitly or implicitly authorizes BOEM to issue such a lease before reviewing and analyzing the criteria set forth therein.  As such, the *ultra vires* "Smart from the Start" policy and its application to Lease OCS-A 0501 is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

      In addition, the "Smart for the Start" policy impermissibly enables private companies to lay claim to valuable ocean areas without an adequate public process.  Under that policy, the site to be leased is determined prior to public input, without meaningful consideration of existing natural resources, reasonable uses, or alternative sites.  That is

September 17, 2021
Page 5

what happened with regard to Lease OCS-A 0501, and nothing in 43 U.S.C. § 1337(p) authorizes BOEM to skirt the substantive requirements or public input in such a manner. Accordingly, the *ultra vires* policy and its application to Lease OCS-A 0501 is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  *See* 43 U.S.C. § 1337(p)(K).

**B.     Violations Based on Approving the Construction and Operations Plan**

1.      On December 1, 2020, Vineyard Wind withdrew the Construction and Operations Plan (the "COP") via letter, citing the need to conduct further review of its project design resulting from the selection of General Electric Company's ("GE's) large Haliade-X 13-14 MW turbines ("Haliade-X").  The letter did not explain in detail *why* further review was required.  Nor did the letter ask that review of the COP be suspended pending the review.  Rather, Vineyard Wind's letter, which was made pursuant to 30 CFR § 585.628, withdrew the COP "from further review and decision making by BOEM."  It was "effective immediately."  *See Notice of Termination,* 85 Fed. Reg. 81486 (December 16, 2020).

The large 13-14 MW Haliade-X is a brand-new technology, with only a single prototype operating for less than two years at the Port of Rotterdam, Netherlands.  The operation of that equipment at that single location began in November of 2019.  The Haliade-X technology has not operated in any other location and, consequently, does not have a proven track record of safety and efficacy.[1]  Small wonder that Vineyard Wind withdrew the COP in order to reevaluate the use of that unproven technology.

Upon receipt of the termination letter, BOEM immediately terminated its review of the COP, stating that the administrative review of the Vineyard Wind Project "is no longer necessary and the *process* is hereby terminated," 85 Fed. Reg. 81486 (emphasis added)*.*  The "process" that was terminated by BOEM is the process of determining whether to approve the COP and its Environmental Impact Statement.  With the termination of that process, the entire Vineyard Wind Project was terminated pursuant to 30 C.F.R § 585.628 and 40 C.F.R. §§ 1503.1 and 1506.6.

Within a few weeks, on January 22, 2021, Vineyard Wind submitted another letter to BOEM stating that it had completed its review of the large Haliade-X technology and had concluded that it was safe and effective, without explaining how such a review could have occurred so quickly in connection with an unproven technology that is in the prototype stage at one location at the Port of Rotterdam.  The letter asked BOEM to revive the terminated Vineyard Wind Project and continue its review of the existing COP without any amendment.  The letter did not provide detailed documentation regarding Vineyard

---

[1]      *See* 30 C.F.R. § 585.115(e) (incorporating by reference Am. Petroleum Inst. API RP 2A-WSD, Recommended Practice for Planning, Designing and Constructing Fixed Offshore Platforms – Working Stress Design (21ˢᵗ ed. 2000); Errata and Supplement 1 (2002); Errata and Supplement 2 (2005); Errata and Supplement 3 (2007)).

September 17, 2021
Page 6

Wind's lightning-speed review of the safety and efficacy of the larger Haliade-X technology nor the opportunity for public input.

Less than two months later, BOEM resumed its review of the COP, stating that "Because Vineyard Wind has indicated that its proposed COP is 'a decision pending before BOEM, BOEM is resuming its review of the COP." *See Notice to Resume*, 86 Fed. Reg. 12494 (March 3, 2021). In fact, the COP was not a "decision pending before BOEM" at that time because the regulatory process had been terminated on December 16, 2020, and there was no longer a pending COP awaiting any decision by BOEM.

The public was not given an opportunity to review and comment on the hurry-up review of the safety and efficacy of the large Haliade-X, nor was it provided with any documentation regarding such review other than a curiously sparse description of the resuscitation of the Vineyard Wind project in the Federal Register. *Id*.

By reinstituting the COP review process in the foregoing manner, BOEM violated the following statutory and regulatory provisions:

a.   BOEM failed to ensure that Vineyard Wind's review of the new large Haliade-X technology was sufficient to show that the use of that technology by Vineyard Wind would provide for safety, protection of the environment, prevention of waste, conservation of natural resources of the Outer Continental Shelf, protection of national security interests, and prevention of interference with reasonable uses. *See* 43 U.S.C. §§ 1337(p)(4)(A), (B), (C), (D), (F), and (I);

b.   BOEM failed to provide public notice and opportunity for comment on Vineyard Wind's analysis and work product during the review period of December 1, 2020, to January 22, 2021, regarding the use of the large Haliade-X technology and its ability to provide for safety, protection of the environment, prevention of waste, conservation of natural resources of the Outer Continental Shelf, protection of national security interests, and prevention of interference with reasonable uses. *See* 43 U.S.C. § 1337(p)(4)(K);

c.   Nothing in 30 CFR 585.62 or in any other regulation or statute permits BOEM to recommence the formally terminated process simply because the project sponsor asserted falsely that the COP "is a decision pending before BOEM." *See* 86 Fed. at 12494. BOEM has never cited any statutory or regulatory authority to support its action. Accordingly, BOEM's action was *ultra vires*.

d.   BOEM's action violates 40 C.F.R. § 1500.2(d) (agencies must encourage and facilitate public involvement in decisions which affect the quality of the human environment).

September 17, 2021
Page 7

    e.    BOEM acted arbitrarily, capriciously, contrary to law, and in excess of its statutory authority when it recommended the COP review process. *See* 5 U.S.C. § 706(2). *See Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415-17 (1971) (opining that agency decision should be overturned if there was not a consideration of appropriate factors, if there was a clear error of judgment, or if there was a failure to follow mandated procedure); *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989) (agency action should be overturned if any part of the action is not based on a reasoned decision).

    f.    BOEM's action violated 30 C.F.R § 585.626, which requires the COP to contain details describing all studies, surveys, and other project-specific information gathered in connection with planned facilities proposed for construction and operation of the project. BOEM reinstated the review process without being provided with such details in connection with the review conducted by Vineyard Wind during the period from December 16, 2020, to January 22, 2021. *See also* 30 C.F.R. § 585.620.

2.    43 U.S.C. § 1337(p)(4)(I) states that "The Secretary *shall* ensure that any activity under this subsection is carried out in a manner that provides for . . . *prevention of interference* with reasonable uses . . . of the exclusive economic zone, the high seas, and the territorial seas." (emphasis added). The term "shall" denotes a mandatory and not a discretionary duty. *N.C. Fisheries Ass'n v. Gutierrez*, 518 F. Supp. 2d 62, 97 (D.D.C. 2007). In turn, 43 U.S.C. § 1337(p)(4)(J) requires the Secretary to consider the "use of the sea or seabed . . . for a fishery." Accordingly, the use of the sea for a fishery is a protected reasonable use under OCSLA, and the plain statutory language requires the Secretary of Interior (and BOEM) to prevent interference with that use.

    The implementing regulations add that lessees such as Vineyard Wind must demonstrate that the activities proposed under a COP will not "*unreasonably* interfere with other uses of the OCS." *See* 30 C.F.R. § 585.621(c) (emphasis added). Reading the statute and regulations together, the Secretary must carry out the duties under 43 U.S.C. § 1337(p), including decisions regarding whether to approve or disapprove a COP, in a manner that *prevents unreasonable interference* with the use of the sea for a fishery. Nothing in the statutory or regulatory language expressly or impliedly limits the term "interference" only to interference with legal rights.

    BOEM violated these statutory and regulatory requirements by approving the Vineyard Wind COP, which proposed wind energy activities that would unreasonably bar access to and otherwise unreasonably interfere with fishing activities in the lease area, as follows:

    a.    Commercial fishing for whiting and squid using bottom trawls is one of the primary uses of the lease area. BOEM acknowledges that "bottom trawl fishery provides the highest revenue from the WDA." FEIS p. 3-213. This is especially significant given that "[t]he small mesh bottom fishery targeting

September 17, 2021
Page 8

whiting and squid are most likely to be impacted." FEIS at 3-221. BOEM admits "that disruptions to access or unavailability of fish as a result of the Proposed Action during operations and maintenance" may be especially pronounced for "pelagic fishery resources." DEIS at 3-184.

b.  The Vineyard Wind project will be economically catastrophic to bottom trawl fishing vessels given the likelihood of "fishing gear [becoming] entangled in protections placed over cables or around foundations of WTGs or ESPs, and/or restrictions on maneuverability due to the presence of infrastructure within the WDA result[ing] in the displacement of fishing vessels." FEIS at 3-215.

   i.  Indeed, "the squid trawl fishery" in particular "may not be able to safely operate and harvest the resource in the WDA using status-quo fishing techniques." DEIS at 3-183 - 84; FEIS, at 3-222.

   ii.  "The conversion of soft sediment habitat to hard bottom via protective cover could also negatively impact the bottom trawl industry by increasing the risk of net hangs and vessel instability, and generally decreasing trawlable habitat." FEIS at 3-219.

c.  The Vineyard Wind project is also likely to severely reduce the population of squid within the WDA.

   i.  Sediment deposition associated with construction kills both squid eggs and squid larvae. FEIS at 03-62. This likely will significantly lower future squid populations.

   ii.  Low frequency noise produced by the construction and operation of the windfarm is also likely to kill squid eggs and squid larvae.

   iii.  "Permanent habitat alteration in the form of scour and cable protection would . . . displace species that prefer soft-bottom habitat (e.g., squid) from the area immediately surrounding the foundation footprint." FEIS at 3-219.

d.  Bottom trawling vessels will be forced to fish in new areas, increasing competition for scarce resources.

   i.  "Restrictions on maneuverability due to the presence of structures in the WDA could displace some fishing vessels, increasing conflict over alternative fishing grounds." SEIS at 3-100.

   ii.  "Potential displacement of fishing vessels and increased competition on fishing grounds could have long-term adverse impacts on commercial fisheries and for-hire recreational fishing." SEIS at 3-97.

September 17, 2021
Page 9

iii. Up to 46 vessels may be present within the Vineyard Wind construction area at any given time and up to 184 might be present in the entire navigational analysis area. SEIS at 3-112. The presence of that many vessels will necessarily and unreasonably restrict the operation of fishing vessels within the area.

iv. Additionally, "[b]ottom tending mobile gear is more likely to be displaced than fixed gear." SEIS at 3-100. Thus, "future offshore wind projects would be more likely to displace larger fishing vessels with small mesh bottom-trawl gear and mid-water trawl gear." SEIS at 3-97.

v. Moreover, as BOEM admits, "due to the placement of the turbines it is likely that the entire 75,614-acre area will be abandoned by commercial fisheries due to difficulties with navigation." ROD at 39.

vi. Additionally, the process of boulder relocation changes the position of already-existing hangs to new locations on the seafloor potentially outside of the lease area, rending it unsuitable for bottom trawling, without any requirement to inform vessels of the change or update currently existing navigational charts. *See* ROD at 94, mitigation measure 81. Without such requirements or updates, navigating the area with a bottom trawl vessel becomes analogous to treading blindly through a minefield.

e. This project will also make travel to and from fishing sites more costly for fishing vessels. As BOEM admits, "[t]he presence of WTGs could also lead to long-term changes to fishing vessel transit routes during operations, which could affect travel time and trip costs." SEIS at 3-96. These disruptions mean that "a large portion of annual income for vessels may be inaccessible during operations, resulting in major impacts on individual vessel owners for a given year that could have longer-term impacts due to low operating capital." DEIS at 3-184; *see also* FEIS at 3-222. BOEM recognizes yet understates these impacts by observing "impacts on some commercial fisheries may be moderate to major." DEIS at 3-184; *see also* FEIS at 3-222. For example:

i. NOAA has observed that, "approximately 25 permitted vessels would lose the majority of the revenue if not able to access traditional grounds within the RI and MA Lease Areas." FEIS at 3-221. This figure is substantially understated.

ii. Additionally, NOAA falsely asserts that the average vessel "would experience $819 per trip loss (revenue net of variable costs), with a maximum annual loss of slightly over $8,000 for one permitted vessel." FEIS at 3-221. This figure is substantially understated.

September 17, 2021
Page 10

iii.   "The extent of impact to commercial fisheries and loss of economic income is estimated to total $14 million over the expected 30-year lifetime of the Project." ROD at 39. This figure is substantially understated.

f.   This project will also negatively impact the economics of onshore seafood processors and distributors. BOEM recognizes yet understates these severe impacts. "If commercial fisheries experience decreased catch due to the inability to operate in the WDAs for the projects or being unsuccessful in finding alternative fishing locations that provide comparable catch and fishing revenue, seafood processors and distributors could see lower volumes and/or value of product." FEIS at 3-219.

g.   The approval of the COP notwithstanding the foregoing severe impacts on the fishing industry violated 43 U.S.C. § 1337(p)(4)(I) and its implementing regulations and was arbitrary and capricious, an abuse of discretion, not in accordance with law, and often inconsistent with the facts found by BOEM.

h.   The state-by-state financial mitigation proffered by Vineyard Wind to certain limited fishing interests is woefully inadequate to compensate for the types of severe adverse impacts and injuries that will be caused by the project to numerous commercial fishing and processing businesses, many of which were not consulted in connection with the secretive negotiations leading to the final offers, making the effort and result of those financial mitigation efforts, which were implicitly or explicitly sanctioned by BOEM, arbitrary and capricious.

3.   43 U.S.C. § 1337(p)(4)(A) states that "The Secretary *shall* ensure that any activity under this subsection is carried out in a manner that provides for (A) safety." (emphasis added). The use of the term "shall" denotes a mandatory and not a discretionary duty. *N.C. Fisheries Ass'n v. Gutierrez*, 518 F. Supp. 2d 62, 97 (D.D.C. 2007). The regulations parrot the statutory language. *See* 30 C.F.R. § 585.102(a)(1). In turn, 30 C.F.R. § 585.621(b) adds that a COP must demonstrate that the proposed activity "[i]s safe." Accordingly, a COP may not be approved if it does not "ensure" safety at sea by demonstrating that the proposed activity "is safe." BOEM violated these statutory and regulatory requirements by approving the Vineyard Wind COP, which threatens safety at sea in the following substantial ways:

a.   The COP fails to ensure safe travel for commercial fishing boats, including bottom trawl fishing vessels. Although BOEM acknowledges some negative impacts, they are given undue short shrift by BOEM, which impermissibly failed to require Vineyard Wind to make the lease area safe for commercial fishing.

i.   As BOEM acknowledges, "[t]he location of the proposed infrastructure within the WDA could impact transit corridors and access to preferred

September 17, 2021
Page 11

fishing locations." FEIS at 3-214. Accordingly, "commercial and for-hire recreational fishing fleets may find it more challenging to safely transit to and from homeports as there may be less space for maneuverability and greater risk of allision or collision if there is a loss of steerage." FEIS at 3-214.

ii. Likewise, "[m]aneuverability within WDAs would vary depending on many factors, including vessel size, fishing gear or method used, and weather conditions." FEIS at 3-207. "Trawl and dredge vessels require a relatively large space between turbines to maneuver their gear, as the gear does not directly follow the vessel." DEIS at 3-184. While "trawling vessels require 180-degree turning diameter" of up to "0.86 nautical mile in good weather and sea conditions," of course "larger diameters would be required in poor weather and sea conditions." FEIS at 3-215. And because "commercial fishing vessels typically stay out at sea over multiple days," it is inevitable "that vessels would be navigating at nighttime or during adverse weather conditions." FEIS at 3-214. No wonder "BOEM expects navigation in the WDA to be difficult at night, or in challenging weather conditions such as fog." FEIS at 3-214. Of course, night and fog are frequently recurring conditions in the project area.

iii. Further, "[t]he presence of structures (including transmission cable infrastructure) would have long-term impacts on commercial fisheries and for-hire fishing by increasing the risk of allisions, entanglement or gear loss/damage, and navigational hazards." SEIS at 3-96.

iv. Even if destruction of life, limb, or property does not directly result from a trawling vessel's nets becoming entangled on additional seafloor "hangs" attributable to the Project, such a vessel cannot navigate any further until it has managed to free itself from those snags. Depending on factors such as currents, prevailing winds, and the amount of space available to maneuver, the time during which the vessel is rendered immobile could span from hours to days. This immobility becomes especially dangerous when combined with detrimental weather conditions. *See* FEIS at 3-219.

v. As also recognized in the FEIS, "[t]ransiting through the WDA could create challenges associated with using navigational radar when there are many radar targets that may obscure smaller vessels and where radar returns may be duplicated under certain meteorological conditions like heavy fog." FEIS at 3-214. Poor navigating conditions are the rule rather than the exception since commercial fishing vessels "would be navigating at nighttime or during adverse weather conditions" because they "typically stay out at sea over multiple days." Id. BOEM admits that

September 17, 2021
Page 12

it "expects navigation in the WDA to be difficult at night, or in challenging weather conditions such as fog." Id. This interference with navigational radar presents yet another significant danger to safety that was not adequately considered by BOEM in approving the COP.

b.   The COP fails to ensure safety for the unique fishing operations of bottom trawl fishing vessels.

i.   The threat to safety from infrastructure placement is compounded for bottom trawl vessels. "Fisheries that use bottom trawls and dredge may find it challenging to deploy gear, maneuver, and fish in the WDA or along the OECC where cable protection measures have been deployed." DEIS at 3-183. By their nature, such vessels must navigate around existing hangs to avoid snags on the seafloor, such as large rocks and shipwreck debris.   Introduction of the additional hangs via the infrastructure required for the Vineyard Wind Project, including so-called "scour protection" around the base of the wind platforms, makes navigation particularly dangerous for bottom trawl vessels. Thus, "the chance of snagging mobile gear on Project infrastructure is much greater than if—in the case of fixed gear—the gear were set on the infrastructure or waves or currents pushed the gear into the infrastructure." SEIS at 3-96.

ii.   Electrified cables are also among the infrastructure required for the Vineyard Wind Project. "Protections placed over cables or around foundations of WTGs or ESPs may catch or entangle fishing gear." DEIS at 3-183. Those cables are not only located within the Wind Development Zone, but also to and from the coast and the Zone as well. While those cables would initially be buried under sand on the ocean floor, burial in such a dynamic environment is necessarily short-lived. Cables will become exposed, with substantial danger to both the vessels and their occupants likely to result from contact between vessels constructed mostly of metal and these electrified cables.

iii.   Additionally, the process of boulder relocation and clearing of other objects of the ocean floor introduces additional safety concerns. This practice of relocating existing hangs to new locations on the seafloor without any requirement to inform vessels of the change or update currently existing navigational charts is both reckless and illegal. The half-hearted effort to mitigate is woefully inadequate to protect safety. See ROD at 94, mitigation measure 81. Without appropriate mitigation requirements or updates, navigating the area with a bottom trawl vessel becomes analogous to treading blindly through a minefield.

September 17, 2021
Page 13

      iv.   Given these substantial adverse impacts, it is obvious why "some fisheries—like the squid trawl fishery—may not be able to safely operate and harvest the resource in the WDA using status-quo fishing techniques." FEIS at 3-222. Having acknowledged this devastating adverse impact on safety of commercial fishing transit in the area, and having failed to require the COP to provide adequate solutions, BOEM acted arbitrarily, capriciously, and otherwise not in accordance with law.

  c.   The COP fails to ensure that emergency rescues can be safely conducted within the WDA.

      i.   Interference by the Project with marine navigational radar makes emergency rescue operations unsafe. The United States Coast Guard (the "Coast Guard") utilizes radar for search and rescue operations. The issue of the extent to which the wind turbines will interference with high frequency radar ("HR Radar") search and rescue efforts was impermissibly given short shrift by BOEM, notwithstanding public and government agency comments and contemporaneous statements alerting the Agency to this enormous safety problem.  For example, prior to Vineyard Wind's COP submission, NOAA's National Ocean Service Integrated Ocean Observing System (the "IOOS") submitted comments to BOEM stating that HF Radar coverage for essential rescue operations and for oil spill response would be lost as the result of the offshore wind project.  Additionally, on July 27, 2020, the United States Department of Energy held a webinar on the topic of HF Radar interference from wind farms. BOEM was a collaborator on the webinar. The slides presented show that massive HF Radar interference would be caused by offshore wind farms in current leases should they be built.

          Earlier, in 2019, an HF Radar Wind Turbine Community Working Group Report addressed the issue of radar interference from turbines and stated that no operational solutions exist to mitigate the future interference. The Report specifically raised concerns about the Vineyard Wind project with regard to the then-planned turbines (up to 10 MW), which are far larger than any offshore wind turbines in use in the Outer Continental Shelf.  These issues were raised in comments submitted by Meghan Lapp on the Supplemental Environmental Impact Statement at pp. 60-62. These issues are exacerbated by Vineyard Wind's switch from the smaller 8-10 MW Haliade-X turbines to the larger 13-14 MW turbines. The relevant webinar slides describing this interference may be found at: [Offshore Wind Turbine Radar Interference Mitigation (WTRIM) Webinar: Oceanographic High Frequency (HF) Radar Webinar (energy.gov)](#).

September 17, 2021
Page 14

Significantly, BOEM acknowledges that "[r]ecent BOEM research shows that the Lessee's project is within the line of sight (the "LOS") of *seven* oceanographic high-frequency (HF) radar systems" (emphasis added). The so-called solution proffered by BOEM is as follows:

> The Lessee must coordinate with these radar operators to determine if the facility causes radar interference to the degree that radar performance is no longer within the specific radar systems' operational parameters, or mission objectives . . . In coordination with the radar operators, the Lessee must perform an analysis of radar impacts and provide the results to DOI within six months of commercial operation . . . If this information indicates that the project facilities reduce radar performance to a degree where the system no longer meets operations parameters, or mission objectives, the Lessee must provide [within one year] mitigation to demonstrate the radar's performance stats within the system's operational parameters as appropriate" within one year of the discovery.

*See* ROD Attachment B, Compliance Memo, Proposed Technical, Navigation, and Safety Concerns at 15-16.

Thus, although BOEM received substantial information before approving the COP that the Vineyard Wind Project would interfere with the HF Radar system used by the Coast Guard for Search and Rescue operations ("SAROPS"), it nevertheless approved the project knowing that such operations could be adversely impacted for over a year, thereby failing to meet its duty to protect safety in the Outer Continental Shelf for fishing vessels and other legitimate, protected uses, in violation of 43 U.S.C. § 1337(p)(4)(A).

ii.    Additionally, the wind turbines present an extra hazard for helicopter rescues, particularly in combination with adverse weather. For example, high winds present a significant risk of injury or death for rescue personnel. This is especially true when those being rescued are in a vessel that has drifted close to a turbine. Potential collision between the rescue helicopter or its equipment and the turbine may present an unacceptable risk for rescue personnel, causing them to forego rescue efforts in such situations. This life-and-death safety issue was impermissibly ignored by BOEM in the decision documents.

September 17, 2021
Page 15

    d.    The approval of the COP notwithstanding the foregoing severe impacts on safety violated 43 U.S.C. § 1337(p)(4)(A) and its implementing regulations, was arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and inconsistent with the facts found by BOEM.

4.    43 U.S.C. § 1337(p)(4)(B) states that "The Secretary *shall* ensure that any activity under this subsection is carried out in a manner that provides for . . . (B) protection of the environment." (emphasis added). The use of the term "shall" denotes a mandatory and not a discretionary duty. *N.C. Fisheries Ass'n v. Gutierrez*, 518 F. Supp. 2d 62, 97 (D.D.C. 2007). The regulations echo the statutory language. *See* 30 C.F.R. § 585.102(a)(2).  In turn, 30 C.F.R. § 585.621(d) adds that a COP must demonstrate that the proposed activity "does not cause undue harm or damage to natural resources; life (including human and wildlife) . . . [or] the marine, coastal or human environment."   Accordingly, a COP may not be approved if it fails to demonstrate that undue harm or damage will not occur to the foregoing protected resources, conditions, and qualities.   BOEM violated these statutory and regulatory requirements by approving the Vineyard Wind COP, which fails to demonstrate that undue harm or damage will not occur to such resources, conditions, and qualities, as follows:

    a.    Natural Resources:

        i.    Pile driving during construction emits low frequency noise. Windmill operation also emits low frequency noise. Low frequency noise kills both squid eggs and squid larvae. This will significantly lower future squid populations. In addition, peak sound pressure from pile driving will kill other marine species and generally interfere with their anti-predator alarm responses, further disturbing the marine population in the project area.

        ii.    The project industrializes the natural environment. Squid require a sandy ocean bottom to thrive. This Project will change that environment to concrete, boulders, and electrified cables, making it unhabitable by squid.

    b.    Human Life and the Human Environment:

        i.    The additional fixed structures required by the project are likely to result in the loss of human life. While understating the risk, BOEM admits as much: "The main IPF is the presence of structures, which increase the risk of collision/allusion and navigational complexity." SEIS at 3-114. This risk to the human environment is greater still when cumulative impact is considered. "Cumulative impacts resulting from individual IPFs associated with the Proposed Action would range from negligible to major." SEIS at 3-114. Thus, "BOEM anticipates the overall cumulative impacts on navigation and vessel traffic would be major, due

September 17, 2021
Page 16

primarily to the increased loss of life due to maritime incidents." SEIS at 3-114. *See* FEIS at 3-246.

ii. The potential loss of life is further exasperated by the failure to adequately research the project's interference with navigational radar. No adequate study on this potentially major threat to safe navigation was done prior to the ROD being issued.  Instead, there is only a vague promise to study such an impact after the fact.  *See* FEIS at 3-246.

c. Marine Environment:

i. The Project will forever alter the marine environment. "Permanent habitat alteration in the form of scour and cable protection would . . . displace species that prefer soft-bottom habitat (e.g., squid) from the area immediately surrounding the foundation footprint."  FEIS at 3-219.

ii. This "conversion of soft sediment habitat to hard bottom via protective cover" is likely to have the effect of "generally decreasing trawlable habitat." FEIS at 3-219.

iii. Pile driving during construction omits low frequency noise. Windmill operation also omits low frequency noise. This low frequency noise will harm the marine environment by making it significantly less hospitable to various forms of marine life. FEIS at 3-81; 3-89. Furthermore, pile driving can kill and maim local species and operational sound can mask communication among and between species.

iv. Each large Haliade-X wind turbine to be used by Vineyard Wind is at least 260 meters high, which is approximately the equivalent of a 23-story building, and contains substantial quantities of oil and other chemicals. There is no documentation that the equipment can withstand a category 3 or higher Atlantic hurricane, which is likely to occur during the useful life of the equipment.  Destruction of even one unit could lead to a catastrophic release into the marine environment, with attendant ecological harm that would be felt for generations.  Multiply that by up to 84-100 units and the potential for ecological disaster is massive.

d. Coastal Environment:

i. The project's electrified cables will reach into the breeding grounds for the horseshoe crab, which are located on the beaches of Cape Cod in the Project area. The blood of these crabs is an essential ingredient for life-saving medical tests and treatments. FEIS at 3-28. For example, on July 27, 2020, Lonza Walkersville, Inc, a manufacturer of Limulus Amebocyte Lysate ("LAL") for medical use, submitted comments on the

September 17, 2021
Page 17

DEIS showing that disturbance of horseshoe crabs by the Vineyard Wind Project will unreasonably interfere with the production of LAL, urging the agencies to carefully examine this important health issue. The comment stated: "BOEM must undertake to determine the impacts of these wind farm projects on the horseshoe crab. Failure to fully assess these impacts puts at risk the LAL assay which is vital to protecting the health of all Americans and billions of people around the world."

ii. In a letter dated November 13, 2020, from Adm. Bret Giroir, M.D., Assistant Secretary for Health, U.S. Department of Health and Human Services, urged the Department of Interior to closely examine this crucial issue and "to properly assess any impacts to the habitat of the North American Horseshoe Crab before any offshore wind project is approved on the East Coast."

iii. In a letter dated September 28, 2020, Congressman Andy Harris, M.D. wrote to Secretary of Health and Human Services Alex M. Azar II, stating "Given the biopharmaceutical importance of [the North American Horseshoe Crab] . . . I urge you to take action to ensure that offshore wind energy development does not, in any way, compromise the United States' access to this precious natural resource."

iv. The agencies' response to these comments and entreaties was inadequate at best and nonexistent at worst.

e. The approval of the COP notwithstanding the foregoing severe impacts on natural resources, human life and the human environment, the marine environment, and the coastal environment violated 43 U.S.C. § 1337(p)(4)(B) and its implementing regulations, was arbitrary and capricious, and was inconsistent with the incontrovertible facts found by or presented to BOEM.

5. 43 U.S.C. § 1337(p)(4)(D) states that "The Secretary *shall* ensure that any activity under this subsection is carried out in a manner that provides for . . . (D) conservation of the natural resources of the outer Continental Shelf" (emphasis added). The use of the term "shall" denotes a mandatory and not a discretionary duty. *N.C. Fisheries Ass'n v. Gutierrez*, 518 F. Supp. 2d 62, 97 (D.D.C. 2007). The regulations parrot the statutory language. *See* 30 C.F.R. § 585.102(a)(4). Fish and marine mammals are "natural resources" of the Outer Continental Shelf. *See* 16 U.S.C. § 1801 (stating that "[t]he fish off the coasts of the United States" as well as "the species which dwell on or in the Continental Shelf appertaining to the United States" and "the anadromous species which spawn in United States rivers or estuaries, constitute valuable and renewable natural resources"). Accordingly, with regard to fish and marine mammals, a COP may not be approved if it does not "ensure . . . conservation of . . . [such] natural resources of the outer Continental Shelf." BOEM violated these statutory and regulatory requirements by approving the Vineyard Wind

September 17, 2021
Page 18

COP, which utterly fails to conserve fish and marine mammals in the lease area of the Outer Continental Shelf, as follows:

a.   Fish

   i.   Vessel anchoring can cause permanent displacement to fishery habitats. FEIS at 3-43. "Anchoring would cause increased turbidity levels and would have the potential to cause mortality of finfish and invertebrates and, possibly, degradation of sensitive habitats." *Id.*

   ii.   "The presence of structures can lead to impacts on finfish, invertebrates, and EFH through entanglement and gear loss/damage, hydrodynamic disturbance, fish aggregation, habitat conversion, and migration disturbance." FEIS at 3-46.

b.   Marine Mammals

   i.   "Hearing is the most important sensory modality for marine mammals because they rely on sound to obtain detailed information about their surroundings, communicate, navigate, reproduce, socialize, and avoid predators" FEIS at 3-75. "Noise-producing activities may negatively affect marine mammals during foraging, orientation, migration, response to predators, social interactions, or other activities." FEIS at 3-74. The increase of noise can have "behavioral effects [that] can include changes to or cessation of biologically important behaviors such as socializing, breeding, calving, feeding or resting; changes in diving behavior (e.g., reduced or prolonged dive times, increased time at the surface or number of blows per surfacing, changes in swimming speed or direction); reduced/ increased vocal activities; visible startle response and/or flight responses (e.g., pinnipeds flushing into water from haulouts or rookeries) or aggressive behavior (e.g., tail/fluke slapping or jaw clapping); avoidance of areas where noise sources are located; and changes in historical migration routes." FEIS at 3-76. NMFS acknowledges the incidental take of marine mammals during the construction of the Vineyard Wind project. *See* ROD at 50. And NMFS admits that choosing the "no action" alternative in connection with the NEPA review would "be the environmentally preferable alternative . . . since no construction activities resulting in harassment would occur." ROD, p. 51. Notwithstanding NMFS's cautions, BOEM approved the COP without requiring the appropriate protections for listed species.

   ii.   In addition, harm to endangered North Atlantic Right Whales, which are now sometimes inadvertently taken by ship strikes, would be substantially exacerbated by the increased activities attendant to the construction, operation and decommissioning of the Vineyard Wind

September 17, 2021
Page 19

> Project, including but not limited to pile driving, which will create massive sound for years, thereby having major impacts on this endangered species likely leading to takes.

    c.    Sea Turtles

        i.    The modification of bottom habitat through the discharge of fill and habitat conversion will have long term effects on the habitats of sea turtles. ROD at 35. Additionally, the operations of offshore wind operations will cause a heightened risk for the discharge of toxic fluids and waste. FEIS at 3-103. The ingestion of plastic waste can cause side effects including "dietary dilution, chemical contamination, depressed immune system function, poor body condition as well as reduced growth rates, fecundity, reproductive success" and death. FEIS at 3-103.

        ii.    Construction activities could temporarily displace animals into areas that have a lower foraging quality or result in higher risk of interactions with ships or fishing gear. FEIS at 3-105. A greater risk of interaction with fishing gear can cause entanglement, ingestion, injury, and death. FEIS 3-108. Potential impacts on sea turtles from multiple construction activities within the same calendar year could affect migration, feeding, breeding, and individual fitness. FEIS at 3-105.

    d.    The approval of the COP notwithstanding these severe impacts on natural resources of the outer Continental Shelf such as fish, marine mammals, and sea turtles violated 43 U.S.C. § 1337(p)(4)(D) and its implementing regulations, was arbitrary and capricious, an abuse of discretion, otherwise not in accordance with law, and inconsistent with the facts found by or presented to BOEM.

6.    43 U.S.C. § 1337(p)(4)(I) states that "The Secretary *shall* ensure that any activity under this subsection is carried out in a manner that provides for . . . (I) *prevention of interference* with reasonable uses . . . of the exclusive economic zone, the high seas, and the territorial seas." (emphasis added). The term "shall" denotes a mandatory and not a discretionary duty. *N.C. Fisheries Ass'n v. Gutierrez*, 518 F. Supp. 2d 62, 97 (D.D.C. 2007). In turn, 43 U.S.C. § 1337(p)(4)(J) requires the Secretary to consider the "use of the sea or seabed . . . for a . . . sealane . . . or navigation." Accordingly, the use of the sea for a sealane or navigation are protected reasonable uses under OCSLA, and the plain statutory language requires the Secretary to prevent interference with those uses.

    The implementing regulations add that lessees such as Vineyard Wind must demonstrate that the activities proposed under a COP will not "*unreasonably* interfere with other uses of the OCS." *See* 30 C.F.R. § 585.621(c) (emphasis added). Reading the statute and regulations together, the Secretary must carry out the duties under Section 1337(p), including decisions regarding whether to approve or disapprove a COP, in a manner that

September 17, 2021
Page 20

*prevents unreasonable interference* with the use of the sea for a sealane or navigation. Nothing in the statutory or regulatory language expressly or impliedly limits the term "interference" only to interference with legal rights.

BOEM violated these statutory and regulatory requirements by approving the Vineyard Wind COP, which proposed wind energy activities that would unreasonably interfere with sealanes and navigation in the lease area, as follows:

a.   Sealanes

i.   The Coast Guard has not established any designated transit lane, fairway or traffic separation scheme through the Vineyard Wind leasing area. Yet this is crucial for providing prevention of interference with the use of the project area for a "sealane . . . or navigation." The spacing between wind turbines as provided in the COP is insufficient to permit safe travel by bottom trawl fishing vessels. This is demonstrated in the analysis contained in the FEIS. "The location of the proposed infrastructure within the WDA could impact transit corridors and access to preferred fishing locations." FEIS at 3-214. Accordingly, "commercial and for-hire recreational fishing fleets may find it more challenging to safely transit to and from homeports as there may be less space for maneuverability and greater risk of allision or collision if there is a loss of steerage." *Id.*

ii.  "Maneuverability within WDAs would vary depending on many factors, including vessel size, fishing gear or method used, and weather conditions." FEIS at 3-207. "Trawl and dredge vessels require a relatively large space between turbines to maneuver their gear, as the gear does not directly follow the vessel." DEIS at 3-184. While "trawling vessels require 180-degree turning diameter" of up to "0.86 nautical mile in good weather and sea conditions," of course "larger diameters would be required in poor weather and sea conditions." FEIS at 3-215. And because "commercial fishing vessels typically stay out at sea over multiple days," it is inevitable "that vessels would be navigating at nighttime or during adverse weather conditions." FEIS at 3-214. No wonder "BOEM expects navigation in the WDA to be difficult at night, or in challenging weather conditions such as fog." FEIS, at 3-214. Additionally, "[t]he presence of structures (including transmission cable infrastructure) would have long-term impacts on commercial fisheries and for-hire fishing by increasing the risk of allisions, entanglement or gear loss/damage, and navigational hazards." SEIS at 3-96.

iii. BOEM uses the MARIPARS conducted by the Coast Guard as its overall navigational safety touchstone for decision/analysis. Alternative D, which was chosen by BOEM as its final preferred alternative in the FEIS, sets out the turbines in East-West orientation with a 1 nm spacing in an

September 17, 2021
Page 21

East-West manner, thereby establishing the spacing going northwest-southeast only at 0.7 nm wide. But Northwest-southeast is, in fact, the predominant transit (traffic/travel) direction.  According to the FEIS, the USCG would only be able to conduct search and rescue operations safely on the diagonal only in the straight east-west and north-south corridors.  Thus, in the most heavily transited direction, the USCG would not have the straightaway needed for effective rescues.

Contrary to BOEMs' final decision on sealanes, the 2020 Final Massachusetts and Rhode Island Port Access Route Study ("MARIPARS") provided quantitatively derived recommendations for turbine spacing and transit lane widths within the wind arrays.  For an array developed in a uniform grid, aligned along cardinal headings with 1-nautical-mile spacing, the diagonal lanes would be approximately 0.7 nautical mile wide.  The MARIPARS concluded that "(1) lanes for vessel transit should be oriented in a northwest to southeast direction, 0.6 NM [nautical mile] to 0.8 NM wide.  That width would allow vessels the ability to maneuver in accordance with the COLREGS [International Regulations for Preventing Collisions at Sea] while transiting through the RI/MA WEA [Rhode Island/Massachusetts Wind Energy Area]; (2) lanes for commercial fishing vessels actively engaged in fishing should be oriented in an east to west direction, 1 NM wide; and (3) lanes for USCG search and rescue operations should be oriented in a north to south and east to west direction, 1 NM wide.  Such an arrangement would ensure two lines of orientation for USCG helicopters to conduct search and rescue operations."

BOEM requires as a condition of COP approval that any movements in turbine location, as may be permissible pursuant to 30 C.F.R. § 585.634, do not shrink the diagonal lanes to less than 0.6 nautical mile.  Thus, the USCG requires 1 nm wide sealanes to conduct search and rescue operations while the FEIS/ROD provide that the most heavily trafficked lanes by commercial fishing vessel transit can be 0.6 nm wide, almost 50% less than required by the U.S.C.G.

BOEM's utterly inadequate response to these concerns was: "Small variances throughout a wind energy facility should not significantly affect safety of navigation."  *See* FEIS at ES-8, fn 6.  This flies in the face of the fact that the larger the area of any WEA, the longer a vessel must transit through it, and therefore the more dangerous it is to the vessel. Currently the world's largest wind farm is 55 square miles and is part of a conglomerate wind lease area of about 110 square miles.  The MA/RI WEA (the giant conglomerate lease area of which Vineyard Wind is a part) is over 1400 square miles, which is larger than the area of Rhode Island.  The large area requires a corresponding large sealane.

September 17, 2021
Page 22

For example, an on-the-ground radar study in an offshore wind farm in the UK found serious radar interference at 1.5 nm from the turbines. With wind turbines on either side, the minimum sealane should be 4 nm between the rows of wind turbines.  That would provide for a clear sealane free of radar interference of 1 nm.  Notably, the turbines in the UK study were approximately 2 MW, much smaller than the Vineyard Wind giants consisting of 13 MW turbines.  Accordingly, at the very least, BOEM should have conducted a modeling study of the impacts on marine radar from 13 MW turbines before making any decision regarding the appropriate width of sealanes in the project area.

By not considering the cumulative impacts to navigation through the whole WEA, in a southeast/northwest direction, BOEM impermissibly short-changed the availability and safety of sealanes and navigation concerns, thereby acting arbitrarily, capriciously, inconsistently with the facts found or presented to BOEM, and otherwise not in accordance with law, including but not limited to 43 U.S.C. §§ 1337(p)(4)(I) and (J) and their implementing regulations.

b.   As recognized in the FEIS, "[t]ransiting through the WDA could also create challenges associated with using navigational radar when there are many radar targets that may obscure smaller vessels and where radar returns may be duplicated under certain meteorological conditions like heavy fog."  FEIS at 3-214.  Poor navigating conditions are the rule rather than the exception since commercial fishing vessels "would be navigating at nighttime or during adverse weather conditions" because they "typically stay out at sea over multiple days."  Id.  Indeed, BOEM admits that it "expects navigation in the WDA to be difficult at night, or in challenging weather conditions such as fog."  Id.  This interference with navigational radar presents yet another significant danger to safety that was not adequately considered by BOEM.

c.   BOEM's approval of the COP notwithstanding the foregoing instances of unreasonable interference with reasonable uses of the project area for sealanes and navigation violated 43 U.S.C. §§ 1337(p)(4)(I) and (J) and their implementing regulations, was arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and inconsistent with the facts found or duly presented to BOEM.

7.     43 U.S.C. § 1337(p)(4)(F) states that "The Secretary *shall* ensure that any activity under this subsection is carried out in a manner that provides for . . . (F) protection of national security interests of the United States.*"*  The term "shall" denotes a mandatory and not a discretionary duty. *N.C. Fisheries Ass'n v. Gutierrez*, 518 F. Supp. 2d 62, 97 (D.D.C. 2007). The regulations parrot the statutory language. *See* 30 C.F.R. § 585.102(a)(6).  The implementing regulations add that lessees such as Vineyard Wind must demonstrate that the activities proposed under a COP will not "*unreasonably* interfere with . . . National

September 17, 2021
Page 23

Security or defense." *See* 30 C.F.R. § 585.621(c) (emphasis added). Reading the statute and regulations together, the Secretary must carry out the duties under § 1337(p), including decisions regarding whether to approve or disapprove a COP, in a manner that *prevents unreasonable interference* with National Security or Defense.

BOEM violated these statutory and regulatory requirements by approving the Vineyard Wind COP, which proposed wind energy activities that would unreasonably interfere with National Security or Defense in the lease area, as follows:

a. National Security / Defense

    i. Wind turbines located in the radar line of sight of air defense radars can adversely impact the ability of those units to detect and track incoming aircraft. *See* Report to the Congressional Defense Committees, "The Effect of Windmill Farms on Military Readiness," Department of Defense Office of the Director of Defense and Research Engineering, 2006, p 4. Among the radar types utilized by the Department of Defense that would be vulnerable to interference by offshore wind turbines are near-shore military "terminal area" air traffic control radars, "enroute" air traffic control radars, air defense long-range air surveillance radars, ground based military unique radars, and missile tracking radars. In 2016, the federal interagency Wind Turbine Radar Interference Mitigation Working Group acknowledged radar interference as an impediment to air traffic control, homeland security, and national defense. *See* Federal Interagency Wind Turbine Radar Interference Mitigation Strategy, available at https://www.energy.gov/sites/prod/files/2016/06/f32/Federal-Interagency-Wind-Turbine-Radar-Interference-Mitigation-Strategy-02092016rev.pdf.

    ii. Nor can this problem be solved by overlapping radar coverage. In 2017, the Wind Turbine Radar Interference Mitigation Working Group determined that radar interference caused by similar offshore wind leases off Massachusetts and Rhode Island could not be solved by overlapping coverage mitigation approaches and that such approaches could not restore low altitude radar coverage. *See* Ground Based Coastal Air Surveillance Wind Turbine-Radar Interference Vulnerability Study Public Summary, available at https://www.energy.gov/sites/prod/files/2017/12/f46/Final%20Coastal%20Radar%20Public%20Summary%20-%20Comments%20Incorporated.pdf.

b. The approval of the COP notwithstanding these severe impacts on National Security and Defense violated 43 U.S.C. § 1337(p)(4)(I) and its implementing regulations, was arbitrary and capricious, an abuse of discretion, and

inconsistent with the incontrovertible facts found by or duly presented to BOEM.

### VIOLATIONS OF ESA COMMITTED BY THE DEPARTMENT OF COMMERCE, THE NATIONAL MARINE FISHERIES SERVICE, THE DEPARTMENT OF THE INTERIOR, THE BUREAU OF OCEAN ENERGY MANAGEMENT, AND THEIR OFFICERS AND/OR EMPLOYEES

*All of the foregoing facts set forth above are hereby incorporated here.*

**A.      Procedural and Substantive Violations of ESA and its Implementing Regulations**

1.      Throughout the ESA consultation process in connection with the Vineyard Wind Project, the agencies impermissibly gave greater weight to the potential economic costs associated with denial of the project than to the potential negative impacts of approving the project associated with extinction, conservation, and recovery of listed species in the project area, thereby failing to adhere to the ESA's statutory mandates and the Supreme Court's instructions in *Tennessee Valley Authority v. Hill*. Specifically, 16 U.S.C. 1536(a)(1) states that "[a]ll . . . Federal agencies shall . . . utilize their authorities in furtherance of the purposes of [the ESA] by carrying out programs for the conservation of endangered species and threatened species." The duty to advance and assist the conservation of species is discharged, in large part, through consultation by agencies such as BOEM and the Corps of Engineers with NMFS. A program of conservation is one that brings the species to the point of recovery and delisting. *See* 16 U.S.C. 1532(3). In approving the COP, NMFS and the other relevant agencies impermissibly ignored the overarching instructions of the United States Supreme Court regarding how to interpret these foundational ESA mandates:

> The plain intent of Congress in enacting [the ESA] was to halt and reverse the trend toward species extinction, whatever the cost. This is reflected not only in the stated policies of the Act, but in literally every section of the statute. All persons, including federal agencies, are specifically instructed not to 'take' endangered species, meaning that no one is 'to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect' such life forms. Agencies in particular are directed . . . to use . . . *all* methods and procedures which are necessary to preserve endangered species.

*Tennessee Valley Authority v. Hill*, 437 U.S. 153, 184-85 (1978) (emphasis in original; cleaned up).

Numerous lower courts from coast to coast have applied this strict standard to the protection of listed species. *See e.g., City of Tacoma v. FERC*, 460 F.3d 53, 75 (D.C. Cir. 2006) (concluding that Endangered Species Act imposes an obligation on each federal agency to ensure protection of each listed species); *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 414 (D.C. Cir. 2004) (same); *Sierra Club v. Glickman*, 156 F. 3d 606, 616

September 17, 2021
Page 25

(5th Cir. 1998) (same); *Pyramid Tribe v. Navy*, 848 F. 2d 1410, 1416 (9th Cir. 1990); *Defenders of Wildlife*, 2007 WL 641439 (E.D. Wash. Feb. 26, 2007) (same); *see also Def's of Wildlife v. Andrus,* 428 F. Supp. 167 (D.D.C. 1977*)* ( "The terms 'conserve', 'conserving', and 'conservation' mean to use and the use of *all* methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this Act are no longer necessary.") (emphasis added).  By systematically and continually favoring the economic considerations of approving the project over the adverse impacts to listed species, the agencies violated the strict standards imposed by *Tennessee Valley Authority v. Hill.  See, e.g.* ROD at 1-11; FEIS at 3-81, 3-7, 3-8.

2.      The biological opinion was prepared in accordance with unlawful regulatory standards created by impermissible changes to regulations promulgated in 2019 (the "2019 Regulations").  Those changes are not authorized by the ESA and are antithetical to *Tennessee Valley Authority v. Hill*.  Moreover, the agencies appear to be conceding in litigation that the regulatory changes were inappropriate.  *See California v. Haaland,* Case No. 4:19-cv-06013-JST (N.D. Cal.); *Center for Biological Diversity v. Haaland,* Case No. 4:19-cv-05206-JST (N.D. Cal.); *Animal Legal Defense Fund v. U.S. Department of Interior,* No. 4:19-cv-06812-JST (N.D. Cal.). Specifically, the interagency consultation provisions of the 2019 Regulations impermissibly: (a) limit the circumstances under which agency action would be deemed to destroy or adversely modify designated critical habitat by requiring the action to affect such habitat "as a whole," (b) limit the scope of analysis of effects by altering the definitions of "effects of the action" and "environmental baseline" and requiring that the effects be both a "but for" result of the agency action and "reasonably certain to occur" based on "clear and substantial information," (c) limit the instances where changed circumstances would require re-initiation of consultation, (d) limit agencies' duties to ensure mitigation of adverse effects and unlawfully delegates to other agencies the ability to make biological determinations that NMFS is required to make, and (e) allow for broad-based "programmatic" and "expedited" consultations that lack the required site-specific and in-depth analysis of proposed agency action.  Using the unlawful standard set forth in the 2019 Regulations, the agencies impermissibly narrowed and limited the description of the effects of the Vineyard Wind Project and the cumulatively foreseeable onshore and offshore impacts.  Accordingly, the consultation process was fatally flawed from the beginning and cannot serve to support the approval of the COP.

3.      16 U.S.C. §1536(a)(2) states that "[each Federal agency shall . . . insure that any action authorized . . . by such agency is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species unless such agency has been granted an exemption for such action by the Committee [established under 16 U.S.C. 1536(h)]."  The "Committee" referred to in the statute is colloquially known as the "God Squad." BOEM, NMFS and the Corps of Engineers violated 16 U.S.C. § 1536(a)(2) by failing to seek an exemption from the God Squad once it was clear that critical habitat of the North Atlantic Right Whale would result in destruction or adverse modification due to the Vineyard Wind Project.  *See Ctr. for Biological Diversity v. Salazar*, 770 F. Supp. 2d 68 (D.D.C. 2011)

September 17, 2021
Page 26

(quoting 16 U.S.C. § 1536(a)(2)  (holding that "[e]ach Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species"); *Western Watersheds Project v. Bernhardt*, 468 F. Supp. 3d 29, 48 (D.D.C. 2020) (holding that agencies must give the benefit of the doubt to each species in question and to place the burden of risk and uncertainty on the proposed action and that "requiring Plaintiffs to show jeopardy to the existence of a species in order to secure injunctive relief would stand the ESA on its head"); *see also Envt'l. Prot. Infor v. Simpson*, 255 F. 3d 1073, 1080 (9th Cir. 2001); *W. Watersheds Project v. Matejko*, 468 F. 3d 1099, 1108 (9th Cir. 2006); *Sierra Club v. Marsh,* 816 F. 2d 1376, 1386 (9th Cir. 1987).

4.      50 C.F.R. § 402.14(g)(4) of the current regulations requires NMFS to "[a]dd the effects of the action *and* cumulative effects to the environmental baseline [in determining] whether the action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat."  (Emphasis added.)  *See Am. Rivers & Ala. Rivers All. v. FERC,* 895 F.3d 32, 38 (D.C. Cir. 2018).  NMFS violated this requirement by failing to properly consider the cumulative effects of the Vineyard Wind project with the likely effects of other wind generation projects contemplated by BOEM in the North Atlantic and other areas of the Outer Continental Shelf.

5.      50 C.F.R. §402.14(g)(5) of the current regulations requires NMFS to inform BOEM of "reasonable and prudent alternatives" that BOEM and the applicant can take to avoid jeopardy to listed species. *See United States Fish & Wildlife Serv. v. Sierra Club, Inc.,* 141 S. Ct. 777, 784 (2021); *Turbal v. Hodel,* 859 F. 2d 651 (9th Cir. 1988).  NMFS did not provide an adequate assessment of reasonable and prudent alternatives to BOEM in connection with several listed species, including, but not by way of limitation, the North Atlantic Right Whale.

**B.      The Biological Opinion Is Defective In Numerous Ways**

1.      In preparing a biological opinion, NMFS must use "the best scientific and commercial data available." *See* 16 U.S.C. § 1536(a)(2).  *See Shafer & Freeman Lakes Envtl. Conservation Corp. v. FERC,* 992 F.3d 1071, 1089 (D.C. Cir. 2021)*.*  Such data must support the conclusions drawn in the biological opinion regarding jeopardy and adverse modification, and a NMFS biological opinion is arbitrary and capricious if it fails to consider the relevant factors and articulate a rational connection between the facts found and the choice made.  *See United States Sugar Corp. v. EPA,* 830 F.3d 579, 606 (D.C. Cir. 2016*); Center for Biological Diversity v. U.S. Bureau of Land Management,* 698 F. 3d 1101, 1121 (9th Cir. 2012); *Water Keeper Alliance v. U.S. Dep't of Def.,* 271 F. 3d. 21, 25 (1st Cir. 2001).  Moreover, BOEM cannot "abrogate its responsibility to ensure that its actions will no[t] jeopardize a listed species; its decision to rely on a . . . biological opinion must not have been arbitrary or capricious," especially where, as here, the biological opinion is deeply flawed.  *See, e.g., Haw. Longline Ass'n v. Nat'l Marine Fisheries Serv.,*

September 17, 2021
Page 27

281 F. Supp. 2d 1, 25 (D.D.C. 2003); *Strahan v. Roughead,* 910 F. Supp. 2d 358, 381 (D. Mass. 2012); *see also Wild Fish Conservancy v. Salazar*, 628 F. 3d 513, 532 (9th Cir. 2010)*.* In turn, 50 C.F.R. 402.14(h) of the current regulations sets forth the required contents of biological opinions issued by NMFS. The biological opinion issued by NMFS in connection with the Vineyard Wind Project is deeply flawed and violates these statutory and regulatory requirements in several ways, including but not limited to the following:

a.   The biological opinion does not properly establish the environmental baseline, in violation of 50 C.F.R. § 402.02 of the current regulations defining the term "environmental baseline." *See Am. Rivers & Ala. Rivers All. v. FERC,* 895 F.3d 32, 38 (D.C. Cir. 2018); *Nat'l Wildlife Fed'n v. NMFS*, 481 F. 3d 1224 (9th Cir. 2007).

b.   The biological opinion does not properly set forth the "[e]ffects of the action," in violation of 50 C.F.R. § 402.02. Such effects must include "direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action." *See Medina County Envtl. Action Ass'n v. Surface Transp. Bd.,* 602 F. 3d 687 (5th Cir, 2010); *Oceana, Inc. v. Evans*, 384 F. Supp. 2d 203 (D.D.C. 2005). By way of example but not by way of limitation, the loss of physical space available to the North Atlantic Right Whale resulting from construction and operation of the Vineyard Wind Project has not been adequately analyzed. *See Riverside Irrigation District v. Andrews*, 758 F. 2d 508 (10th Cir. 1985).

c.   The biological opinion does not adequately address the cumulative effects of the Vineyard Wind Project on listed species. *See Nat'l Wildlife Fed'n v. Norton*, 332 F. Supp. 2d 179 (D.D.C. 2004).

d.   The biological opinion does not properly consider the impacts of the Vineyard Wind Project on both the survival and recovery of listed species in the project area. *See Wildlife Federation v. NMFS,* 481 F. 3d 1224, 1238-39 (9th Cir. 2007).

e.   The incidental take statement associated with the biological opinion does not properly outline the reasonable and prudent alternatives and the conditions for complying with those alternatives that would prevent a violation of ESA Section 7(a)(2). *See* 16 U.S.C. §§ 1536(b)(4), 1536(b)(3)(A); *Gifford Pinchot Task Force v. FWS,* 378 F. 3d 1059 (9th Cir. 2004) (addressing diminishment of critical habitat); *National Wildlife Fed'n v. NMFS*, 481 F. 3d 1224, 1227 (9th Cir. 2007) (addressing jeopardy).

f.   The biological opinion ignored or downplayed "the best scientific and commercial data available," 16 U.S.C. § 1536(a)(2), by not adequately considering the work of a Harvard University alternative energy researcher, David Keith, who has extensively studied the impact of wind turbine

September 17, 2021
Page 28

generators on the environment and who found that such devices are worse in the short-term for the marine environment than coal or natural gas.  "The direct [adverse] impacts of wind power are instant, while the benefits accumulate slowly . . . If your perspective is the next 10 years, wind power actually has – in some respects – more climate impact than coal or gas."  *See* Cell Press, "*Large-scale US wind power would cause warming that would take roughly a century to offset*."  ScienceDaily 4 October 2018, https://www.sciencedaily.com/releases/2018/10/181004112553.htm;  *see also* Miller and Keith, Climatic Impacts of Wind Power, Joule (2018), https://doi.org/10.1016/j.joule.2018.09.009;  https://seas.harvard.edu/directory/dkeith (the "Harvard Wind Study").  According to the Harvard Wind Study, temperatures in the area of wind farms are raised around 1-degree Celsius by the projects themselves, meaning that the ocean around the location of various off-shore wind farms proposed for New York, Connecticut, Massachusetts, and Rhode Island would be warming at a greater rate than would otherwise occur.  That warming would likely extend to the Gulf of Maine.  Notwithstanding this readily available "best scientific and commercial data," neither the biological opinion nor the incidental take permit properly account for the additional stress on the North Atlantic Right Whale and its habitats caused by the localized increase in temperatures attributable to the Vineyard Wind Project, coupled with similar wind power projects in the area, including potential impacts on essential food supply for the North Atlantic Right Whale.  The failure of the agencies to consider an important aspect of the problem, i.e., the risk of diminished or elimination of the food supply of the North American Right Whale, is in direct violation of the ESA.  *See* 16 U.S.C. 1536(a)(2); *see also Rapid Climate-Driven Circulation Changes Threaten Conservation of Endangered North Atlantic Right Whales,* by Nicholas R. Record, et al (the "Record Paper"), published on BOEM's website ("The North Atlantic right whales primarily migrate into the [Vineyard Wind] area and engage in short-term feeding moving onto feeding grounds throughout the Gulf of Maine.").

g.  The biological opinion is legally flawed for the additional reasons set forth in items 1 through 49 on pages 3 through 11 of the 60-Day Notice letter dated May 24, 2021, from David P. Hubbard of the law firm of Gatzke Dillon & Balance, LLP, to Gina M. Raimondao (Secretary of Commerce), Benjamin Friedman (NOAA Administrator), and Amanda Lefton (Director, Bureau of Ocean Energy Management) on behalf of the Nantucket Residents Against Turbines (the "Nantucket Residents Against Turbines 60-Day Notice Letter").  All the violations noted in the Nantucket Residents Against Turbines 60-Day Notice Letter items 1 through 49 on pages 3 through 11 are hereby incorporated herein as though fully set forth herein.  A true and correct copy of the Nantucket Residents Against Turbines 60-Day Notice Letter is included as Exhibit A of the instant notice letter for the convenience of the agencies receiving this notice letter.

September 17, 2021
Page 29

h.   The biological opinion impermissibly ignores or downplays the significance of the fact that approximately 100 North Atlantic Right Whales, comprising approximately 25% of worldwide population, have been sited in the Vineyard Wind Lease area, according to the best scientific and commercial date available.   *See   https://whalemap.ocean.del.ca./WhaleMap/;   see also https://content.govdelivery.com/accounts/USNOAAFISHERIES/bulletins/22 b3b69.*   Notwithstanding the fact that a substantial threat to the North American Right Whale is from vessel strikes, numerous vessels are expected to be involved in the construction of the Vineyard Wind project, including but not limited to tugboats, barge cranes, and hopper scows, many of which would be substantially larger than fishing vessels and operations vessels. *See e.g.,* DEIS at 3-52, 3-61, 3-68, 3-78, 3-79.   Accordingly, substantial takes of the listed species associated with construction activities can be anticipated.   The biological opinion does not adequately deal with this major threat to the survival or recovery goals of the species. *See* Biological Op. at 53–55.

i.   The biological opinion impermissibly ignores or downplays the best scientific and commercial data available with regard to the substantial negative impacts of pile driving during construction on marine mammals such as the North Atlantic Right Whale, and other endangered species, including, but not by way of limitation, permanent threshold shifts in hearing, which render them unable to navigate or communicate. Pile driving can also cause the species to leave and not return to an area and mask biological communication.   *See NOAA Fisheries Technical Guidance for assessing the Effects of Anthropogenic Sound on Marine Mammal Hearing,* April 1, 2018, https://www.fisheries.noaa.gov/resource/document/technical-guidance-assessing-effects-anthropogenic-sound-marine-mammal-hearing.   *See also, Assessing noise impact of offshore wind farm construction may help protect marine mammals,* November 4, 2013, *https://phys.org/news/2013-11-noise-impact-offshore-farm-marine.html.*   The biological opinion fails to adequately assess noise impact from the construction of the Vineyard Wind project.  *See* Biological Op. at e.g., 264, 275-77.

j.   The biological opinion also impermissibly ignores or downplays the high frequency and low frequency of underwater noise that would be made by the larger turbines after construction and during operation and the effect of such noise on the North Atlantic Right Whale.  Scientific studies regarding the negative impacts of ambient noise on whales were available well before the issuance of the biological opinion. *See, e.g., Roagosa, et al., "Underwater Ambient Noise in Baleen Whale Migratory Habitat off the Azores, Frontiers in Marine Science, 2011,* https://www.frontier.org/articles/10.3389/fmars.2017.00109/full.  ("High levels of low frequency noise in this area could displace whales or interfere with foraging behavior, impacting energy intake during a critical stage of their annual cycle [and] in the long term

behavioral disturbance and physiological stress caused by noise could lead to population-level effects.").  Although the FEIS notes in passing that North American Right Whales engage in foraging and [that] mothers with calves were sighted [in the project area] in recent surveys, and although the FEIS acknowledges that "the habitat within the vicinity of the WDA has a higher ecological significance than previously known," noise sensitivity of the species set forth in the scientific literature were downplayed and minimized both in the biological opinion and, consequently, in the FEIS. Failure to properly consider the best scientific and commercial data available in studies analyzing the adverse impact of ambient noise on listed species in the area is arbitrary, capricious and otherwise not in accordance with law.

**C.**     **The Failure to Reinitiate the Consultation Process Was Impermissible**

1.     BOEM impermissibly failed to reinitiate consultation with NMFS under 50 C.F.R. § 402.16 of both the current and prior regulations, which would have required reconsideration of the biological opinion after BOEM realized that the COP may require modification based upon studies of the project area that were not completed at the time of the issuance of the biological opinion and the incidental take statement.  *See Envtl. Prot. Info. Ctr. v. Simpson Timber Co.,* 255 F. 3d 1073, 1076 (9th Cir. 2001); *see also W. Watersheds Project v. Matejko*, 468 F. 3d 1099, 1108 (9th Cir. 2006).

2.     BOEM impermissibly failed to reengage NMFS in the consultation process regarding the North Atlantic Right Whale and other listed species in the project area once Vineyard Wind conclusively decided to increase the project design envelope by selecting the new, prototype GE Haliade-X 13-14 MW turbine that is in use only at one facility at the Port of Rotterdam, Netherlands.  At the time Vineyard Wind made the definitive decision to use the larger turbine, the biological opinion had not adequately addressed the impacts on endangered species of such turbine.  It was only at the time of the publication of the SEIS that the agencies suggested the larger turbines may be used in lieu of the originally planned 8-10 MW turbines.  The biological opinion, which was finalized on September 11, 2020, addressed in an impermissibly cursory way the "anticipated commercial viability" of as few as 57 and as many as 100 offshore wind turbine generators varying between 8 MW and 14 MW each, without accounting for the fact that the electrical platforms, onshore and offshore cabling, and onshore operation and maintenance facilities would differ substantially depending upon the size, location, and MW capacity of each turbine selected for the project.  By failing to carefully examine and document the impact on listed species of these differing electrical platforms and related onshore and offshore supporting facilities, the agencies violated the ESA and its implementing regulations.  *See* Biological Op. at 7.  This is made clear by the following timeline.

a.     On December 1, 2020, several months after the biological opinion had been issued, Vineyard Wind withdrew its construction and operations plan (the "COP") from review.  The stated reason was to allow for better evaluation of the larger (up to 14 MW) wind turbines.

September 17, 2021
Page 31

    b.     On December 16, 2020, BOEM published a decision in the Federal Register terminating the review process.

    c.     On January 22, 2021, Vineyard Wind notified BOEM that it had completed its review and had concluded that the new, prototype, larger turbine did not warrant any modifications to the COP.  Vineyard Wind informed BOEM that it was rescinding its withdrawal of the COP and asked BOEM to resume the COP review process at the point it had been terminated on December 16, 2020, without any further consultation with NFMS.

    d.     BOEM resumed the review, concluding impermissibly that there was no need to reengage in the consultation process notwithstanding the fact that NMFS did not have an opportunity to review in detail Vineyard Wind's final selection of the larger turbines and the associated impacts of that selection on listed species in the project area.

    e.     Among other things, the original, DEIS noted that the "Hammer size" needed for a maximum-case scenario of an 8-10 MW equipment is 4,000 kj, but after the agencies provided in the SEIS that the project design envelope could be increased substantially by the use of the much larger 13-14 MW units, the "Hammer size" in the SEIS remained unchanged, which is a physical impossibility given the greatly increased size of each individual wind turbine generating station and the hammer power necessary to install the larger equipment.  Compare DEIS Appendix G at G-2 to SEIS Appendix E at E-2. Comments making this objection were duly filed.  *See* Seafreeze SEIS Comments at 2.  The biological opinion impermissibly focuses on the construction effects on listed species only of a maximum hammer size of 4,000 kj, regardless of how large or small each wind electricity generating unit is considered.  *See* Biological Op. at 8 (Table 3.1), 11, and 122.  That decision by NMFS was arbitrary, capricious, and an abuse of discretion, as well as irrational.

    f.     Similarly, the DEIS noted that the maximum diameter of an 8 MW monopile foundation is 25 ft. and the maximum diameter of a 10 MW turbine foundation is 34 ft., but after the agencies provided in the SEIS that the project design envelope could be increased substantially by the use of the much larger 13-14 MW units the maximum diameter of the 14-MW turbine remained unchanged, which is a physical impossibility given the greatly increased size and length requirements of the larger turbines.  Compare DEIS Appendix G at G-2 to SEIS Appendix E at E-2.  Comments making this objection were duly filed.  *See* Seafreeze SEIS Comments at 2.  Thus, the biological opinion is based upon faulty assumptions regarding the size of each turbine, and consequently, impermissibly underestimates the potential impact of construction of the larger units on listed species in the area.

September 17, 2021
Page 32

g.   BOEM's failure to reengage the consultation process under the foregoing circumstances is a violation of the ESA. *See Nat'l Parks Conservation Ass'n v. Jewell*, 62 F. Supp. 3d 7,12-13 (D.D.C. 2014) (holding that "actions that have any chance of affecting listed species or critical habitat–even if it is later determined that the actions are 'not likely' to do so-require at least some consultation under the ESA.") (quoting *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1027 (9th Cir. 2012)); *Sierra Club v. Marsh*, 816 F. 2d 1376, 1389 (9th Cir. 1987); *Mayo v. Jarvis*, 177 F. Supp. 3d 91, 102-03 (D.D.C. 2016) (citing 50 C.F.R. § 402.16) (holding that "FWS and the applicable agency [must] reinitiate formal consultation in four situations, including if 'the amount or extent of [the] taking specified in the incidental take statement is exceeded,' if 'new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered,' or if 'the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion)'"; *Nat'l Wildlife Fed. V. NMFS*, 481 F. 3d 1224 (9th Cir. 2007) (opining that consultation must be re-initiated where environmental baseline was faulty); *Nat'l Wilderness Inst. v. United States Army Corps of Eng'Rs*, No. 01-0273 (TFH), 2005 U.S. Dist. LEXIS 5159 at *9 (D.D.C. Mar. 23, 2005) (quoting 16 U.S.C. § 1536(d) (holding that "after initiation or re-initiation of consultation, an agency is prohibited from making  'any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measure.'"); *Envt'l. Prot. Infor v. Simpson*, 255 F. 3d 1073, 1080 (9th Cir. 2001); *Friends of the Capital Crescent Trail v. Fed. Transit Admin.*, 255 F. Supp. 3d 60, 72 (D.D.C. 2017); *W. Watersheds Project v. Matejko*, 468 F. 3d 1099, 1108 (9th Cir. 2006).

## D.   Failure to Account for Likely Catastrophic Weather Events Was Arbitrary and Capricious

There is a serious question as to whether the large Haliade-X equipment can survive a Category 3 or greater Atlantic Hurricane, and no engineering reports, tests or other studies were provided to or addressed by the agencies regarding the structural integrity and safety of the 13-14 MW Haliade-X wind turbines that will be used in the Vineyard Wind Project Area.  An adverse weather event of a category 3 or greater hurricane could lead to a catastrophic release of the oil and other contaminants from the wind turbine generators, thus causing the take, and possibly extinction, of the North Atlantic Right Whale and other listed species in the project area.

The draft EIS stated at 2-18: "The WTGs would be designed to endure sustained wind speeds of up to 112 mph (182.2 kph) and gusts of 157 pph (252.7 kph)."  As commenters pointed out, this means that the equipment would not survive a Category 3 or

September 17, 2021
Page 33

greater Atlantic storm.  Curiously, the final EIS omitted the referenced language regarding the capability of the equipment to sustain the indicated wind speeds, even though the project design envelope had been extended from a maximum of 10 MW described in the DEIS to a maximum of 14 MW units described in the SEIS.  And the biological opinion ignored the issue entirely.  In the process, the FEIS did not take a hard look or make an informed decision of the extent to which either the larger or smaller Haliade-X equipment could survive a category 3 or greater hurricane in the North Atlantic and the likely devastation that would occur to the marine environment, including to the North Atlantic Right Whale and other endangered species, in the project area. Prior reported incidences of winds exceeding a wind turbine's survival speed should have alerted the agencies to the likelihood of such a catastrophic scenario.  *See* https://www.windpowermonthly. com/article/957297/cyclone-winds-exceeded-survival-margins.   Failure to take these issues into account was arbitrary, capricious and an abuse of discretion.

Neither the biological opinion nor any other decision document associated with the Vineyard Wind Project addressed the additional stress on and possible catastrophic consequences to the endangered marine population and their habitat caused by these foreseeable hurricane events and their impact on the large Haliade-X technology, in violation of, *e.g.,* 16 U.S.C. § 1536(a)(2) and 50 C.F.R. § 402.02.

## VIOLATIONS OF THE CLEAN WATER ACT BY THE DEPARTMENT OF DEFENSE, THE ARMY CORPS OF ENGINEERS, AND THEIR OFFICERS AND/OR EMPLOYEES

*All of the foregoing facts set forth above are hereby incorporated here.*

**A.     The Corps of Engineers' Failure to Review Alternatives Outside of the Lease Area Was Arbitrary and Capricious.**

1.      Section 404(a) of the CWA authorizes the Secretary of the Army, acting through the Army Corps of Engineers, to issue permits for the discharge of dredged or fill material into navigable waters after notice and opportunity for public hearings. 33 U.S.C. § 1344(a). In making permitting decisions, the Corps must follow the 404(b)(1) Guidelines.  *See id*. § 1344(b); *Mingo Logan Coal Co. v. United States* EPA, 70 F. Supp. 3d 151, 155-56 (D.D.C. 2014).  The Guidelines prohibit the Corps from granting a Section 404 permit "if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences."  40 C.F.R. §230.10(a); *see Monongahela Power Co. v. Marsh,* 809 F. 2d 41, 51 (D.C. 1987).  The Corps' regulations further require the Corps to conduct a public interest review for each proposed discharge, and prohibit the Corps from granting a permit that (1) would not comply with [EPA's] 404(b)(1) Guidelines and/or (2) would be contrary to the public interest." 33 C.F.R. § 320.4(a)(1); *see Sierra Club v. United States Army Corps of Engineers,* 990 F. Supp. 2d 9 (D.D.C. 2013).

September 17, 2021
Page 34

    a.    Under EPA's 404(b)(1) Guidelines, an alternative to the proposed discharge is practicable if it is "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2); *See Sierra Club v. Van Antwerp,* 661 F. 3d 1147, 1152 (D.C. Cir. 2011). Alternatives need not be in locations that are presently owned or leased by a permit applicant so long as they are otherwise practicable and could "reasonably be obtained, utilized, expanded or managed in order to fulfill the basic purpose of the proposed activity." *See Newport Galleria Grp. v. Deland,* 618 F. Supp. 1179, 1182 (D.D.C. 1985) (citing 40 CFR § 230.10(a)(2). "[P]racticable alternatives include, but are not limited to activities which do not involve a discharge of dredged or fill material into the waters of the United States or ocean waters," *see* 40 C.F.R. § 230.10(a)(1)(i), such as onshore renewable energy generation.

    b.    The only alternative locations actually considered were those located within the Vineyard Wind lease area. There is no justification for limiting the consideration of alternatives under the 404 Guidelines to different versions of the Project in the lease area versus a dead-on-arrival no action alternative. 40 C.F.R. § 230.10(a)(2); *see Antwerp,* 661 F. 3d 1147 (D.C. Cir. 2011) (opining that "an alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes").

    c.    The Corps correctly concluded that the project is *not* water dependent, but then illogically restricted the analysis to a solely water dependent purposes, i.e., placing wind turbines in the water simply because the applicant wanted to develop a wind farm in the specified area of the lease. "[A]n applicant cannot define a project in order to preclude the existence of any alternative sites and thus make what is practicable appear impracticable." *Van Antwerp,* 661 F. 3d at 1153 (citing *Sylvester v. U.S. Army Corps of Engineers*, 882 F.2d 407, 409 (9th Cir. 1989).

2.    The Corps erroneously concluded that the project would not discharge into a special aquatic site, *see* ROD at 31, in violation of the presumption set forth in 40 C.F.R. § 230.10(a)(3). *See Van Antwerp*, 661 F. 3d at 1150.

    a.    A special aquatic site is one of the type of sites listed in 40 C.F.R. §230.40 (sanctuaries and refuges), § 230.41 (wetlands), § 230.42 (mud flats), §230.43 (vegetated shallows), § 230.44 (coral reefs), § 230.45 (riffle and pool complexes). *See Deland*, 618 F. Supp. 1179, 1181 n.1 (D.D.C. 1985).

    b.    Appendix K of the FEIS states that there is a 10-mile impact zone for special aquatic sites. *See* Index number 12930-082, p. K-862 ("The analysis for the SEIS for each resource was based on a specific geographic analysis area. As stated in Table A-1, the geographic analysis area for water resources included

a 10-mile (16.1-kilometer) radius around the WDA, the OECC, and vessel approach routes to port facilities that would be used by the proposed Project."). Figure ES-1, at p. ES-7 shows the Project elements. There are special aquatic sites within the Project's 10-mile impact zone, as follows:

    i.    Coral (40 C.F.R. § 230.44) exists off Woods Hole, Massachusetts which is within the 10-mile impact zone of the Offshore Export Cable Corridor ("OECC"). *See*, https://www.nbcboston.com/news/local/massachusetts -woods-hole-researchers-cape-cod-

    ii.    Eel grass (40 C.F.R. § 230.43) exists in Edgartown Harbor which is within the 10- mile impact zone of the OECC.

    iii.    Wetlands (40 C.F.R. § 230.41) exist in Eel Pond in Edgartown which is within the 10-mile impact zone of the OECC.

    c.    The Corps' conclusion that the project does not affect a special aquatic site is erroneous, arbitrary and capricious and not supported by the evidence.

    d.    Where, as here, a discharge is proposed for a special aquatic site, "all practicable alternatives to the proposed discharge which do not involve a discharge into a special aquatic site are *presumed* to have less adverse impact on the aquatic ecosystem, unless clearly demonstrated otherwise." *See* 40 C.F.R. § 230.10(a)(3) (emphasis added); *Nat'l Wildlife Fed'n v. Norton*, 332 F. Supp. 2d 170, 186 n. 13 (D.D.C. 2004) ("The Corps has a duty to evaluate whether practicable alternatives exist to a project that will result I. the filling of a jurisdictional wetland. . . . the regulations create a rebuttable presumption that there are, in fact, practicable and environmentally preferable alternatives to discharging dredged and fill material into [special] aquatic sites."). By failing to adequately review less damaging practical alternatives outside of the lease area, and by failing to articulate why no such alternatives exist, the Corps acted arbitrarily and capriciously. *See All. to Save the Mattaponi v. United States Army Corps of Engineers,* 606 F. Supp. 2d 121, 130 (D.D.C. 2009) (*Mattaponi I*) (opining that [t]he Corps must adequately explain why there is no less-damaging practicable alternative. If the Corps cannot so explain based on the record before it, it must reconsider its determination based on an adequate analysis of the alternatives.")

3.    The Corps violated 40 C.F.R. § 230.1(c) by failing to demonstrate that the discharges attributable to the project will not have an unacceptable impact on the aquatic ecosystem. *See All. to Save the Mattaponi v. United States Army Corps of Engineers*, 810 F. Supp. 2d 160, 163 (D.D.C. 2011) (*Mattaponi II*).

    a.    40 C.F.R. § 230.1(c) states that "dredged or fill material should not be discharged into the aquatic ecosystem unless it can be demonstrated that such

September 17, 2021
Page 36

a discharge will not have an unacceptable adverse impact either individually or in combination with known and/or probable impacts of other activities affecting the ecosystems of concern." Probable impacts of other activities include the foreseeable thousands of wind turbines that will dot the Outer Continental Shelf, as explained in the FEIS, the ROD and other relevant documents.

b. In violation of 40 C.F.R. § 230.1(c), the Corps impermissibly failed to demonstrate that discharges from the additional wind turbines will not have "an unacceptable adverse impact." Accordingly, the Corps' action is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See Mattaponi I,* 606 Supp. 2d at 131-134.

4.     For the Corps to issue a permit for a proposed project, the use must be in the public interest. *See* 33 CFR § 320.4(a)(1).

a. The Corps failed to show in the documentation that the project meets the public interest test. *See Mattaponi I*, 606 F. Supp. 2d at 136 ("This regulation requires the district engineer to weigh the benefits that reasonably may be expected to accrue from the proposal against its reasonably foreseeable detriments, considering all relevant factors.").

i. The documentation fails to address (1) the rise in temperatures at and near the Project area attributable to the WTGs, (2) the potential vulnerabilities to the electric grid by concentrating so much electricity from one source, namely wind energy), (3) the impact on the loss of thousands of jobs in the fishing industry, (4) jeopardy to and modification of critical habitat of endangered species, and (5) adverse impacts on food supply.

ii. Accordingly, the Corps' action is arbitrary, capricious, an abuse of discretion, not supported by the evidence, a violation of the Guidelines, and otherwise not in accordance with law. *See Mattaponi I*, 606 F. Supp. 2d at 136.

b. The Corps failed to properly consider the public interest in dealing with the adverse impacts of the Vineyard Wind Project on horseshoe crabs in the area.

i. Horseshoe crabs are a species native to the East Coast of the United States, which is the only place in the word with a currently stable and healthy population of horseshoe crabs. These animals live on the seafloor, are slow moving, and bury into sand/mud. *See* Atlantic States Marine Fisheries Commission Horseshoe Crab Information and FMP at http://www.asmfc.org/species/horseshoe-crab. Horseshoe crab blood produces limulus amebocyte lysate ("LAL"), which is used to detect

September 17, 2021
Page 37

bacteria in medical treatments to prevent death of patients. The FDA requires all drugs, injectable or implantable medical devices, including vaccines, in the United States to first be tested for bacterial endotoxins, with LAL considered the gold standard of endotoxin testing. Accordingly, horseshoe crabs are an essential and necessary component to the entire U.S. medical field and public health. *See* https://bioscience.lonza.com/lonza_bs/CH/en/endotoxin-testing and https://www.usatoday.com/story/news/health/2020/06/15/covid-19-coronavirus-vaccine-tested-horseshoe-crab-blood/3190180001/ and https://www.unionleader.com/news/health/coronavirus/horseshoe-crabs-essential-to-finding-covid-19-vaccine-in-america/article_9fb7ea1e-b99b-5218-a54a-54054cf035c6.html?utm_medium=social&_utm_source=email&utm_campaign=user-share.

ii.   LAL from horseshoe crabs is used for vaccine preparations before release to the American public. *See* https://bioscience.lonza.com/lonza_bs/CH/en/endotoxin-testing. LAL is being used in testing COVID19 vaccines by horseshoe crab biomedical facilities in both Massachusetts and Maryland. The horseshoe crabs used in these facilities are sourced from adjacent waters off the Maryland/Delaware and Massachusetts coasts. *See* https://www.acciusa.com/ and https://lonza.com/news/2020-05-01-04-50.

iii.   The Vineyard Wind lease is on horseshoe crab habitat, and the COP proposes to run electrical export cables through horseshoe crab habitat/harvest areas. Vineyard Wind cable laying along with associated dredging and filling operations would occur through Massachusetts Division of Marine Fisheries survey areas for horseshoe crabs and spawning beach areas. *See* https://www.mass.gov/service-details/horseshoe-crab-monitoring and https://www.mass.gov/doc/2018-horseshoe-crab-compliance-report/download. Horseshoe crabs are found within the Vineyard Wind SEIS's "Coastal Habitats Geographic Analysis Area," "Benthic Geographic Analysis Area" and "Water Quality Geographic Analysis Area." *See* SEIS, Appendix A, p. A-26, p. A- 27 and p. A-39. The horseshoe crab population and resource will suffer if turbine foundations and scour protection pave over thousands of square miles of their sand/mud habitat and are installed directly on top of the crabs, which would also be directly impacted by electromagnetic fields ("EMF") from massive underwater power cables both inside and outside the proposed wind farms, as well as injured or killed during cable installation.

iv.   Neither the Corps of Engineers nor the other agencies approving the project have conducted appropriate impacts analysis of offshore wind

farm construction to the U.S. medical supply based on threats to horseshoe crabs.  Yet the agencies have stated that since horseshoe crabs bury into the sediment in winter their already slow avoidance response to construction is increased by the contemplated construction activities, with slower avoidance responses subjecting them to "increased injury or mortality during dredging and cable installation" and that "immobile benthic species …in the direct path of construction vessels would experience direct mortality or injury."  Vineyard Wind COP, Volume III, Section 6 Biological Resources, p. 6-144.  The lack of appropriate attention to the potential devastating impacts of the project on horseshoe crabs (and therefore on U.S. medical supplies of life-protecting substances) is in violation of 33 CFR § 320.4(a)(1) and is arbitrary, capricious, and otherwise not in accordance with law.

## VIOLATIONS OF THE MMPA BY THE DEPARTMENT OF COMMERCE AND NMFS AND THEIR OFFICES AND/OR EMPLOYEES

*All of the foregoing facts set forth above are hereby incorporated here.*

**A.      It Was Impermissible for NMFS to Issue the Incidental Harassment Authorization.**

1.      NMFS violated the MMPA by authorizing the take and harassment of marine mammals in the Incidental Harassment Authorization ("IHA"), particularly the North Atlantic Right Whale, without properly considering the best scientific evidence available and accounting for, analyzing, and documenting the stress on such mammals and their habitat that will occur for longer than one year caused by:

(a) increase in localized temperatures in the project area attributable to the operation of the WTGs, which will cause ongoing take for the life of the project;

(b) potential catastrophic oil spills from the WTGs attributable to category 3 or higher hurricanes descending upon the project area;

(c) vessel strikes resulting in takes during construction and maintenance activities, *see*, *e.g.,* FEIS at 3-84, 3-94

(d) ocean noise from construction and operation activities, *see e.g.,* FEIS Appendix H at H-4; FEIS at 3-78;

(e) the sudden increase in the project design envelope from the publication of the DEIS to the publication of the SEIS without corresponding studies and analyses of the impacts on marine mammals in the project area resulting from necessary changes to the type of equipment required for construction and operation;

(f) dredged material causing turbidity increases and long term sedimentation;

September 17, 2021
Page 39

(g) loss of physical space available to the North Atlantic Right Whale resulting from construction and operation of the Vineyard Wind Project; and

(h) failure to account for the significance of the fact that approximately 100 North Atlantic Right Whales, comprising approximately 25% of worldwide population, have been sighted in the general vicinity of the Vineyard Wind Lease area and that the very existence of the species is put at risk because of the project, according to the best scientific and commercial data available.

(i) The failure to conduct the above studies and analyses, and the failure to allow for full public comment on these crucial issues in connection with the Vineyard Wind Project did not provide information sufficient for the agencies to make the required determinations under the MMPA. These failures violate the MMPA and constitute acts that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See e.g., Committee for Humane Legislation, Inc. v. Richardson*, 414 F. Supp. 297, 308-09 (D.D.C. 1976), aff'd 540 F. 2d 1141 (D.C. Cir. 1976) (opining that, the "primary goal of the MMPA is to ensure the well-being of . . . marine mammals," and "even the use of the best technology available cannot justify results inconsistent with the purpose of the Act."). Notably, the purpose of the Act is "to achieve an *optimum* sustainable population for each species of marine mammals." *Id* at 310 (emphasis added). And the take of marine mammals "may not be authorized if the impact is to the disadvantage of the mammals involved." *Id.*at 308. *See also Kokechik Fishermen's Asso. v. Sec'y of Commerce*, 839 F. 2d 795, 800 (D.C. Cir. 1988) ("Secretary [of Commerce] is obligated to determine that the permit applicant has carried its burden of proving that the taking sought does not disadvantage the species involved and is consistent with the policies and purposes of the [MMPA]."); *Fed'n of Japan Salmon Fisheries Coop. Assoc. v. Baldridge*, 679 F. Supp. 37, 39 (D.D.C. 1987) (holding that [mammal] population stocks should not be permitted to diminish beyond the point at which they cease to be a significant functioning element in the ecosystem of which they are a part, and consistent with this major objective, they should not be permitted to diminish below their optimum sustainable population.").

2.     NMFS and the other agencies have impermissibly failed to provide (1) substantial evidence that the takes from the Project as set forth above will only affect small numbers of marine mammals; (2) substantial evidence that the project would have a negligible impact on the affected marine mammal species or stocks and a mitigable impact on their availability for subsistence uses; and (3) any evidence that the project will be completed within one year of the issuance of the IHA. *See e.g., Pac. Ranger, LLC v. Pritzker*, 211 F. Supp. 3d 196, 213 (D.D.C. 2016); U.S.C. 1371 (D)(i); FEIS at 3-80.

3.     The Vineyard Wind Project will be decommissioned, *see, e.g.*, FEIS at ES4.1.2, in accordance with 30 C.F.R. Part 585 and other BOEM requirements. Vineyard Wind must remove all installations and clear the seabed of all obstructions created by the Project. The

September 17, 2021
Page 40

need to decommission the Project makes it impermissible for NMFS to issue *any* type of permit under the MMPA because the take will continue to occur even beyond the end of the useful life of the Project, thereby far exceeding both the one-year statutory limitation on an IHA and the five-year statutory limitation on permitting under a LOA.  *See Waterman S.S. Corp. v. Burnley,* 691 F. Supp*.,* 1524, 1534 (D.D.C. 1988).

## VIOLATIONS OF NEPA COMMITTED BY THE DEPARTMENTS OF INTERIOR, COMMERCE AND DEFENSE AND THE BUREAU OF OCEAN ENERGY MANAGEMENT, THE NATIONAL MARINE FISHERIES SERVICE, AND THE UNITED STATES ARMY CORPS OF ENGINEERS, AS WELL AS THEIR OFFICERS AND/OR EMPLOYEES

*All of the foregoing facts set forth above are hereby incorporated here.*

A.   **BOEM, the Corps of Engineers, and NMFS Defined the Purpose of the Proposed Action in an Unreasonably Narrow Way, Thereby Impermissibly Pre-ordaining the Approval of the Construction and Operations Plan.**

1.   The ROD states:

> "The *purpose* of the . . . action . . . is to determine whether to approve, approve with modifications, or disapprove the COP to construct, operate, and decommission an approximately 800 MW, commercial scale wind energy facility within the area of Lease OCS-A 0501 to meet *New England's demand* for renewable energy. More *specifically*, the proposed Project would deliver power to the New England Energy grid to contribute to *Massachusetts' renewable energy requirements - particularly*, the Commonwealth's mandate that *distribution companies* jointly and competitively *solicit proposals* for offshore wind energy generation (220 Code of Massachusetts Regulations 23.04(5)." (Emphasis added).

*See* ROD § 2.2.  By its own terms, the purpose of the federal action is to ensure that Massachusetts' energy requirements, as imposed by state law, are met.  By unreasonably linking the purpose of the action to seeking compliance with Massachusetts' law, BOEM, the Corps of Engineers, and NMFS impermissibly pre-ordained the result of the NEPA process by allowing the Massachusetts legal tail to wag the federal NEPA and energy policy dog.   "[An] agency may not define the objectives of its action in terms so unreasonably narrow that only one alternative . . . would accomplish the agency's action, and the EIS would become a foreordained formality." *See Citizens against Burlington, Inc. v. Busey*, 938 F. 2d 190, 196 (D.C. Cir. 1991); *Young v. GSA*, 99 F. Supp. 2d 59, 71 (D.D.C. 2000) (agency cannot define its objectives in unreasonably narrow terms).

September 17, 2021
Page 41

2.      In addition, the ROD states, ". . . specifically, the proposed Project would *deliver power* to the New England Energy grid to contribute to Massachusetts' *renewable energy requirements*." *See* ROD § 2.2 (emphasis added).  The agencies violated NEPA by defining the "specific" purpose of the action in such unreasonably narrow terms, thereby setting the stage to ensure that state "renewable energy requirements" were achieved.  In so doing, the agencies relied on factors which Congress had not intended to be considered during the NEPA process.  *See* 42 U.S.C. § 4331(b)-(c) (spelling out the specific factors Congress intended for agencies to consider under NEPA, none of which includes ensuring that state energy mandates are achieved); *see also Nat'l Ass'n of Home Builders v. Defs. of Wildlife,* 551 U.S. 644, 658 (2007) (opining that is it arbitrary and capricious for an agency's decision to rely "on factors Congress did not wish it to consider").

3.      Further, the ROD states that the purpose of the action is linked "particularly [to] the Commonwealth's mandate that *distribution companies* . . . solicit proposals for offshore energy generation." *See* ROD § 2.2 (emphasis added). Ensuring compliance by distribution companies with Massachusetts' energy policies is not and cannot be a reasonable purpose of the action taken by the agencies in approving the COP.  That purpose is neither within the goals of NEPA nor within the goals of any of the statutes administered by BOEM, the Corps of Engineers or NMFS. Accordingly, it was both *ultra vires* and arbitrary and capricious for the agencies to consider the achievement of such an irrelevant and unreasonably narrow purpose as the springboard of the NEPA process in the Vineyard Wind Project.  *See Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F. 3d 66, 73 (D.C. Cir. 2011) (opining that agencies must take a hard look "at the factors relevant to the definition of purpose" or face rejection of "an unreasonably narrow definition of objectives" as arbitrary and capricious); *Klamath-Siskiyou Wildlands Center v. Graham,* 899 F. Supp. 2d 948, 058 (E.D. Cal. 2012) (stating that agencies must shape the project's purpose and need statement according to applicable statutory and regulatory requirements).

4.      Moreover, the ROD states "Vineyard Wind's contractual obligation with the Commonwealth of Massachusetts to deliver the generated energy to the Massachusetts power grid was used as a criteria for the evaluation of alternatives as the ability to deliver to the power grid limits where the project can be located geographically." *See* ROD at 32. It is impermissible to use the project sponsor's private contractual obligations to define the need for the project or to limit the reasonable range of alternatives.

**B.      BOEM, the Corps of Engineers, and NMFS violated NEPA and its Implementing Regulations Because the EIS Did Not Properly Consider a Reasonable Range of Alternatives to the Proposed Action.**

1.      40 C.F.R. 1500.2(e)[2] provides: "Federal agencies shall *to the fullest extent possible* . . . [u]se the NEPA process to identify and assess the reasonable alternatives to proposed

---

[2]      As set forth in more detail *infra* in Section D.7, the ROD states that the agencies prepared the FEIS and the ROD under CEQ's prior NEPA regulations and not the current ones because "BOEM's NEPA review of the proposed Project began prior to . . . September 14, 2020," the effective date of the current

September 17, 2021
Page 42

actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment." (Emphasis added). In turn, 40 C.F.R. § 1502.14 characterizes the identification and assessment of alternatives as "the heart of the environmental impact statement." The regulations require agencies to "rigorously explore and *objectively evaluate* all reasonable alternatives to proposed actions" *Id*. at 1502.14(a). (Emphasis added). The agencies acted arbitrarily and capriciously by utterly discounting and failing to take a hard look at alternatives to placing the project in the lease area. And the agencies actually acknowledge that their failure to review such alternatives will result in the decimation of the commercial fishing industry and related shoreside businesses in the lease area. See ROD at 39 ("[D]ue to the placement of the turbines it is likely that the entire 75,614-acre area will be abandoned by commercial fisheries due to difficulties with navigation."). *See Anglers Conservation Network v. Pritzker*, 139 F. Supp. 3d 102, 119 (D.D.C. 2015) (holding that NOAA violated NEPA and acted arbitrarily when it failed to take a "hard look" at the impacts of and alternatives to its proposed refusal to add river herring and shad to a fishery); *Union Neighbors United, Inc. v. Jewel*, 831 F. 3d 564, 576-77 (D.C. Cir. 2016) (holding that the Fish and Wildlife Service acted arbitrarily when it failed to consider economically feasible alternatives to an energy company's wind farm proposal that would result in fewer bat kills).

2.      The range of alternatives analyzed in detail by the agencies was impermissibly narrow because the need and purpose of the action, as set forth above, was unduly narrowly defined. *See e.g., Citizens against Burlington*, 938 F. 2d at 196; *Theodore Roosevelt Conservation*, 661 F. 3d at 73.

3.      The range of alternatives analyzed in detail by the agencies was impermissibly narrow because commenters proposed significant, concrete, and reasonable alternatives during the comment process and those alternatives were impermissibly dismissed from consideration by the agencies. *See DOT v. Public Citizen,* 541 U.S. 752, 764-65 (2004) (opining that "significant and viable alternatives" proffered by the public must be fully and fairly considered); *Oceana, Inc. v. Locke*, 831 F. Supp. 2d 95, 131 (D.D.C. 2011) (noting that "concrete alternative proposals" made by interested parties merit full and fair consideration). *American Oceans Campaign v. Daley*, 183 F. Supp. 2d 1, 19-21 (D.D.C. 2000) (opining that NMFS violated NEPA where it impermissibly failed to consider

---

regulations. *See* ROD at 3 fn 1. However, the COP was approved and both the FEIS and the ROD were issued by the agencies well after September 14, 2020. Accordingly, the current regulations should have been used in connection with the analysis in the FEIS and the ROD, and it was arbitrary and capricious for the agencies to use the prior version of the regulations to demonstrate compliance. The burden is on the agency to demonstrate compliance with CEQ's current NEPA regulations, which the agencies have failed to do in the FEIS and the ROD. For purposes of demonstrating that the FEIS and ROD do not meet the legal requirements of NEPA even under the superseded regulations, the analyses set forth in this 60-day notice letter focuses on the version of the regulations in effect before September 14, 2020, in order to maintain consistency with the citations and analyses set forth in the FEIS and ROD. Based on recent case law construing the current regulations, however, this notice letter also cites and refers to the current regulations as and where appropriate.

September 17, 2021
Page 43

reasonable alternatives).  Among others, the following reasonable alternatives proffered during the comment period were impermissibly dismissed from consideration:

a.   Concrete proposals were made by Seafreeze Shoreside that the COP should not be approved unless and until interference by the Vineyard Wind Project with essential HF Radar supporting search and rescue efforts could be fully analyzed.   *See* Seafreeze Comments Re:  BOEM-2020-0005-0001 "Supplemental to the Draft Environmental Impact Statement for Vineyard Wind LLCs Proposed Wind Energy Facility Offshore Massachusetts and Public Meetings," dated July 27, 2020 (the "Seafreeze SEIS Comments") at 62.  The agencies summarily dismissed this reasonable proposal and decided without adequate explanation to approve the COP and only then determine the extent of HF Radar interference after-the-fact, making the decision procedurally flawed and substantively arbitrary and capricious.

b.   Without adequate explanation, the agencies and summarily dismissed comments pointing out that the flawed structural analysis of the MARIPARS should be changed before the approval of the COP and reasonable alternatives associated therewith.  *See id.* at 60.  The summary dismissal of the proposal without adequate explanation was procedurally flawed and substantively arbitrary and capricious.

c.   Without adequate explanation, the agencies summarily dismissed concrete proposals to eliminate certain important fishery areas of the lease from the COP, constituting a reasonable alternative impermissibly dismissed.  *See id.* at 2.  The summary dismissal of the proposal without adequate explanation was procedurally flawed and substantively arbitrary and capricious.

d.   Without adequate explanation, the agencies summarily dismissed concrete proposals that the cumulative impacts of Vineyard Wind's decision to increase the project design envelope using larger turbines should be carefully analyzed in order to address reasonable alternatives.  *See id.* at 2-3.  The summary dismissal of the proposal without adequate explanation was procedurally flawed and substantively arbitrary and capricious.

e.   Without adequate explanation, the agencies summarily dismissed concrete proposals to consider the devastating impact of the Vineyard Wind Project specifically on the longfin squid fishery, which is by far the largest fishery in the project area.  This reasonable alternative was impermissibly dismissed. *See id.* at 43.  The summary dismissal of the proposal without adequate explanation was procedurally flawed and substantively arbitrary and capricious.

f.   Without adequate explanation, the agencies summarily dismissed concrete proposals regarding the manner in which compensation packages should be

September 17, 2021
Page 44

developed for commercial fishermen and related shoreside industries negatively impacted by the Vineyard Wind Project. *See, e.g., id.* at 51. These were reasonable alternatives essentially ignored by the agencies. Particularly egregious was the arbitrary and capricious refusal to properly analyze the RI DEM economic analysis, which was not incorporated into the compensation/value/mitigation review, notwithstanding the fact that RI DEM is listed as a cooperating agency. The summary dismissal of the proposal without adequate explanation was procedurally flawed and arbitrary and capricious.

g.   Without adequate explanation, the agencies summarily dismissed the alternatives suggested by the High Frequency Radar Wind Turbine Interference Community Working Group Report dated June 2019. For the convenience of the agencies, a copy of the report is attached as Exhibit A. The summary dismissal of the proposal without adequate explanation was procedurally flawed and arbitrary and capricious.

h.   The agencies acted arbitrarily and capriciously in rejecting a viable alternative proffered by the Responsible Offshore Development Alliance ("RODA"). *See Flaherty v. Pritzker*, 17 F. Supp. 3d 52, 59 (D.D.C. 2014) (noting that the D.C. Circuit "has repeatedly observed" that arbitrary agency action in rejecting alternatives that were considered is impermissible); *see also Sierra Club v. Van Antwerp*, 709 F. Supp. 2d 1254, 1273 (S.D. Fla. 2009). RODA proposed a significant alternative to the proposed project, which was initially delineated by BOEM as Alternative F, setting forth proposed transit lanes in the lease area to ensure safety and viability of commercial fishing operations. In connection with Alternative F, BOEM issued a notice in the Federal Register informing all adjacent lessees to ensure that their construction and operation plans must provide for appropriate transit lanes allowing for the safety and viability of commercial fishing operations and that "Lessee may not construct any surface structures in such vessel transit corridors." *See Commercial Leasing for Wind Power on the Outer Continental Shelf: Atlantic Wind Lease Sale 4A Offshore Massachusetts*, 83 Fed. Reg. 53089, 53091 (October 19, 2018). Commercial fishermen and fishing organizations strongly supported Alternative F's general concept of a clear vessel transit lane, while the project sponsor and certain other commenters representing the offshore wind industry, along with certain environmental advocacy groups and the Commonwealth of Massachusetts opposed Alternative F on the ground that its adoption would lead to project delays and increased costs that could make it impracticable to complete the project. The comments against the adoption of Alternative F did not adequately address the issues raised by the fishing community regarding safety and the continuing viability of commercial fishing in the area without the type of transit lane suggested by Alternative F. BOEM sided with the wind industry commenters but did not adequately explain why the concerns of the fishing community were rejected

September 17, 2021
Page 45

in favor of those championed by the wind industry.  Accordingly, rejection of Alternative F was arbitrary and capricious.  *See Public Emples. for Envtl. Responsibility v. Hopper*, 827 F. 3d 1077, 1083 (D.C. Cir. 2016) (holding that BOEM's refusal to explain the reasoning and consequences of its failure to take a "hard look" at all available relevant information in connection with the Cape Wind project was arbitrary and capricious).

## C.   The Agencies Violated NEPA by Failing to Comply with the Requirements for Analysis of Cumulative Impacts

1.     40 C.F.R. 1508.7 defines the term "cumulative impact" as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably *foreseeable* future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.  Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." (Emphasis added).  *See Del. Riverkeeper Network v. FERC*, 753 F. 3d 1304 (D.C. Cir. 2014) (opining that the federal Energy Regulatory Commission acted arbitrarily and impermissibly when it approved a pipeline that was part of a program involving three other pipeline projects); *Hammond v. Norton*, 370 F. Supp. 2d 226, 267 (D.D.C. 2005) (opining that the Bureau of Land Management acted arbitrarily and impermissibly when it allowed two pipeline projects to be reviewed separately and not as connected actions).

2.     BOEM violated this requirement by failing to analyze cumulative impacts when performing the Environmental Assessment ("EA") in connection with the determination of whether or not to grant the lease to the corporate predecessor of Vineyard Wind.  BOEM knew that the "foreseeable" future actions would include not only the initial studies authorized by the lease and the development of the Vineyard Wind COP but also BOEM's own plans to develop vast areas in the Outer Continental Shelf outside of lease area for wind energy generation under the Energy Policy Act of 2005, BOEM's implementing regulations, and applicable executive orders.  By issuing the Finding of No Significant Impact ("FONSI") in the EA without reviewing the environmental impacts of those "foreseeable" future leasing actions, BOEM violated 40 C.F.R. 1508.7.  *See Theodore Roosevelt Conservation P'ship. v. Salazar*, 616 F. 3d 497, 514 (D.C. Cir. 2010) (opining that mandatory compliance with the cumulative impact requirement early in the planning stages prevents "agencies from dividing one project into multiple individual actions each of which has an insignificant environmental impact, but which collectively have a substantial impact").

3.     When reviewing the COP, BOEM, the Corps of Engineers, and NMFS violated the requirement to fully analyze cumulative impacts by failing to adequately take into account in the FEIS and ROD the "foreseeable" impacts outside of the COP area in connection with BOEM's concrete plans to develop vast areas throughout the Outer Continental Shelf on the Atlantic, Pacific, and Gulf Coasts for wind energy generation, as set forth in the Energy Policy Act of 2005, BOEM's implementing regulations, and applicable executive orders.  *See Nat. Res. Defense Council, Inc. v. Hodel*, 865 F. 2d 288, 298-300 (D.C. Cir. 1988)

September 17, 2021
Page 46

(requiring an inter-regional cumulative effects analysis in light of evidence that marine species would travel between project areas). Without explanation, even the woefully inadequate discussion of cumulative impacts in the SEIS were not included in any recognizable form in the FEIS of the ROD. This failure is procedurally flawed and arbitrary and capricious and is a fatal flaw in the agencies' NEPA analysis. *See Fund For Animals v. Hall*, 448 F. Supp. 2d 127, 134-137 (D.D.C. 2006) (invalidating the issuance of six final agency rules that expanded hunting in 37 national wildlife refuges because the Fish and Wildlife Service acted arbitrarily when it failed to examine cumulative effects of increased sport hunting prior to issuing the final rules).

**D.    Other NEPA Violations**

1.    When preparing the EA and the EIS, the agencies failed to comply with the requirements of 40 C.F.R. §§ 1502.22(a)-(b), which instruct agencies how to deal with situations in which there is "incomplete information relevant to reasonably foreseeable significant adverse impacts." This failure caused the agency to arbitrarily limit not only the consideration of cumulative impacts but also thwarted their "reasoned choice among alternatives," in direct violation of NEPA and its implementing regulations.

a.    By way of example, but not by way of limitation, the first indication that each wind turbine would be dramatically increased from a maximum of 10 MW to a Haliade-X prototype of a maximum of 13-14 MW appeared in the Supplemental Environmental Impact Statement dated June 2020 (the SEIS"). *See* SEIS at 1-3; 1-4 fn 13; 3-30, 3-79; 3-131 fn 15; Appendix A at A-18. The SEIS refers to the equipment as "the largest turbine now commercially available." SEIS at 1-3. The equipment is in use only at one place worldwide, that is, on land located in the Port of Rotterdam, Netherlands. The equipment has never been pile-driven directly into the ocean floor. It contains substantial quantities of oil, with the serious potential of catastrophic oil spills. *See OCSLA* violations and MMPA violations *supra.*

b.    Vineyard Wind submitted a draft Oil Spill Response Plan for review by BOEM on June 28, 2021, over a month after the approval of the COP/ROD. *See* COP Appendix 1-F. Furthermore, the pile driving technology needed to place the equipment in the lease area, and the noise associated with construction and operation of the large turbines have been recently documented to cause substantial interference with marine life and resources. *See "How could operational underwater sound from future offshore wind turbines impact marine life?"* 149 J. of the Acoustical Soc'y of America 1791 (2021), https://doi.org/10.1121/10.0003760. In addition, the DEIS indicated that a certain hammer size and monopole diameter would be needed to construct the then-maximum project design envelope that had been set at 10 MW. When that maximum project design envelope had been increased to 13-14 MW in the SEIS, the agencies never bothered to amend the discussion and

analysis of the required hammer size and monopole diameter.  That failure was procedurally flawed and arbitrary and capricious.

c.  Moreover, although the SEIS and FEIS recognize in a cursory fashion the potential impacts of the construction and operation of wind turbine generating project in the lease area and beyond, neither document meets the stringent requirements of 40 C.F.R. §§ 1502.22(a)-(b).  *See, e.g.,* FEIS at 3-81 (summarily dismissing "biologically significant consequences"); FEIS Appendix H at H-4 (refusal to quantify acoustic impacts associated with pile driving on marine species); SEIS at 3-7 (summarily dismissing noise from trenching of export cables over the "assumed 4-year construction period" while observing that the "intensity and extent of the resulting impacts on coastal habitat are difficult to generalize"); SEIS 3-8 (summarily dismissing cumulative noise impacts).  This documentation falls far short of the stringent requirements of 40 C.F.R. §§ 1502.22(a)-(b) regarding how to deal with "incomplete information relevant to reasonably foreseeable significant adverse impacts."

d.  These glaring omissions by the agencies were procedurally flawed and arbitrary and capricious.  The D.C. Circuit recently held that that an agency acted arbitrarily and impermissibly when it failed to adequately deal with the regulatory requirements regarding incomplete information.  *See Vecinos para el Bienestar de la Communidad Costera v. FERC*, Case No. 20-1045, slip op. at 11-12 (D.C. Cir. Aug. 3, 2021).

2.  The agencies violated 40 CFR § 1508.25 by impermissibly limiting the scope of both the EA and the EIS to the Vineyard Wind Project, which is only one of many foreseeable actions pursuant to statutory, regulatory, and executive order requirements to develop the Outer Continental Shelf for wind energy generation.   The agencies acknowledge in the ROD that "BOEM's decision on Vineyard Wind's Cop is needed to carry out its duty . . . in furtherance of the United States Policy to make OCS energy resources available for expeditious and orderly development."  Thus, the Vineyard Wind Project is one of many "interdependent parts of a larger action and depends on the larger action for [its] justification."  40 C.F.R. § 1508.25(a)(1)(iii). *See Wilderness Soc'y v. Salazar*, 603 F. Supp. 2d 52, 68 (D.D.C. 2009), citing *Kleppe v. Sierra Club,* 427 U.S. 390, 413 (1976) (holding that scope of NEPA analysis had to include multiple coal development areas because "all coal-related activity in that region is . . . related").

a.  While BOEM suggested that it analyzed the "reasonably foreseeable effects measured by installed power capacity," FEIS, p. 1-5, it did not adequately analyze the cumulative environmental impact of offshore wind development in the neighboring lease areas, let alone in the broader Atlantic, Pacific or Gulf Coasts.  Thus, the scope of analysis was inappropriately narrow and was therefore arbitrary, capricious, or otherwise not in accordance with law.

September 17, 2021
Page 48

    b.    Additionally, the FEIS considered only 22 GW of Atlantic offshore wind development is reasonably foreseeable. FEIS, p. 1-6. However, the *already-pledged* target commitment totaled approximately 30 GW, thereby making the FEIS analysis inadequate. *See https://www.whitehouse.gov/briefing-room/statements-releases/2021/03/29/fact-sheet-biden-administration-jump-starts-offshore-wind-energy-projects-to-create-jobs/.* Accordingly, the limitation on the scope of the analysis to 22 GW was arbitrary and capricious.

    c.    The proper degree of scoping would have informed BOEM's judgment on cumulative impact. However, because BOEM failed to correctly identify the scope of analysis, its resulting cumulative impact analysis was fundamentally flawed and, as a result, was arbitrary and capricious.

3.    The agencies violated 40 C.F.R. § 1506.6 by failing to make "diligent efforts to involve the public in preparing and implementing their NEPA procedures." There are numerous instances in which such diligent efforts were not made, including, e.g.:

    a.    In many instances, BOEM did not directly engage with the public, choosing instead to rely on state agencies and their appointed boards. For example, BOEM heavily and impermissibly relied upon the Rhode Island Fisheries Advisory Board (the "FAB"), which was a subsidiary agency of the Rhode Island Coastal Resources Management Council (the "CRMC"). For its part, the FAB also failed to engage with a significant and particularly relevant portion of the public. Specifically, both the offshore squid trawl industry and the shore side businesses were excluded from the FAB and were not permitted to participate in the process that developed mitigation measures. Instead, negotiations between the FAB, CRMC, and Vineyard Wind were conducted privately. To date, substantial information set forth in reports, data, or proposals involved in those negotiations have not been made public. This lack of both the opportunity to actively participation and access to relevant documents meant that significant portions of the public with an important stake in the outcome of these negotiations had no input in an essential aspect of the NEPA process. BOEM also impermissibly delegated to Massachusetts the chore of negotiating certain commercial fishing mitigation measures, which Massachusetts pursued without substantial input from those most affected, i.e. commercial fishermen. This failure by the agencies to comply with 40 C.F.R. 1506.6 was arbitrary, capricious, and otherwise not in accordance with law.

    b.    The offshore fishing industry from the state of New York was also denied any ability to participate in this process. Neither the Massachusetts nor the Rhode Island state-formed task forces notified stakeholders from other states nor featured any members to represent the interests of those working within the fishing industry in New York. The task forces also failed to include any of New York's economic catch data and consider the traditional fishing grounds

September 17, 2021
Page 49

that have been of historical importance to the trawl fleet of New York.  Thus, New York fishermen lacked input on receiving compensation for mitigation purposes and were left with no safe, direct, and sufficiently wide transit lane to either travel to or from their fishing grounds.  These omissions by the agencies were arbitrary, capricious, or otherwise not in accordance with law.

4.     The agencies violated 40 C.F.R. § 1503.4(a)(5) and acted arbitrarily and capriciously by failing to adequately explain why specific comments submitted during the comment period "do not warrant further agency response." The agencies' responses failed to adequately cite "the sources, authorities, or reasons which support the agency's position [and did not] indicate those circumstances which would trigger agency reappraisal or further response."  In responding to public comments, this regulatory provision requires agencies to take "into account the needs and goals of the parties involved." *Citizens against Burlington, Inc. v. Busey*, 938 F. 2d 190, 196 (D.C. Cir. 1991).  And agencies must give comments "good faith attention." *Warm Springs Dam Task Force v. Gribble*, 565 F. 2d 549, 554 (9th Cir. 1977). Specific instances in which the agencies violated 40 C.F.R. 1503.4(a)(5) include but are not limited to:

a.     BOEM gave inadequate attention to Comment 1063-002, which expressed concern regarding the assumptions made in relation to a comprehensive and appropriate fisheries mitigation and compensation plan.  In particular, the comment contended that "Vineyard Wind is not offering a comprehensive or appropriate mitigation or compensation plan to RI fishing vessels and businesses that would reduce impacts from 'major.'" *See* FEIS, p. K-195.

b.     BOEM failed to adequately address Comment 0076-004, which questions the sufficiency of the purpose and need statement for the purposes of NEPA. *See* FEIS, K-51.  Specifically, attempting to justify the project by reference to an executive order extolling the virtues of renewable energy and Massachusetts' arbitrarily self-imposed clean energy demands is insufficient under NEPA. BOEM failed to explain adequately its reliance on these two sources and/or supplement its purpose and need statement in order to fully comply with NEPA.

c.     Comment 13185-017 pointed out that the agencies had "failed to consider cumulative impacts of these mitigation plans, without any prediction or assurance of how compensatory mitigation for other projects will be decided." FEIS, p. K-1262.  In response, and without further explanation, BOEM claimed that "it was not necessary to develop or specify compensatory mitigation programs for other projects that are under development." *Id*.

d.     Comment 13185-018 addressed the failure to "include analysis of indirect impacts or multiplier impacts to shoreside businesses" as well as the lack of "peer review or public input." FEIS, p. K-1262.  In response, BOEM only cited Vineyard Wind's compensation funds that are dependent on entities

September 17, 2021
Page 50

being able to "demonstrate losses *directly related* to the Vineyard Wind 1 Project." *Id*. (emphasis added).  BOEM's response did not address the issue of peer review or public participation, nor cumulative losses associated with future planned wind energy projects in the immediate vicinity of Vineyard Wind.

    e.    The agencies failed to adequately address the comments made by Seafreeze Ltd in connection with the SEIS regarding the increase in megawatt capacity of each wind turbine generator to a maximum of 13-14 MW made at the last-minute without appropriate analysis.  *See* Seafreeze Ltd Comments dated July 27, 2020, at 2-3, 7, 10-13, 30, 33-34, 55-56, 61, 70.

5.    The agencies violated 40 C.F.R. § 1503.4(b) by failing to attach "all substantive comments received on the draft statement (or summaries thereof where the response has been exceptionally voluminous) to the final statement."

6.    BOEM violated NEPA and the APA at the time it issued the lease to the predecessor of Vineyard Wind by failing to conduct an EIS. By conducting only an EA in connection the issuance of the lease, EPA violated NEPA procedurally and acted arbitrarily and capriciously.  And even the EA itself was insufficient under NEPA.  The agencies acted impermissibly by:

    a.    Improperly segmenting its NEPA analysis and failing to consider the foreseeable impacts of a wind energy farm in the lease area on fisheries, ocean and benthic fish habitat, protected species, and navigation prior to issuing the Final Lease Notice.  In conducting any NEPA analysis, and agency cannot "segment" its "NEPA review [by] divid[ing] connected, cumulative, or similar federal actions into separate projects and thereby fail[ing] to address the true scope and impact of the activities that should be under consideration." *Del. Riverkeeper Network v. FERC,* 753 F. 3d 1304, 1313 (D.C. Cir. 2014). Rather, an agency must consider "connected actions" within the same EA, which includes actions that are "interdependent parts of a larger action and depend on the larger action for justification." *Id* at 1314 (citing 40 C.F.R. § 1508.25).  *See WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 63, 67-75 (D.D.C. 2019) (Department of Interior acted arbitrarily when it failed to give a "hard look" at the leasing stage analysis of greenhouse gas emissions by (1) failing to quantify drilling-related emissions in aggregate, and (2) failing to discuss the cumulative effects of emission).

    b.    Failing to consider a reasonable range of alternative locations for the construction of the wind energy farm.  The record shows that no alternatives to the actual lease location were considered because the location was pre-ordained by BOEM. 40 C.F.R. § 1502.14(a) mandates that an agency must "rigorously explore and objectively evaluate *all* reasonable alternatives," at the EA stage.  *See Flaherty v. Bryson,* 850 F. Supp. 2d 38, 72 (D.D.C. 2012).

September 17, 2021
Page 51

7.     The ROD states that the agencies prepared the FEIS and the ROD under CEQ's prior NEPA regulations that were in effect before September 14, 2020, because "BOEM's NEPA review of the proposed Project *began* prior to . . . September 14, 2020." *See* ROD at 3 fn 1 (emphasis added).  However, both the FEIS and the ROD were issued by the agencies well after the effective date of the current regulations.  The FEIS was issued in March 2021, while the ROD was issued in May of 2021.  Accordingly, the current regulations should have been used in connection with the analysis in the FEIS and the ROD, and it was arbitrary and capricious for the agencies to use the prior version of the regulations to demonstrate compliance with NEPA's procedural requirements.

Nevertheless, for purposes of demonstrating that the FEIS and ROD do not comply even with the prior CEQ regulations, this notice letter cites to the version of the regulations in effect before September 14, 2020, in order to maintain consistency with the citations and analyses set forth in the FEIS and ROD and in order to demonstrate that the process used by the agencies and the substantive results reached were inconsistent with decades of judicial decisions made under the prior regulations.  *See* fn 1 hereof.  However, because the agencies impermissibly used a prior version of the CEQ regulations to determine whether the FEIS and ROD met the procedural requirements of NEPA, the agencies must rescind both the FEIS and ROD and conduct the compliance analysis using the version of the regulations currently in effect.

Of course, the burden is on the agencies to show compliance with the current CEQ NEPA regulations, which set forth the procedural details appliable to compliance with NEPA at the time the FEIS and ROD were adopted by the agencies. *See Sierra Club v. Watkins*, 808 F. Supp. 852, 859 (D.D.C. 1991) (NEPA establishes a "strict standard of compliance" with procedural requirements), citing *Calvert Cliffs' Coordinating Comm., Inc. v. United States Atomic Energy Comm'n,* 449 F. 2d 1109, 1112 (D.C. Cir. 1971); *see also Bennet v. Spear*, 520 U.S. 154, 172 (1997) ("It is rudimentary administrative law that discretion as to the substance of the ultimate decision does not confer discretion to ignore the required procedures of decisionmaking.").

September 17, 2021
Page 52

Sincerely,

ROBERT HENNEKE
THEODORE HADZI-ANTICH
901 Congress Avenue
Austin, TX 78701
tha@texaspolicy.com

*Counsel for XIII Northeast Fishery Sector, Inc.,
Heritage Fisheries, Inc. & Nat. W. Inc.,
Seafreeze Shoreside, Inc., Long Island Commercial
Fishing Assoc., Inc., and Old Squaw Fisheries, Inc.*

Pursuant to 28 U.S.C. § 1746 and 43 U.S.C. § 1349, I declare under penalty of perjury that the foregoing facts contained in this notice letter are true and correct to the best of my knowledge and belief.

DATED:         September 17, 2021        _____

John Haran, Executive Director
XIII NORTHEAST FISHERY SECTOR, INC.

Pursuant to 28 U.S.C. § 1746 and 43 U.S.C. § 1349, I declare under penalty of perjury that the foregoing facts contained in this notice letter are true and correct to the best of my knowledge and belief.

DATED:        September 17, 2021

Thomas E. Williams, Sr., President
HERITAGE FISHERIES, INC. & NAT. W. INC.

Pursuant to 28 U.S.C. § 1746 and 43 U.S.C. § 1349, I declare under penalty of perjury that the foregoing facts contained in this notice letter are true and correct to the best of my knowledge and belief.

DATED:        September 17, 2021

Arthur R. Ventrone, Treasurer
SEAFREEZE SHORESIDE, INC.

Pursuant to 28 U.S.C. § 1746 and 43 U.S.C. § 1349, I declare under penalty of perjury that the foregoing facts contained in this notice letter are true and correct to the best of my knowledge and belief.

DATED:          September 17, 2021          _____

Bonnie Brady, Executive Director
LONG ISLAND COMMERCIAL FISHING ASSOC., INC.

Pursuant to 28 U.S.C. § 1746 and 43 U.S.C. § 1349, I declare under penalty of perjury that the foregoing facts contained in this notice letter are true and correct to the best of my knowledge and belief.

DATED:        September 17, 2021

David Aripotch, President
OLD SQUAW FISHERIES, INC.

# EXHIBIT A



May 24, 2021                                                                                    *By E-Mail*

Gina M. Raimondo, Secretary of Commerce
U.S. Department of Commerce
1401 Constitution Ave NW
Washington, DC 20230
secyraimondo@doc.gov

Benjamin Friedman, NOAA Administrator
National Oceanic and Atmospheric Administration
1401 Constitution Avenue NW, Room 5128
Washington, DC 20230
benjamin.friedman@noaa.gov

Amanda Lefton, Director
Bureau of Ocean Energy Management
1849 C Street, NW
Washington, D.C. 20240
Amanda.Lefton@boem.gov

*Re: 60-Day Notice of Intent to Sue: Violations of Endangered Species Act Section 7 – Legally Deficient Biological Opinion for Vineyard Wind Offshore Energy Project and Related Incidental Take Authorization and Incidental Harassment Authorization*

To whom it may concern:

This firm represents Nantucket Residents Against Turbines ("ACK Rats"), whose members live and/or own property on Nantucket Island, Massachusetts. The members of ACK Rats will be affected by the proposed Vineyard Wind offshore wind energy project (the "Vineyard Wind Project") recently approved by the Bureau of Ocean Energy Management ("BOEM"). The Vineyard Wind Project will consist of up to 100 wind turbines located on a federal leasehold of 166,866 acres (Lease Area OCS-A 0501), located approximately 14 miles south of Nantucket Island and Martha's Vineyard.

On September 11, 2020, the National Marine Fisheries Service ("NOAA Fisheries") issued a Biological Opinion (BiOp) for the Vineyard Wind Project, granting Vineyard Wind authority to "take" a variety of federally-listed species that reside in or use the Project Area, as that term is defined in the BiOp. Among the listed species for which take authority was granted is the North Atlantic right whale ("right whale"), one of the most imperiled animals in the world. Despite the right whale's declining population and rapid slide toward extinction, the BiOp inexplicably determined that the Vineyard Wind project – which is located in one of the last right whale foraging and nursery strongholds on the Atlantic coast and which will involve thousands of miles of vessel

**G | D | B**   **Gatzke Dillon & Ballance LLP**
L A W Y E R S

Gina M. Raimondo, Secretary
U.S. Department of Commerce
May 24, 2021
Page 2

trips through right whale habitat – will not jeopardize the species. As explained below, this determination is not supported by the evidence and thus is arbitrary and capricious, resulting in a violation of the Endangered Species Act (ESA). The BiOp's findings regarding Project-related impacts on other federally-listed species, including the Atlantic sturgeon and four sea turtle taxa, also lack evidentiary support and thus are arbitrary and capricious.

On behalf of ACK Rats, we have reviewed the BiOp closely and determined that it fails to meet the legal requirements set forth in the ESA, as interpreted and applied by the federal courts of the United States. Therefore, pursuant to ESA section 11(g)(2)(A)(i), ACK Rats hereby provides the following 60-Day Notice of Intent to Sue NOAA Fisheries and BOEM 60-days over the BiOp. (16 U.S.C. § 1540(g)(2)(A)(i).) If NOAA Fisheries and BOEM do not correct the defects discussed below within the 60-day notice period, ACK Rats will file an action in federal district court and request an order declaring the BiOp invalid.

**Procedural Objection to the Vineyard Wind Biological Opinion**

NOAA Fisheries issued the BiOp for the Vineyard Wind project on September 11, 2020. Approximately three months later, on December 1, 2020, Vineyard Wind formally withdrew its entire project from further consideration by BOEM. This withdrawal effectively rendered moot the BiOp issued on September 11, 2020.

Then, on or about January 22, 2021, Vineyard Wind "reapplied" to BOEM for approval of the offshore wind project it had previously withdrawn. BOEM and NOAA Fisheries should have treated this "reapplication" as a **_new_** application requiring an updated BiOp. BOEM and NOAA Fisheries, however, did not prepare a new or updated BiOp. Thus, the new Vineyard Wind Project – i.e., the one for which Vineyard Wind applied on January 22, 2021 – currently has no valid BiOp and no take authorization. To the extent, BOEM and NOAA Fisheries believe the BiOp issued on September 11, 2020 "covers" the new Project, they are in error. Simply put, the September 2020 BiOp addressed a project that was formally and completely withdrawn. The new project, regardless of its similarities to the withdrawn project, requires its own BiOp.

**Legal Requirements for Biological Opinions**

Under ESA section 7(a)(2), "[e]ach federal agency *shall . . . insure* that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the adverse modification of [critical] habitat of such species." 16 U.S.C. § 1536(a)(2) (emphasis added); see also *Water Keeper Alliance v. U.S. Dep't of Def.,* 271 F.3d 21,25 (1ˢᵗ Cir. 2001). To satisfy its duty to protect against jeopardy or adverse modification, agencies must give the benefit of the doubt to the species in question – here, the right whale and other species discussed in the BiOp – and to place the burden of risk and uncertainty on the proposed action. *See Sierra Club v. Marsh,* 816 F.2d 1376, 1386 (9ᵗʰ Cir. 1987).

**G | D | B**  **Gatzke Dillon & Ballance LLP**
L A W Y E R S

Gina M. Raimondo, Secretary
U.S. Department of Commerce
May 24, 2021
Page 3

The ESA's substantive protections are implemented, in part, through consultation between the acting agency (here, BOEM) and the agency with jurisdiction over the conservation and recovery of the listed species in question (here, NOAA Fisheries). 16 U.S.C. §1536. When there is evidence that a proposed action may adversely affect a listed species, the wildlife agency (NOAA Fisheries) must prepare a biological opinion that evaluates the impacts of the proposed action on listed species and their critical habitat. If NOAA Fisheries finds that the proposed action is likely to jeopardize a listed species or adversely modify critical habitat, NOAA Fisheries must propose reasonable and prudent alternatives, if available, that will mitigate the proposed action so as to avoid jeopardy and/or adverse modification of critical habitat. 16 U.S.C. § 1536(b); *Idaho Dep't of Fish & Game v. Nat'l Marine Fisheries Service,* 56 F.3d 1071 (9th Cir. 1995).

In addition, ESA section 7(a)(1) mandates that federal agencies "utilize their authorities in furtherance of the purposes of this chapter by carrying out programs for the conservation or endangered species and threatened species listed" under the Act. 16 U.S.C. § 1536(a)(1). Like the duty to avoid jeopardy, the duty to advance and assist the conservation of listed species is discharged, in part, through the acting agency's consultation with NOAA Fisheries. *Id.* A program of "conservation" is one that brings the species to the point of recovery and delisting. 16 U.S.C. § 1532(3).

Finally, when preparing a biological opinion, NOAA Fisheries must use "the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2); 50 CFR Part 402.14(g)(8). Further, the scientific data must support the ultimate conclusions drawn in the biological opinion regarding jeopardy and adverse modification. In other words, a biological opinion is arbitrary and capricious if it fails to "consider the relevant factors and articulate a rational connection between the facts found and the choice made." *Center for Biological Diversity v. U.S. Bureau of Land Management,* 698 F.3d 1101, 1121 (9th Cir. 2012), citing *Natural Res. Def. Council v. U.S. Dep't of the Interior,* 113 F.3d 1121, 1124 (9th Cir. 1997).

**Substantive Defects in the Biological Opinion**

Even if NOAA Fisheries and BOEM intend to use the September 2020 BiOp for purposes of granting take authorization for the 2021 Vineyard Wind project, the BiOp itself is legally deficient for the reasons set forth below:

1. The BiOp is unclear as to the number and size of the wind turbine generators (WTGs). It is critical that this information be stable and reliable, because when the number of WTGs goes down, the size of the WTGs goes up. And the larger the WTG, the more pile driving it requires. The BiOp must analyze and explain whether the switch from fewer but larger

G | D | B   **Gatzke Dillon & Ballance LLP**
L A W Y E R S

Gina M. Raimondo, Secretary
U.S. Department of Commerce
May 24, 2021
Page 4

WTGs will alter, one way or the other, the amount and intensity of pile driving in the Project Area.

2. The BiOp never provides the number of estimated vessel miles traveled, which is the only meaningful metric when determining vessel strike risks on North Atlantic right whales and other marine animals, such as the federally-listed Atlantic sturgeon and the four federally-listed sea turtles identified in the BiOP.[1]  It is not enough to disclose the number of vessel trips; it is the *length* of those trips that determines whether and to what extent the vessels pose a risk to federally-listed whales, fish, and turtles.

3. The BiOp cites no evidence for the claim that each monopile will require only 3 hours of pile driving. This is a critical omission, given that the BiOp's "no jeopardy" finding and take authorization determinations rely on Vineyard Wind's assertion that no more than 3 hours of pile driving will occur with respect to each monopile.

4. The BiOp indicates that some of the monopiles may be installed via vibratory driving as opposed to impact driving.   Yet, the BiOp does not analyze the effects of this pile driving method on right whales or the other federally-listed species known to reside in or use the Project Area.

5. The BiOp does not clearly or adequately disclose how many vessel trips and vessel miles will be required to lay the cables that (1) connect the WTGs together and (2) connect the Project's wind array to onshore transfer facilities. As a result, the BiOp underreports and/or under-analyzes the impacts of vessel strikes on right whales and other federally-listed species.

6. The BiOp admits that procurement for offshore installation activities will require vessel trips from a variety of mainland ports.  However, the BiOp also admits that the ports of origin are currently unknown.  This makes it impossible to calculate the number of vessel miles that will be traveled to and from the wind array for purposes of WTG installation. Without this information, it is likewise impossible to determine the vessel strike risk to right whales and other federally-listed species.

7. The vessel miles traveled issue is especially important in scenarios where procurement ships will be traveling from ports in Canada (e.g., Sheets Port, St. John, and Halifax), as these ports are more than 400 miles from the WGA installation site.  Moreover, ships from

---

[1] The four federally-listed sea turtles are (1) the loggerhead sea turtle, (2) the leatherback sea turtle, (3) the green sea turtle, and (4) the Kemp's Ridley sea turtle.

**G | D | B**   **Gatzke Dillon & Ballance LLP**
L A W Y E R S

Gina M. Raimondo, Secretary
U.S. Department of Commerce
May 24, 2021
Page 5

these ports will travel through seas known to be used by the right whale and other federally-listed species. In failing to account for the vessel miles traveled by ships transiting between the project installation site and Canadian ports, the BiOp underreports the vessel strike risks to right whales, Atlantic sturgeon, and federally-listed sea turtles.

8.  The BiOp's "No Jeopardy" determination as to project impacts on right whales is based on the successful implementation of various "detect and avoid" measures.  These measures, however, are so diluted by exceptions, qualifications, and loopholes as to be functionally meaningless.   Thus, they cannot be used to support any "take" or "no jeopardy" determination. In issuing a BiOp that does not protect right whales from jeopardy, NOAA Fisheries has violated Section 7 of the ESA. 16 U.S.C. § 1536(a)(2).

9.  The BiOp is inconsistent and unclear as to when project-related vessels must travel at speeds less than 10 knots.  The BiOp refers to so many overlapping exceptions and qualifications to the 10-knot speed limit that one has no idea what rule will be enforced under any given circumstance. Strict compliance and enforcement of the 10-knot vessel speed limit is imperative to reducing vessel strikes on right whales, Atlantic sturgeon, and federally-listed sea turtles. Reduced vessels speeds would also minimize harm to these species (including mortality) if vessel strikes occur.

10. The BiOp indicates that Vineyard Wind will engage in "soft start" pile driving consisting of three single hammer strikes at 40 percent hammer energy, followed by at least a one-minute delay before full energy hammer strikes begin.  Although the BiOp does not discuss the purpose of the "soft start" procedure, it is clearly being proposed as a means of "warning" whales and other federally-listed species and encouraging them to leave the action area.  Consequently, the "soft start" functions as a form of active, purposeful harassment/hazing that is <u>not</u> incidental to the action in question (i.e., construction and operation of offshore wind farms.) Such purposeful harassment/hazing is a "take" not authorized under the ESA.

11. The BiOp's "take" determinations and "no jeopardy" finding vis-à-vis right whales are based, in part, on the implementation of "seasonal" protections for the species.  The BiOp acknowledges, however, that right whales are present in the project action area year-round.  Thus, the proposed seasonal protections will not adequately safeguard the resident/non-migratory population of whales. For this reason, the BiOp fails to provide an adequate take analysis and further fails to protect right whales from jeopardy.

12. The BiOp's "take" and "no jeopardy" determinations rely heavily on the ability of vessel-based Protected Species Observers (PSOs) to visually scan the ocean surface and detect

**G D B**  **Gatzke Dillon & Ballance LLP**
L A W Y E R S

Gina M. Raimondo, Secretary
U.S. Department of Commerce
May 24, 2021
Page 6

right whales at distances sufficient to allow the vessel to alter course and avoid a collision. The BiOp also relies on PSOs to locate whales that might enter the project impact area during pile driving.  There is no evidence, however, that PSOs are effective at detecting right whales under these conditions or for these purposes.  First, the BiOp only requires two PSOs to be on watch at any given time.  Second, the Project Area, as defined in the BiOp, is huge and cannot be surveilled by two PSOs at a time. Third, PSOs cannot see whales more than a few feet below the surface, and many whale strikes happen below the draft-depth of vessels.  Fourth, the PSOs will not be able to effectively detect whales on the surface unless the seas are almost completely calm, a situation that rarely occurs in the Project Area.  Moderate to high seas – with corresponding swells – will obscure whales during the brief moments when they surface to breathe or feed.  Moreover, Nantucket and the seas around it are among the foggiest areas in the entire country, especially during June and July, two of the months when project-related pile driving is scheduled to occur. The fog rolls in quickly, often too fast for the kind of adjustments Vineyard Wind would have to make to avoid collisions with whales. Fifth, unlike some marine mammals, right whales have no dorsal fin, which makes them even harder to detect visually on the water's surface. For these reasons, the BiOp's reliance on the PSO "detect and avoid" measures proposed by Vineyard Wind is misplaced and will result in excessive take of right whales. Such take will also result in jeopardy to the species.  Reliance on PSOs to protect other federally-listed species in the Project Area is likewise misplaced.

13. The Reasonably Prudent Measures (RPMs) described in the BiOp provide a "feasibility" exception to pile during limitations, under which Vineyard Wind can continue pile driving even in the presence of right whales or other listed species if halting the pile driving work is not feasible. This exception makes the pile driving protections and limitations meaningless, as it gives Vineyard Wind complete discretion as to when and under what circumstances they can be disregarded. In other words, the BiOp is deficient because it does not define "feasibility" or describe the criteria that must be met before Vineyard Wind can claim that a given pile during limitation is "not feasible."

14. The RPMs described in the BiOp provide a "practicability" exception to pile during limitations, under which Vineyard Wind can continue pile driving even in the presence of right whales or other listed species if halting the pile driving work is not practicable. This exception makes the pile driving protections and limitations meaningless, as it gives Vineyard Wind complete discretion as to when and under what circumstances they can be disregarded. In other words, the BiOp is deficient because it does not define the term "practicable" or describe the criteria that must be met before Vineyard Wind can claim that a given pile during limitation is "not practicable."

**G | D | B**  **Gatzke Dillon & Ballance LLP**
L A W Y E R S

Gina M. Raimondo, Secretary
U.S. Department of Commerce
May 24, 2021
Page 7

15. Vessel speed limits are subject to a host of exceptions, qualifications, and loopholes, thereby reducing their ability to protect right whales and other listed species from unauthorized take and jeopardy.

16. The seasonal restriction on pile driving (Jan 1- April 30) does not protect year-round resident whales.

17. The BiOp fails to provide an adequate, complete, and legally compliant analysis of project impacts on the survival and recovery of the right whale. This is an especially glaring omission, given the precarious state of right whale populations in New England. Recent reports – i.e., post-COVID – indicate the right whale is having something of a "baby boom", as 18 calves have been spotted during the last calving season. This likely is the result of COVID-related reductions in large vessels in the area. The BiOp must examine whether this nascent recovery will be impeded or stopped altogether by the Project and the renewal of intense human activity in or near right whale calving areas.

18. The BiOp relies on the 2005 Recovery Plan for the right whale, but that plan is now 15 years old and does not account for recent data showing sharp declines in right whale population numbers.

19. The BiOp fails to acknowledge that the PSOs will not be able to see effectively at night. There is not prohibition on vessels transiting at night; nor does the BiOp prohibit pile driving at night, provided it begins in the daylight hours.

20. The BiOp does not require that PSOs be independent of Vineyard Wind. Without such independence, the PSOs will be subject to "corporate capture" and thus less likely to call for a shutdown of vessel traffic or pile driving when right whales and other listed species may be preset in the Project Area.

21. The BiOp is unclear whether all transit vessels will be assigned PSOs. The PSO requirement seems to apply only to pile driving activities. Transit vessels are allowed to rely on crew members, all of whom will be incentivized to keep boats running, even if whales are detected. This protocol, to the extent it can be called one, provides little assurance that right whales and other federally-listed species will be adequately protected.

22. To protect right whales and other federally-listed species, the BiOp applies a 10-knot speed limit to vessels 65 feet or greater in length. However, Vineyard Wind can circumvent this speed limit by using ships that are 64 feet in length or less. The BiOp fails to assess this contingency or provide RPMs that would address it.

**G | D | B**  **Gatzke Dillon & Ballance LLP**
L A W Y E R S

Gina M. Raimondo, Secretary
U.S. Department of Commerce
May 24, 2021
Page 8

23. The BiOp does not address the project's construction and operational impacts on right whale echolocation and navigation.

24. The BiOp does not consistently address or analyze impacts on right whales for the entire "Project area" as defined on page 35.

25. The BiOp does not clearly or adequately analyze whether the WTGs, when operational, will emit noise or vibrations capable of affecting whales and other federally-listed species.

26. The BiOp fails to adequately assess project-related impacts on right whales in light of recent evidence showing that the species has shifted its feeding grounds to areas in and near the WDA and other portions of the Project Area.  (See, pp. 50, 98.)

27. The BiOp's no jeopardy determination is based on unsubstantiated and/or outdated whale carcass recovery percentages. As a result, the BiOp underestimates the number of right whales the Project will take and correspondingly fails to make a proper jeopardy finding.

28. The BiOp's no jeopardy determination fails to account for recent sharp declines in right whale populations. It also fails to account for the extremely low abundance number for the species, which is now less than 400 individuals. Given the low number of right whales and the consistent loss of calf-bearing females, the BiOp should analyze and explain how project-related take of ***any*** individual could be absorbed without jeopardizing the species as a whole. The BiOp, however, provides no such analysis or explanation and is therefore deficient as a matter of law.

29. The data discussed in the BiOp demonstrates that the right whale is in serious peril and headed toward extinction; yet the BiOp concludes that the Project will not hasten this trend nor impede the species' recovery.  This conclusion is not supported by the evidence.  To the contrary, most of the recent right whale sightings have occurred south of Nantucket Island, precisely where the Vineyard Wind Project is to be installed.  This suggests a high likelihood of project-to-whale conflict and interaction, resulting in potential harm to the species.  (See p. 98.)

30. The BiOp admits that human-derived threats to the right whale are worsening (p. 53) but does not factor this trend into the jeopardy analysis.

31. The BiOp admits that "North Atlantic right whales' resilience to perturbations is expected to be very low"  (p. 54) but does not address this fact in its jeopardy analysis.

**G|D|B**  **Gatzke Dillon & Ballance LLP**
L A W Y E R S

Gina M. Raimondo, Secretary
U.S. Department of Commerce
May 24, 2021
Page 9

32. The BiOp recognizes that shipping, along with commercial fishing, accounts for most right whale injuries and deaths (p. 55), but inexplicably concludes that project-related vessels will be able to avoid all contact with the species.

33. The BiOp acknowledges that right whales spend most of their time (72%) within 33 feet of the water's surface, making them "particularly vulnerable to ship strike . . ." (p. 98.) Yet, the BiOp's "take" and "no jeopardy" determinations ignore this finding and, in the absence of any evidence or analysis, conclude that no right whales will sustain vessel strikes. This is the quintessence of an arbitrary and capricious determination by a federal agency.

34. The BiOp indicates that right whale "hot spots" are located just offshore of the Muskeget Channel and within the Project Area (namely, the offshore export cable corridor or "OECC"). Again, this suggests a high probability of interaction between project-related activities and right whales, leading to adverse impacts, including take and potential jeopardy. Yet the BiOp ignores these facts.

35. The BiOp provides clear evidence of recent mortal vessel strikes on right whales. (pp. 108-109.) But then the BiOp disregards this evidence when making determinations as to take and jeopardy. This is arbitrary and capricious.

36. The BiOp fails to assess vessel strike risk to right whales and other federally-listed species in the context of the already-crowded shipping lanes in or near the Project Area. In addition, the BiOp assumes that right whales and other federally-listed species will move out of Project Area as an "avoidance response" to pile drilling noise; however, if this is true, these animals, in their efforts to swim away from the pile driving noise, will likely enter areas of high vessel traffic, increasing the risk of ship strikes. This impact is not analyzed in the BiOp.

37. The BiOp's analysis of operational noise and vibration impacts on right whales and other federally-listed species is inadequate, as it is based data from wind turbines that are substantially smaller and emit less noise than those proposed for the Vineyard Wind Project. In a recent article in *The Journal of the Acoustical Society of America,* titled "How Could Operational Underwater Sound from Future Offshore Wind Turbines Impact Marine Life?", scientists found that 10 MW wind turbines with gear boxes create enough noise to cause behavioral changes in marine mammals more than 6 kilometers away.[2] The affective distance is reduced to 1.4 kilometers when the wind turbines use direct drive technology

---

[2] Uwe Stober and Frank Thomsen, "How Could Operational Underwater Sound From Future Offshore Wind Turbines Impact Marine Life?", *The Journal of the Acoustical Society of America,* 149, 1791 (2021).

G | D | B   **Gatzke Dillon & Ballance LLP**
L A W Y E R S

Gina M. Raimondo, Secretary
U.S. Department of Commerce
May 24, 2021
Page 10

instead of gear boxes, but the BiOp does not indicate whether Vineyard Wind will be employing gear boxes or direct drives to operate the Project's WTGs. Nor does the BiOp require, as a Reasonable and Prudent Measure, that Vineyard Wind equip each WTG with direct drive technology as a means of reducing operational noise impacts on right whales and other listed species. This represents a failure on the part of NOAA Fisheries to adequately protect right whales and the other listed species within its jurisdiction. Note that this article referenced above recommended that impact studies, such as the SEIS and BiOp for Vineyard Wind, pay close attention to "taxa that are sensitive to low frequency sound, such as baleen whales and fishes." As NOAA Fisheries is aware, right whales are baleen whales and thus warrant the special attention described in the article.

38. According to the BiOp, Vineyard Wind has given itself the option of using wind turbines of various sizes, including turbines larger than those originally studied in the EIS. The BiOp must correct this omission by analyzing operational underwater noise generated by the largest turbines contemplated for the Project. To our knowledge, such an analysis has not yet been conducted.

39. The BiOp improperly accepts Vineyard Wind's position that the project will result in no Level A harassment of right whales.  That position is based on the unproven and unsubstantiated efficiency of Vineyard Wind's proposed "detect & avoid" measures – the very same measures that include a host of exceptions, qualifications, and loopholes.  (See, p. 138.)

40. BiOp improperly and without evidence assumes that PSOs will be able to adequate surveil a right whale clearance zone that is 10 kilometers in size, as is proposed from 5/1 to 5/14 and 11/1 to 12/31.  (p. 140.)

41. The BiOp, without technical or scientific support, assumes that right whales and other listed species disrupted by pile driving will return to their original locations once the 3-hour pile driving session ends.  (See p. 149.)

42. The BiOp improperly limits its evaluation of vessel strikes to the WDA and OECC.  (pp. 186-187.)  It should include the entire Project Area, which consists of the WDA, the OECC, and the vessel transit corridors.

43. The BiOp admits that it can only predict increases in vessel traffic for the WDA and OECC – not the entire Project Area.  The BiOp says that "this is the only portion of the action area that we have an estimate of baseline trips." (p.208.)  This leaves out the areas where vessels will be transiting between mainland ports and the WDA.

**G | D | B**   **Gatzke Dillon & Ballance LLP**
L A W Y E R S

Gina M. Raimondo, Secretary
U.S. Department of Commerce
May 24, 2021
Page 11

44. The BiOp does not clearly indicate whether the proposed "minimization measures" are mandatory and enforceable.

45. The BiOp lists the Dynamic Management Areas (DMAs) established for right whales between 2014 and 2020.  (pp. 199-205.)  The list shows that the vast majority of these DMAs are located South of Nantucket, in or near the Project Area.  This demonstrates that the Project Area is a major right whale population area, thus increasing the likelihood of project-related conflicts with the whales. The BiOp did not take these data into account when making determinations as to right whale "take" and "jeopardy".

46. The BiOp acknowledges that vessel strikes can occur when whales are below the water's surface and cannot be visually detected.  (p. 206.)  Nevertheless, the BiOp's take and jeopardy determinations ignore this fact.

47. The BiOp admits that carcass recovery is a poor means for determining the number of whale deaths.  (p.207.)  Yet the BiOp uses this metric, despite its unreliability, to conclude that no right whales will be killed by vessel strikes.

48. The BiOp's "reasonable and prudent measures" (RPMs) do not appear to include steps to protect right whales from vessel strikes.  Rather, the RPMs appear focused exclusively on pile driving noise impacts.

49. The BiOp's environmental baseline does not account for the other proposed offshore wind projects currently proposed on federal leaseholds adjacent to or in the vicinity of the Vineyard Wind leasehold (Lease Area OCS-A 0501). BOEM and NOAA Fisheries are aware of these nearby projects, as they were the subject of the Supplement to the Environmental Impact Statement (SEIS) that BOEM recently adopted via a Record of Decision on May 11, 2021. These planned offshore wind projects, when combined with Vineyard Wind, will occupy approximately 1,400,000 acres or more than 2060 square miles, which is roughly the size of the state of Delaware. By not including these other offshore wind projects in the environmental baseline, the BiOp grossly underreports the potential impacts on right whales and other listed species from vessel strikes and other human activities connected to the installation and operation of the proposed wind arrays.

**Conclusion**

For the reasons discussed in this 60-Day Notice, NOAA Fisheries and BOEM cannot rely on the BiOp issued on September 11, 2020 for purposes of authorizing Vineyard Wind to take of federally-listed species incidental to the 2021 Vineyard Wind Project. Further, the BiOp's

# G | D | B  Gatzke Dillon & Ballance LLP
L A W Y E R S

Gina M. Raimondo, Secretary
U.S. Department of Commerce
May 24, 2021
Page 12

deficiencies render it incapable of supporting a "no jeopardy" finding as to project-related threats and impacts to the right whale.

In summary, not only was the BiOp prepared in response to a project that was formally withdrawn in December 2020, the BiOp itself is substantively deficient and does not meet the minimum legal requirements of the ESA. By adopting the BiOp and authorizing Vineyard Wind to take and jeopardize the survival of federally-listed species, including the right whale, NOAA Fisheries has acted arbitrarily and capriciously in violation of federal law. Note also that BOEM may not "abrogate its responsibility to ensure that its actions will not jeopardize right whales merely by relying on a biological opinion." *Strahan v. Roughead*, 910 F.Supp. 358, 381 (D.Mass. 2012). This is especially true when the biological opinion is flawed. *Id. See also Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 532 (9th Cir. 2010).

If NOAA Fisheries does not correct the deficiencies described herein within the 60-day notice period provided by statute, ACK Rats will file suit in federal court and request an order invalidating the BiOp. Thank you for your attention to this matter.

Sincerely,

David P. Hubbard
Gatzke Dillon & Ballance, LLP
Counsel for ACK Rats