# EXHIBIT C



**Gatzke Dillon & Ballance LLP**
L A W Y E R S

May 24, 2021                                                                                              *By E-Mail*

Gina M. Raimondo, Secretary of Commerce
U.S. Department of Commerce
1401 Constitution Ave NW
Washington, DC 20230
secyraimondo@doc.gov

Benjamin Friedman, NOAA Administrator
National Oceanic and Atmospheric Administration
1401 Constitution Avenue NW, Room 5128
Washington, DC 20230
benjamin.friedman@noaa.gov

Amanda Lefton, Director
Bureau of Ocean Energy Management
1849 C Street, NW
Washington, D.C. 20240
Amanda.Lefton@boem.gov

*Re: 60-Day Notice of Intent to Sue: Violations of Endangered Species Act Section 7 – Legally Deficient Biological Opinion for Vineyard Wind Offshore Energy Project and Related Incidental Take Authorization and Incidental Harassment Authorization*

To whom it may concern:

This firm represents Nantucket Residents Against Turbines ("ACK Rats"), whose members live and/or own property on Nantucket Island, Massachusetts. The members of ACK Rats will be affected by the proposed Vineyard Wind offshore wind energy project (the "Vineyard Wind Project") recently approved by the Bureau of Ocean Energy Management ("BOEM"). The Vineyard Wind Project will consist of up to 100 wind turbines located on a federal leasehold of 166,866 acres (Lease Area OCS-A 0501), located approximately 14 miles south of Nantucket Island and Martha's Vineyard.

On September 11, 2020, the National Marine Fisheries Service ("NOAA Fisheries") issued a Biological Opinion (BiOp) for the Vineyard Wind Project, granting Vineyard Wind authority to "take" a variety of federally-listed species that reside in or use the Project Area, as that term is defined in the BiOp. Among the listed species for which take authority was granted is the North Atlantic right whale ("right whale"), one of the most imperiled animals in the world. Despite the right whale's declining population and rapid slide toward extinction, the BiOp inexplicably determined that the Vineyard Wind project – which is located in one of the last right whale foraging and nursery strongholds on the Atlantic coast and which will involve thousands of miles of vessel

**G|D|B   Gatzke Dillon & Ballance LLP**
L A W Y E R S

Gina M. Raimondo, Secretary
U.S. Department of Commerce
May 24, 2021
Page 2

trips through right whale habitat – will not jeopardize the species. As explained below, this determination is not supported by the evidence and thus is arbitrary and capricious, resulting in a violation of the Endangered Species Act (ESA). The BiOp's findings regarding Project-related impacts on other federally-listed species, including the Atlantic sturgeon and four sea turtle taxa, also lack evidentiary support and thus are arbitrary and capricious.

On behalf of ACK Rats, we have reviewed the BiOp closely and determined that it fails to meet the legal requirements set forth in the ESA, as interpreted and applied by the federal courts of the United States. Therefore, pursuant to ESA section 11(g)(2)(A)(i), ACK Rats hereby provides the following 60-Day Notice of Intent to Sue NOAA Fisheries and BOEM 60-days over the BiOp. (16 U.S.C. § 1540(g)(2)(A)(i).) If NOAA Fisheries and BOEM do not correct the defects discussed below within the 60-day notice period, ACK Rats will file an action in federal district court and request an order declaring the BiOp invalid.

**Procedural Objection to the Vineyard Wind Biological Opinion**

NOAA Fisheries issued the BiOp for the Vineyard Wind project on September 11, 2020. Approximately three months later, on December 1, 2020, Vineyard Wind formally withdrew its entire project from further consideration by BOEM. This withdrawal effectively rendered moot the BiOp issued on September 11, 2020.

Then, on or about January 22, 2021, Vineyard Wind "reapplied" to BOEM for approval of the offshore wind project it had previously withdrawn. BOEM and NOAA Fisheries should have treated this "reapplication" as a ***new*** application requiring an updated BiOp. BOEM and NOAA Fisheries, however, did not prepare a new or updated BiOp. Thus, the new Vineyard Wind Project – i.e., the one for which Vineyard Wind applied on January 22, 2021 – currently has no valid BiOp and no take authorization. To the extent, BOEM and NOAA Fisheries believe the BiOp issued on September 11, 2020 "covers" the new Project, they are in error. Simply put, the September 2020 BiOp addressed a project that was formally and completely withdrawn. The new project, regardless of its similarities to the withdrawn project, requires its own BiOp.

**Legal Requirements for Biological Opinions**

Under ESA section 7(a)(2), "[e]ach federal agency *shall . . . insure* that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the adverse modification of [critical] habitat of such species." 16 U.S.C. § 1536(a)(2) (emphasis added); see also *Water Keeper Alliance v. U.S. Dep't of Def.,* 271 F.3d 21,25 (1st Cir. 2001). To satisfy its duty to protect against jeopardy or adverse modification, agencies must give the benefit of the doubt to the species in question – here, the right whale and other species discussed in the BiOp – and to place the burden of risk and uncertainty on the proposed action. *See Sierra Club v. Marsh,* 816 F.2d 1376, 1386 (9th Cir. 1987).

**Gatzke Dillon & Ballance LLP**
LAWYERS

Gina M. Raimondo, Secretary
U.S. Department of Commerce
May 24, 2021
Page 3

The ESA's substantive protections are implemented, in part, through consultation between the acting agency (here, BOEM) and the agency with jurisdiction over the conservation and recovery of the listed species in question (here, NOAA Fisheries). 16 U.S.C. §1536. When there is evidence that a proposed action may adversely affect a listed species, the wildlife agency (NOAA Fisheries) must prepare a biological opinion that evaluates the impacts of the proposed action on listed species and their critical habitat. If NOAA Fisheries finds that the proposed action is likely to jeopardize a listed species or adversely modify critical habitat, NOAA Fisheries must propose reasonable and prudent alternatives, if available, that will mitigate the proposed action so as to avoid jeopardy and/or adverse modification of critical habitat. 16 U.S.C. § 1536(b); *Idaho Dep't of Fish & Game v. Nat'l Marine Fisheries Service,* 56 F.3d 1071 (9th Cir. 1995).

In addition, ESA section 7(a)(1) mandates that federal agencies "utilize their authorities in furtherance of the purposes of this chapter by carrying out programs for the conservation or endangered species and threatened species listed" under the Act. 16 U.S.C. § 1536(a)(1). Like the duty to avoid jeopardy, the duty to advance and assist the conservation of listed species is discharged, in part, through the acting agency's consultation with NOAA Fisheries. *Id.* A program of "conservation" is one that brings the species to the point of recovery and delisting. 16 U.S.C. § 1532(3).

Finally, when preparing a biological opinion, NOAA Fisheries must use "the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2); 50 CFR Part 402.14(g)(8). Further, the scientific data must support the ultimate conclusions drawn in the biological opinion regarding jeopardy and adverse modification. In other words, a biological opinion is arbitrary and capricious if it fails to "consider the relevant factors and articulate a rational connection between the facts found and the choice made." *Center for Biological Diversity v. U.S. Bureau of Land Management,* 698 F.3d 1101, 1121 (9th Cir. 2012), citing *Natural Res. Def. Council v. U.S. Dep't of the Interior,* 113 F.3d 1121, 1124 (9th Cir. 1997).

**Substantive Defects in the Biological Opinion**

Even if NOAA Fisheries and BOEM intend to use the September 2020 BiOp for purposes of granting take authorization for the 2021 Vineyard Wind project, the BiOp itself is legally deficient for the reasons set forth below:

1. The BiOp is unclear as to the number and size of the wind turbine generators (WTGs). It is critical that this information be stable and reliable, because when the number of WTGs goes down, the size of the WTGs goes up. And the larger the WTG, the more pile driving it requires. The BiOp must analyze and explain whether the switch from fewer but larger

**G|D|B   Gatzke Dillon & Ballance LLP**
L A W Y E R S

Gina M. Raimondo, Secretary
U.S. Department of Commerce
May 24, 2021
Page 4

> WTGs will alter, one way or the other, the amount and intensity of pile driving in the Project Area.

2. The BiOp never provides the number of estimated vessel miles traveled, which is the only meaningful metric when determining vessel strike risks on North Atlantic right whales and other marine animals, such as the federally-listed Atlantic sturgeon and the four federally-listed sea turtles identified in the BiOP.[1] It is not enough to disclose the number of vessel trips; it is the *length* of those trips that determines whether and to what extent the vessels pose a risk to federally-listed whales, fish, and turtles.

3. The BiOp cites no evidence for the claim that each monopile will require only 3 hours of pile driving. This is a critical omission, given that the BiOp's "no jeopardy" finding and take authorization determinations rely on Vineyard Wind's assertion that no more than 3 hours of pile driving will occur with respect to each monopile.

4. The BiOp indicates that some of the monopiles may be installed via vibratory driving as opposed to impact driving. Yet, the BiOp does not analyze the effects of this pile driving method on right whales or the other federally-listed species known to reside in or use the Project Area.

5. The BiOp does not clearly or adequately disclose how many vessel trips and vessel miles will be required to lay the cables that (1) connect the WTGs together and (2) connect the Project's wind array to onshore transfer facilities. As a result, the BiOp underreports and/or under-analyzes the impacts of vessel strikes on right whales and other federally-listed species.

6. The BiOp admits that procurement for offshore installation activities will require vessel trips from a variety of mainland ports. However, the BiOp also admits that the ports of origin are currently unknown. This makes it impossible to calculate the number of vessel miles that will be traveled to and from the wind array for purposes of WTG installation. Without this information, it is likewise impossible to determine the vessel strike risk to right whales and other federally-listed species.

7. The vessel miles traveled issue is especially important in scenarios where procurement ships will be traveling from ports in Canada (e.g., Sheets Port, St. John, and Halifax), as these ports are more than 400 miles from the WGA installation site. Moreover, ships from

---

[1] The four federally-listed sea turtles are (1) the loggerhead sea turtle, (2) the leatherback sea turtle, (3) the green sea turtle, and (4) the Kemp's Ridley sea turtle.

**Gatzke Dillon & Ballance LLP**
LAWYERS

Gina M. Raimondo, Secretary
U.S. Department of Commerce
May 24, 2021
Page 5

> these ports will travel through seas known to be used by the right whale and other federally-listed species. In failing to account for the vessel miles traveled by ships transiting between the project installation site and Canadian ports, the BiOp underreports the vessel strike risks to right whales, Atlantic sturgeon, and federally-listed sea turtles.
>
> 8. The BiOp's "No Jeopardy" determination as to project impacts on right whales is based on the successful implementation of various "detect and avoid" measures. These measures, however, are so diluted by exceptions, qualifications, and loopholes as to be functionally meaningless.  Thus, they cannot be used to support any "take" or "no jeopardy" determination. In issuing a BiOp that does not protect right whales from jeopardy, NOAA Fisheries has violated Section 7 of the ESA. 16 U.S.C. § 1536(a)(2).
>
> 9. The BiOp is inconsistent and unclear as to when project-related vessels must travel at speeds less than 10 knots.  The BiOp refers to so many overlapping exceptions and qualifications to the 10-knot speed limit that one has no idea what rule will be enforced under any given circumstance. Strict compliance and enforcement of the 10-knot vessel speed limit is imperative to reducing vessel strikes on right whales, Atlantic sturgeon, and federally-listed sea turtles. Reduced vessels speeds would also minimize harm to these species (including mortality) if vessel strikes occur.
>
> 10. The BiOp indicates that Vineyard Wind will engage in "soft start" pile driving consisting of three single hammer strikes at 40 percent hammer energy, followed by at least a one-minute delay before full energy hammer strikes begin.  Although the BiOp does not discuss the purpose of the "soft start" procedure, it is clearly being proposed as a means of "warning" whales and other federally-listed species and encouraging them to leave the action area.  Consequently, the "soft start" functions as a form of active, purposeful harassment/hazing that is <u>not</u> incidental to the action in question (i.e., construction and operation of offshore wind farms.) Such purposeful harassment/hazing is a "take" not authorized under the ESA.
>
> 11. The BiOp's "take" determinations and "no jeopardy" finding vis-à-vis right whales are based, in part, on the implementation of "seasonal" protections for the species.  The BiOp acknowledges, however, that right whales are present in the project action area year-round. Thus, the proposed seasonal protections will not adequately safeguard the resident/non-migratory population of whales. For this reason, the BiOp fails to provide an adequate take analysis and further fails to protect right whales from jeopardy.
>
> 12. The BiOp's "take" and "no jeopardy" determinations rely heavily on the ability of vessel-based Protected Species Observers (PSOs) to visually scan the ocean surface and detect

**Gatzke Dillon & Ballance LLP**
L A W Y E R S

Gina M. Raimondo, Secretary
U.S. Department of Commerce
May 24, 2021
Page 6

right whales at distances sufficient to allow the vessel to alter course and avoid a collision. The BiOp also relies on PSOs to locate whales that might enter the project impact area during pile driving. There is no evidence, however, that PSOs are effective at detecting right whales under these conditions or for these purposes. First, the BiOp only requires two PSOs to be on watch at any given time. Second, the Project Area, as defined in the BiOp, is huge and cannot be surveilled by two PSOs at a time. Third, PSOs cannot see whales more than a few feet below the surface, and many whale strikes happen below the draft-depth of vessels. Fourth, the PSOs will not be able to effectively detect whales on the surface unless the seas are almost completely calm, a situation that rarely occurs in the Project Area. Moderate to high seas – with corresponding swells – will obscure whales during the brief moments when they surface to breathe or feed. Moreover, Nantucket and the seas around it are among the foggiest areas in the entire country, especially during June and July, two of the months when project-related pile driving is scheduled to occur. The fog rolls in quickly, often too fast for the kind of adjustments Vineyard Wind would have to make to avoid collisions with whales. Fifth, unlike some marine mammals, right whales have no dorsal fin, which makes them even harder to detect visually on the water's surface. For these reasons, the BiOp's reliance on the PSO "detect and avoid" measures proposed by Vineyard Wind is misplaced and will result in excessive take of right whales. Such take will also result in jeopardy to the species. Reliance on PSOs to protect other federally-listed species in the Project Area is likewise misplaced.

13. The Reasonably Prudent Measures (RPMs) described in the BiOp provide a "feasibility" exception to pile during limitations, under which Vineyard Wind can continue pile driving even in the presence of right whales or other listed species if halting the pile driving work is not feasible. This exception makes the pile driving protections and limitations meaningless, as it gives Vineyard Wind complete discretion as to when and under what circumstances they can be disregarded. In other words, the BiOp is deficient because it does not define "feasibility" or describe the criteria that must be met before Vineyard Wind can claim that a given pile during limitation is "not feasible."

14. The RPMs described in the BiOp provide a "practicability" exception to pile during limitations, under which Vineyard Wind can continue pile driving even in the presence of right whales or other listed species if halting the pile driving work is not practicable. This exception makes the pile driving protections and limitations meaningless, as it gives Vineyard Wind complete discretion as to when and under what circumstances they can be disregarded. In other words, the BiOp is deficient because it does not define the term "practicable" or describe the criteria that must be met before Vineyard Wind can claim that a given pile during limitation is "not practicable."

Gina M. Raimondo, Secretary
U.S. Department of Commerce
May 24, 2021
Page 7

15. Vessel speed limits are subject to a host of exceptions, qualifications, and loopholes, thereby reducing their ability to protect right whales and other listed species from unauthorized take and jeopardy.

16. The seasonal restriction on pile driving (Jan 1- April 30) does not protect year-round resident whales.

17. The BiOp fails to provide an adequate, complete, and legally compliant analysis of project impacts on the survival and recovery of the right whale. This is an especially glaring omission, given the precarious state of right whale populations in New England. Recent reports – i.e., post-COVID – indicate the right whale is having something of a "baby boom", as 18 calves have been spotted during the last calving season. This likely is the result of COVID-related reductions in large vessels in the area. The BiOp must examine whether this nascent recovery will be impeded or stopped altogether by the Project and the renewal of intense human activity in or near right whale calving areas.

18. The BiOp relies on the 2005 Recovery Plan for the right whale, but that plan is now 15 years old and does not account for recent data showing sharp declines in right whale population numbers.

19. The BiOp fails to acknowledge that the PSOs will not be able to see effectively at night. There is not prohibition on vessels transiting at night; nor does the BiOp prohibit pile driving at night, provided it begins in the daylight hours.

20. The BiOp does not require that PSOs be independent of Vineyard Wind. Without such independence, the PSOs will be subject to "corporate capture" and thus less likely to call for a shutdown of vessel traffic or pile driving when right whales and other listed species may be preset in the Project Area.

21. The BiOp is unclear whether all transit vessels will be assigned PSOs. The PSO requirement seems to apply only to pile driving activities. Transit vessels are allowed to rely on crew members, all of whom will be incentivized to keep boats running, even if whales are detected. This protocol, to the extent it can be called one, provides little assurance that right whales and other federally-listed species will be adequately protected.

22. To protect right whales and other federally-listed species, the BiOp applies a 10-knot speed limit to vessels 65 feet or greater in length. However, Vineyard Wind can circumvent this speed limit by using ships that are 64 feet in length or less. The BiOp fails to assess this contingency or provide RPMs that would address it.

**Gatzke Dillon & Ballance LLP**
LAWYERS

Gina M. Raimondo, Secretary
U.S. Department of Commerce
May 24, 2021
Page 8

23. The BiOp does not address the project's construction and operational impacts on right whale echolocation and navigation.

24. The BiOp does not consistently address or analyze impacts on right whales for the entire "Project area" as defined on page 35.

25. The BiOp does not clearly or adequately analyze whether the WTGs, when operational, will emit noise or vibrations capable of affecting whales and other federally-listed species.

26. The BiOp fails to adequately assess project-related impacts on right whales in light of recent evidence showing that the species has shifted its feeding grounds to areas in and near the WDA and other portions of the Project Area. (See, pp. 50, 98.)

27. The BiOp's no jeopardy determination is based on unsubstantiated and/or outdated whale carcass recovery percentages. As a result, the BiOp underestimates the number of right whales the Project will take and correspondingly fails to make a proper jeopardy finding.

28. The BiOp's no jeopardy determination fails to account for recent sharp declines in right whale populations. It also fails to account for the extremely low abundance number for the species, which is now less than 400 individuals. Given the low number of right whales and the consistent loss of calf-bearing females, the BiOp should analyze and explain how project-related take of ***any*** individual could be absorbed without jeopardizing the species as a whole. The BiOp, however, provides no such analysis or explanation and is therefore deficient as a matter of law.

29. The data discussed in the BiOp demonstrates that the right whale is in serious peril and headed toward extinction; yet the BiOp concludes that the Project will not hasten this trend nor impede the species' recovery. This conclusion is not supported by the evidence. To the contrary, most of the recent right whale sightings have occurred south of Nantucket Island, precisely where the Vineyard Wind Project is to be installed. This suggests a high likelihood of project-to-whale conflict and interaction, resulting in potential harm to the species. (See p. 98.)

30. The BiOp admits that human-derived threats to the right whale are worsening (p. 53) but does not factor this trend into the jeopardy analysis.

31. The BiOp admits that "North Atlantic right whales' resilience to perturbations is expected to be very low" (p. 54) but does not address this fact in its jeopardy analysis.

**GDB Gatzke Dillon & Ballance LLP**
LAWYERS

Gina M. Raimondo, Secretary
U.S. Department of Commerce
May 24, 2021
Page 9

32. The BiOp recognizes that shipping, along with commercial fishing, accounts for most right whale injuries and deaths (p. 55), but inexplicably concludes that project-related vessels will be able to avoid all contact with the species.

33. The BiOp acknowledges that right whales spend most of their time (72%) within 33 feet of the water's surface, making them "particularly vulnerable to ship strike . . ." (p. 98.) Yet, the BiOp's "take" and "no jeopardy" determinations ignore this finding and, in the absence of any evidence or analysis, conclude that no right whales will sustain vessel strikes. This is the quintessence of an arbitrary and capricious determination by a federal agency.

34. The BiOp indicates that right whale "hot spots" are located just offshore of the Muskeget Channel and within the Project Area (namely, the offshore export cable corridor or "OECC"). Again, this suggests a high probability of interaction between project-related activities and right whales, leading to adverse impacts, including take and potential jeopardy. Yet the BiOp ignores these facts.

35. The BiOp provides clear evidence of recent mortal vessel strikes on right whales. (pp. 108-109.) But then the BiOp disregards this evidence when making determinations as to take and jeopardy. This is arbitrary and capricious.

36. The BiOp fails to assess vessel strike risk to right whales and other federally-listed species in the context of the already-crowded shipping lanes in or near the Project Area. In addition, the BiOp assumes that right whales and other federally-listed species will move out of Project Area as an "avoidance response" to pile drilling noise; however, if this is true, these animals, in their efforts to swim away from the pile driving noise, will likely enter areas of high vessel traffic, increasing the risk of ship strikes. This impact is not analyzed in the BiOp.

37. The BiOp's analysis of operational noise and vibration impacts on right whales and other federally-listed species is inadequate, as it is based data from wind turbines that are substantially smaller and emit less noise than those proposed for the Vineyard Wind Project. In a recent article in *The Journal of the Acoustical Society of America,* titled "How Could Operational Underwater Sound from Future Offshore Wind Turbines Impact Marine Life?", scientists found that 10 MW wind turbines with gear boxes create enough noise to cause behavioral changes in marine mammals more than 6 kilometers away.[2] The affective distance is reduced to 1.4 kilometers when the wind turbines use direct drive technology

---

[2] Uwe Stober and Frank Thomsen, "How Could Operational Underwater Sound From Future Offshore Wind Turbines Impact Marine Life?", *The Journal of the Acoustical Society of America,* 149, 1791 (2021).

**Gatzke Dillon & Ballance LLP**
LAWYERS

Gina M. Raimondo, Secretary
U.S. Department of Commerce
May 24, 2021
Page 10

instead of gear boxes, but the BiOp does not indicate whether Vineyard Wind will be employing gear boxes or direct drives to operate the Project's WTGs. Nor does the BiOp require, as a Reasonable and Prudent Measure, that Vineyard Wind equip each WTG with direct drive technology as a means of reducing operational noise impacts on right whales and other listed species. This represents a failure on the part of NOAA Fisheries to adequately protect right whales and the other listed species within its jurisdiction. Note that this article referenced above recommended that impact studies, such as the SEIS and BiOp for Vineyard Wind, pay close attention to "taxa that are sensitive to low frequency sound, such as baleen whales and fishes." As NOAA Fisheries is aware, right whales are baleen whales and thus warrant the special attention described in the article.

38. According to the BiOp, Vineyard Wind has given itself the option of using wind turbines of various sizes, including turbines larger than those originally studied in the EIS. The BiOp must correct this omission by analyzing operational underwater noise generated by the largest turbines contemplated for the Project. To our knowledge, such an analysis has not yet been conducted.

39. The BiOp improperly accepts Vineyard Wind's position that the project will result in no Level A harassment of right whales. That position is based on the unproven and unsubstantiated efficiency of Vineyard Wind's proposed "detect & avoid" measures – the very same measures that include a host of exceptions, qualifications, and loopholes. (See, p. 138.)

40. BiOp improperly and without evidence assumes that PSOs will be able to adequate surveil a right whale clearance zone that is 10 kilometers in size, as is proposed from 5/1 to 5/14 and 11/1 to 12/31. (p. 140.)

41. The BiOp, without technical or scientific support, assumes that right whales and other listed species disrupted by pile driving will return to their original locations once the 3-hour pile driving session ends. (See p. 149.)

42. The BiOp improperly limits its evaluation of vessel strikes to the WDA and OECC. (pp. 186-187.) It should include the entire Project Area, which consists of the WDA, the OECC, and the vessel transit corridors.

43. The BiOp admits that it can only predict increases in vessel traffic for the WDA and OECC – not the entire Project Area. The BiOp says that "this is the only portion of the action area that we have an estimate of baseline trips." (p.208.) This leaves out the areas where vessels will be transiting between mainland ports and the WDA.

**Gatzke Dillon & Ballance LLP**
L A W Y E R S

Gina M. Raimondo, Secretary
U.S. Department of Commerce
May 24, 2021
Page 11

44. The BiOp does not clearly indicate whether the proposed "minimization measures" are mandatory and enforceable.

45. The BiOp lists the Dynamic Management Areas (DMAs) established for right whales between 2014 and 2020.  (pp. 199-205.)  The list shows that the vast majority of these DMAs are located South of Nantucket, in or near the Project Area.  This demonstrates that the Project Area is a major right whale population area, thus increasing the likelihood of project-related conflicts with the whales. The BiOp did not take these data into account when making determinations as to right whale "take" and "jeopardy".

46. The BiOp acknowledges that vessel strikes can occur when whales are below the water's surface and cannot be visually detected.  (p. 206.)  Nevertheless, the BiOp's take and jeopardy determinations ignore this fact.

47. The BiOp admits that carcass recovery is a poor means for determining the number of whale deaths.  (p.207.)  Yet the BiOp uses this metric, despite its unreliability, to conclude that no right whales will be killed by vessel strikes.

48. The BiOp's "reasonable and prudent measures" (RPMs) do not appear to include steps to protect right whales from vessel strikes.  Rather, the RPMs appear focused exclusively on pile driving noise impacts.

49. The BiOp's environmental baseline does not account for the other proposed offshore wind projects currently proposed on federal leaseholds adjacent to or in the vicinity of the Vineyard Wind leasehold (Lease Area OCS-A 0501). BOEM and NOAA Fisheries are aware of these nearby projects, as they were the subject of the Supplement to the Environmental Impact Statement (SEIS) that BOEM recently adopted via a Record of Decision on May 11, 2021. These planned offshore wind projects, when combined with Vineyard Wind, will occupy approximately 1,400,000 acres or more than 2060 square miles, which is roughly the size of the state of Delaware. By not including these other offshore wind projects in the environmental baseline, the BiOp grossly underreports the potential impacts on right whales and other listed species from vessel strikes and other human activities connected to the installation and operation of the proposed wind arrays.

**Conclusion**

For the reasons discussed in this 60-Day Notice, NOAA Fisheries and BOEM cannot rely on the BiOp issued on September 11, 2020 for purposes of authorizing Vineyard Wind to take of federally-listed species incidental to the 2021 Vineyard Wind Project. Further, the BiOp's

**G|D|B  Gatzke Dillon & Ballance LLP**
L A W Y E R S

Gina M. Raimondo, Secretary
U.S. Department of Commerce
May 24, 2021
Page 12

deficiencies render it incapable of supporting a "no jeopardy" finding as to project-related threats and impacts to the right whale.

In summary, not only was the BiOp prepared in response to a project that was formally withdrawn in December 2020, the BiOp itself is substantively deficient and does not meet the minimum legal requirements of the ESA. By adopting the BiOp and authorizing Vineyard Wind to take and jeopardize the survival of federally-listed species, including the right whale, NOAA Fisheries has acted arbitrarily and capriciously in violation of federal law. Note also that BOEM may not "abrogate its responsibility to ensure that its actions will not jeopardize right whales merely by relying on a biological opinion." *Strahan v. Roughead*, 910 F.Supp. 358, 381 (D.Mass. 2012). This is especially true when the biological opinion is flawed. *Id. See also Wild Fish Conservancy v. Salazar,* 628 F.3d 513, 532 (9th Cir. 2010).

If NOAA Fisheries does not correct the deficiencies described herein within the 60-day notice period provided by statute, ACK Rats will file suit in federal court and request an order invalidating the BiOp. Thank you for your attention to this matter.

Sincerely,

*[signature]*

David P. Hubbard
Gatzke Dillon & Ballance, LLP
Counsel for ACK Rats